## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------X

**ANGELEX LTD.,**                                      :          **C.A.   15-CV-56**
  192 Old Bakery Street, Valletta,              :
  VLT 09, Malta                                 :
                                                               :
        **Plaintiff,**                       :
**v.**                                                 :
                                                              :
**UNITED STATES OF AMERICA,**                          :
  Eric Holder, Attorney General                 :
  U.S. Department of Justice                     :
  950 Pennsylvania Ave, N.W.                     :
  Washington, DC 20530-0001                      :
                                                          :
  Ronald C. Manchen, Jr., U.S. Attorney         :
  US Attorney for the District of Columbia      :
  United States Attorney's Office                :
  555 4th Street, NW                            :
  Washington, DC 20530                          :
                                                           :
  Commandant of the Coast Guard                 :
  Admiral Paul F. Zukunft                        :
  United States Coast Guard                      :
  Coast Guard Headquarters                       :
  2703 Martin Luther King Jr Ave SE             :
  Washington, DC 20593-7000                     :
                                                           :
        **Defendant.**                       :
-------------------------------------------------------X

## ORIGINAL COMPLAINT

      **COMES NOW**, PLAINTIFF ANGELEX LTD. ("Plaintiff" or "Angelex"), owner of the

M/V ANTONIS G. PAPPADAKIS ("the Vessel"), by and through undersigned counsel, and

files this Complaint for compensation for, *inter alia*, losses, expenses, damages, and costs

incurred as a result of the unreasonable detention and delay of the M/V ANTONIS G.

PAPPADAKIS which the Defendant UNITED STATES OF AMERICA ("defendant" or "the

government"), caused by and through its agencies including but not limited to, the Department of Homeland Security ("DHS"), the United States Coast Guard ("USCG" or "Coast Guard"), the United States Customs and Border Protection Agency ("CBP"), and the Department of Justice ("DOJ").  This action for Plaintiff's losses, expenses, damages and costs is authorized by 33 U.S.C. § 1904(h), which provides in relevant part: "A ship unreasonably detained or delayed by the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby."

The Defendant has affirmatively conceded and agreed that the statutory compensation prayed for in this suit is the appropriate remedy for losses and/or damages sustained as a result of the Vessel's prolonged and unreasonable detention and delay at Norfolk, Virginia. In addition, in prior proceedings between the parties, the Fourth Circuit Court of Appeals expressly held that Plaintiff Angelex is entitled to pursue a claim for compensation pursuant to 33 U.S.C. § 1904(h). *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. 2013) ("This provision is, as the government asserts, an 'after the fact damages remedy against the United States for unreasonable detention or delay.' Appellant's Br. 37.  This safeguard gives [Angelex] a remedy . . .").  In support of this action, Plaintiff states as follows:

### THE PARTIES

1.      Plaintiff Angelex is a foreign corporation with a registered office address in Malta.  Angelex is the owner of the M/V ANTONIS G. PAPPADAKIS and employer of crew members working onboard the Vessel.  The ANTONIS G. PAPPADAKIS is the only fee earning asset of Angelex.

2.      The defendant is the United States of America.

## JURISDICTION AND VENUE

3.      This Complaint states claims for compensation for losses, expenses, damages, and costs caused by the unreasonable detention and delay of the M/V ANTONIS G. PAPPADAKIS by the government.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and in accordance with 33 U.S.C. § 1904(h).

4.      Plaintiff has satisfied the commencement conditions for this action in accordance with the requirements of 33 U.S.C. § 1910(b).  *See* May 1, 2014 Notice Letter attached as **Exhibit 1**.

5.      Venue is proper in the United States District Court for the District of Columbia pursuant to 33 U.S.C. § 1910(c)(4).

## FACTS AND PRIOR LITIGATION BETWEEN THE PARTIES

### *The Vessel*

6.      The M/V ANTONIS G. PAPPADAKIS, a 73,538 metric ton, bulk carrier built in 1995.

7.      Pursuant to employment contracts, Angelex is the employer of the crew members working onboard the ship.

8.      The Vessel operates pursuant to the laws of Malta, her Flag State[1] and is certified by Lloyd's Register, her classification society.[2]

9.      At all relevant times, the Vessel was managed by Kassian Maritime Navigation Agency, Ltd. ("Kassian" or "ISM Manager"), pursuant to a contract with Angelex and in accordance with the International Management Safety ("ISM") Code.[3]

---

[1] "[T]he law of the flag doctrine ... provides that a merchant ship is part of the territory of the country whose flag she flies, and that actions aboard that ship are subject to the laws of the flag state." *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008).

[2] A classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of ships and offshore structures. *See* http://www.iacs.org.uk/.

10.     At all relevant times, Kassian was a foreign corporation with an office in Athens, Greece.

11.     At all relevant times, Kassian had no proprietary interest in the Vessel.

12.     Kassian was not and is not subject to the jurisdiction of the United States District Court for the Eastern District of Virginia and/or any other courts of the United States.

**_Detention of the Vessel_**

13.     On or about April 14, 2013, the M/V ANTONIS G. PAPPADAKIS arrived at the Norfolk Southern terminal within the Port of Norfolk to load a cargo of coal.

14.     On April 15, 2013, at approximately 9:00 a.m., Coast Guard officers attended onboard to conduct a Port State Control Inspection of the Vessel.  During the inspection, there were no deficiencies identified by Coast Guard personnel.

15.     Thereafter, a crew member passed a note to Coast Guard personnel, alleging that there was a "magic pipe"; meaning an alleged temporary modification of the Vessel's systems intended for use to bypass the ship's pollution prevention equipment, known as an Oil Water Separator ("OWS").

16.     The hoses which were alleged to have been used to create the bypass were authorized shipboard hoses which were properly accounted for onboard and had a legal and legitimate use in the engine room including, but not limited to, the transfer of fuel oil when the ship was changing from regular diesel to low sulfur diesel.

17.     The Act to Prevent Pollution from Ships ("APPS") is the United States codification of MARPOL, which seeks to eliminate discharges of oily wastes at sea.

---

[3]  The ISM Code is an international standard for the safe management and operation of ships and for pollution prevention. _See_ www.imo.org.

18.     APPS provides for a cooperating witness to be rewarded by way of a cash payment of up to one-half (½) of a fine or penalty to be assessed.  *See* 33 U.S.C. 1908(a).

19.     In response to the "tip," the Coast Guard conducted an expanded MARPOL inspection to investigate the allegations.  Several additional Coast Guard officers and agents, including agents from the Coast Guard Investigative Service ("CGIS")[4], boarded to perform a further administrative inspection and criminal inspection.

20.     Multiple interviews of the Vessel's crew were conducted.

21.     Throughout the course of the afternoon and evening of April 15, 2013, approximately ten (10) to twelve (12) USCG agents and officers attended the Vessel and remained on board until approximately 3:30 a.m. on Tuesday, April 16, 2013.   The boarding team exercised immediate control over the Vessel; including taking over control of the Vessel's crew and the engine room.

22.     Additional comprehensive interviews of the Vessel's crew members were completed during the period of April 15 – April 16, 2013; during which the crew members consistently and  unequivocally confirmed that any alleged illegal activity, had been specifically hidden from, among others, the Owner of the Vessel, the Vessel's ISM Manager Kassian, the Captain, as well as the crew members' own manning agent and union representative.

23.     The alleged misconduct clearly was <u>not</u> done in the course and scope of any of the crew members' employment <u>and</u> was not done with the intent to benefit their employer, Angelex.

24.     Over the next three (3) days, Wednesday April 17 to Friday April 19, 2013, the Coast Guard continued its investigations onboard and completed additional rounds of crew

---

[4] The Coast Guard Investigative Service is a federal law enforcement agency established to carry out the Coast Guard's internal and external criminal investigations.  *See* www.uscg.mil/hq/cg2/cgis/.

member interviews.  The investigation was completed on or about April 19, 2013, as neither the

Coast Guard nor CGIS returned to the Vessel again after that time.

25.     Ultimately, the Coast Guard alleged that there was *inter alia*, a bypass of the Oily

Water Separator ("OWS") while in international waters, which was not recorded in the ship's Oil

Record Book ("ORB").[5]

26.     During the shipboard investigation into the alleged conduct, all crew members,

including those identified by the government as "cooperating witnesses," confirmed during their

interviews:

> a.   None of the alleged bad acts were done in the course and scope of the crew
>      members' employment **and** were not done with the intent to benefit their
>      employer; and
>
> b.   All of the alleged bad acts were purposely hidden from Plaintiff as Owner of
>      the Vessel, the ISM Manager, the Captain, and superintendents, technical
>      advisors, and other representatives of the Owner and ISM Manager of the
>      Vessel; and
>
> c.   That the alleged bad conduct was done with express knowledge that it was
>      illegal, in contravention of the requirements of their employment contracts
>      and in violation of the extensive training provided to each crew member both
>      before and after going onboard to begin working, which included above
>      industry standard MARPOL training, and the well-established shipboard
>      policies, practices, and procedures implemented onboard the M/V ANTONIS
>      G. PAPPADAKIS; and
>
> d.   That the alleged bad acts were in contravention to their anti-pollution pledges
>      which all crew members signed and agreed to report bad conduct, which could
>      be done through various means (phone call to the Vessel's designated person
>      ashore or anonymous reporting box onboard the ship), without fear of
>      retaliation or negative consequences; and

---

[5] The U.S. does not have jurisdiction over the alleged discharge of untreated bilge water occurring in international waters.  The activity which runs afoul of United States law is the knowing failure to maintain an accurate ORB while in United States waters.  *See* 33 U.S.C. §§ 1901-1915, *et seq.*, The Act to Prevent Pollution from Ships ("APPS").

      e.    That if the alleged bad acts were discovered by the Vessel's Captain or Owner, it would result in severe disciplinary action, including but not limited to termination and other additional personal consequences such as loss of licenses, arrest, and incarceration.

27.    Subsequent meetings and interviews were conducted by DOJ attorneys and CGIS officers over the course of the next few months. The crew member witnesses never wavered on the fact that the alleged bad acts were purposefully hidden from the Owner, the ISM Manager, and the Captain <u>and</u> that none of the alleged activity was done within the course and scope of their employment <u>and</u> was not done to benefit Plaintiff Angelex (or Kassian).

28.    Notwithstanding the clear absence of any evidence to vicariously implicate Plaintiff[6] for criminal liability, the Captain of the Port gave notice by letter dated April 19, 2013 that the Vessel was being detained pursuant to 33 U.S.C. § 1908(e) and that the departure clearance[7] for the Vessel could be reinstated only once "*. . . adequate surety has been provided to this office, we will notify CBP and request they grant departure clearance for M/V ANTONIS G. PAPPADAKIS.*"  *See* copy of Captain of the Port Letter attached as **Exhibit 2**.

29.    When Plaintiff attempted to communicate with the Coast Guard's Fifth District Legal Office to make arrangements for security, Plaintiff was informed that no one there had authority to discuss the matter.

---

[6] Although Kassian was also charged and indicted, there was no personal jurisdiction over Kassian (*see* ¶ 7, *supra*) and the crew members were clearly the employees of Plaintiff Angelex, as reflected in the employee contracts which the government demanded and Plaintiff readily provided.  Kassian timely moved to dismiss the indictment for lack of jurisdiction.  The District Court reserved decision on the motion, which was ultimately rendered moot once the jury acquitted Kassian. *USA v. Kassian, et al.*, 13-cr-70, Doc. 24 (E.D. Va. 2013).

[7] Pursuant to 46 U.S.C. § 60105(b) (2014), a foreign-flagged ship must obtain departure clearance from CBP before it may depart a U.S. port, and under APPS, the Coast Guard may request CBP to withhold such clearance for established or suspected APPS violations until "the filing of a bond or other surety satisfactory to the Secretary." *See* 33 U.S.C. § 1908(e).

### *Surety Negotiations*

30.     The government's conduct showed that it had no intention of negotiating "surety" that would serve the stated purpose of APPS, *i.e.* to ensure the payment of a potential fine or penalty.  Rather, the government's proposed "Agreement on Security" sought the purported "agreement" of Angelex (the owner of the Vessel and employer of the crew), <u>and</u> Kassian to unauthorized, unreasonable, and excessive terms and conditions.

31.     The quantum of the demanded bond was unreasonable as, *inter alia*, it grossly exceeded the maximum potential fine or civil penalty that Angelex would have been required to pay even if found guilty of the alleged APPS violations and was well in excess of Angelex's financial ability to pay (essentially asking for a pretrial sanction that the Court itself could not have imposed even if Angelex had been found guilty).

32.     The government further insisted that Kassian agree to be jointly and severally liable to all terms and conditions of the Security Agreement despite the fact that there was no jurisdiction over Kassian; it had no ownership interest in the Vessel; it was not the employer of the crew; and no evidence existed that anyone from Kassian had any involvement or knowledge of the alleged bad acts.

33.     The government further demanded Angelex (<u>and</u> Kassian) to "agree" to  several other non-negotiable and unreasonable terms and conditions;[8] including but not limited to,

---

[8] These unreasonable and unjustifiable requirements, included *inter-alia*, (1) Forcing seven foreign national crew members (with no ties to the United States) to disembark from the Vessel and remain in the Eastern District of Virginia to be detained for an unspecified and unlimited amount of time; (2) Angelex agreeing to house, feed, continue to pay (including total wages, benefits, and healthcare), and employ the crew members (irrespective of the terms and conditions of their individual employment contracts) who were potential targets and witnesses for the government's investigation; (3) Angelex agreeing to bear the costs and expenses of repatriation of the crew members; (4) Angelex agreeing to bring a custodian of records to the United States; (5) Angelex agreeing to stipulate to the authenticity of all documents and items seized from the Vessel; (6) Angelex agreeing to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and not in the United States at the time the subpoenas are issued; and (7) Angelex agreeing to waive all jurisdictional defenses.

interfering with the rights of the crew, as well as an express waiver of available jurisdictional defenses; none of which falls within the legislative history and/or otherwise furthers the purpose of APPS (or had anything to do with securing the payment of a fine or civil penalty).

34.     Rather, the non-negotiable terms being demanded were accommodations to facilitate the government's prosecution of Angelex, her employees, and Kassian (an entity for which no jurisdiction existed).

35.     Plaintiff Angelex provided the government with documentation concerning its financial status and its limited financial means.  *See* correspondence providing financial documents to government attached as **Exhibit 3**.  Specifically, Plaintiff provided copies of its corporate financial and tax documents, which demonstrated the Company's ability (or lack thereof) to meet the unreasonable and excessive fiscal security demanded by the Coast Guard. *Id*.

36.     Angelex also provided an uncontested copy of a valuation of the Vessel which demonstrated that the 1995 Vessel was worth approximately USD 6,500,000 and that an outstanding and preferred mortgage in the amount of USD 10,950,000 (approximately) encumbered the Vessel.

37.     At the request of the Coast Guard, Kassian also voluntarily provided its corporate financial records which clearly evinced its inability to meet the security quantum demanded.

38.     Notwithstanding, the Coast Guard issued a "take-it-or-leave-it" demand that the purported Agreement on Security be agreed by Angelex and Kassian and that the bond in the amount of Three Million Dollars (USD 3,000,000.00)[9] be posted jointly and severally as security for the reinstatement of the Vessel's departure clearance.

---

[9] The demand for a "surety bond" in the amount of USD 3,000,000 is the equivalent of requiring cash to be deposited into the Registry of the Court.  Specifically, International Sureties, the premier maritime bonding company that arranges for U.S. Treasury approved sureties to provide an acceptable bond, requires cash collateral

39.     The quantum of financial security demanded was grossly disproportionate and wholly unreasonable considering:  Plaintiff's financial assets;  the value of the Vessel; the mortgage encumbrance on the Vessel; the fact that the maximum APPS fine or penalty which could have been enforced against the Vessel's Owner was statutorily capped at USD 1,500,000 (and amount which is grossly disproportionate to the likely fine which would have been imposed, assuming conviction on all possible APPS counts)[10]; and there was no jurisdiction over Kassian.

40.     The Coast Guard refused to negotiate on the quantum of the bond and rebuffed all offers by Angelex to obtain the release of the Vessel.

41.     The Coast Guard was put on notice that the unreasonable delay and detention of the Vessel due to the unreasonable requirements demanded, including but not limited to the disproportionate and unattainable bond, was causing Angelex significant losses, expenses, and costs each day that the Vessel remained fully laden with cargo yet sitting idle in Norfolk and unable to engage in her regularly scheduled voyage and trade, as the M/V ANTONIS G. PAPPADAKIS was the only income earning asset of Plaintiff Angelex.  *See* **Exhibit 4**.

***District Court Proceedings:***

42.     Unable to progress any sort of meaningful negotiation, given the Coast Guard's "take-it-or-leave-it" demand for surety,  and having reached an impasse, on or about April 25, 2013 Plaintiff had no option but to file an Emergency Petition with the District Court for the

---

equal to the value of the bond.   This policy has been standard procedure for sureties since the financial crisis of 2008.  Said another way, the only way to obtain a bond is by actually having the cash on hand in an amount equivalent to the bond, plus the annual premium (normally 1% to 2% per annum depending on the amount of the bond).

[10] *See USA v. Diana Shipping Services S.A.*, Doc. 146, 149, 13-cr-40 (E.D.Va. Dec. 6, 2013) (District Judge Mark Davis sentenced Diana Shipping to a USD 100,000.00 fine for each of the three (3) APPS counts (as well as each of the other eight (8) felony counts the company was convicted)).

Eastern District of Virginia to set an appropriate bond for the reinstatement of the Vessel's departure clearance.

43.     Following the filing of the Emergency Petition, the Coast Guard made its one and only concession in lowering the quantum demanded for the security bond to the still unattainable amount of USD 2,500,000 along with the demand that it be posted jointly and severally by Angelex and Kassian.   All other unreasonable demands remained; including insistence that defenses be waived (including Kassian's personal jurisdiction defense), and that Angelex (and Kassian) interfere with the rights and liberties of certain members of the crew.

44.     Plaintiff counter-proposed in good faith to provide a surety bond in the amount of USD 1,500,000 and agreed to accept all of the other unreasonable terms and conditions, but the Coast Guard again unreasonably refused to accept the USD 1,500,000 as substitute security and continued to insist, *inter alia*, that Kassian be included in the agreement and expressly waive all jurisdictional defenses.

45.     The refusal by the Coast Guard to accept a bond posted by the Owner in the amount of USD 1,500,000 was facially unreasonable.

46.     Angelex's offer represented the absolute maximum fine which could have been imposed on Angelex in the (very) unlikely event that Angelex would be vicariously convicted on each MARPOL/APPS counts alleged and assuming that the Court would fail to group any of the charges, which it must do.[11]

---

[11] APPS provides that the maximum civil penalty for a false record book is USD 5,000, or a maximum criminal fine up to USD 500,000 per violation. See 33 U.S.C. 1908(a).   Under 33 U.S.C. 1908(a), it is a class D felony to knowingly violate the provisions of MARPOL. "A Class D felony is punishable by…a fine of up to USD 250,000 for an individual, and USD 500,000 for a corporation." *See* U.S.C. § 1908 (a); 18 U.S.C. § 3559(a)(4); 18 U.S.C. § 3571(b)(3); 18 U.S.C. § 3571(c)(3).   Angelex would have been a first time offender and there have been no cases which went to trial which resulted in a maximum fine for any first time offender.

47.     The government unreasonably maintained its opposition to Plaintiff's petition on the argument that the minimum acceptable bond for security was USD 2,500,000, as security had to be jointly and severally posted on behalf of both Angelex (as Owner) and Kassian, the ISM Manager (as "Operator"); and it was necessary for Kassian to waive personal jurisdiction defenses, even though it was clear Kassian had no proprietary interest in the Vessel, was not the employer of the crew members, the Court had no personal jurisdiction over Kassian as Manager, and there was no evidence to implicate either Angelex or Kassian.

48.     District Judge Robert Doumar held a hearing on May 6, 2013 on Angelex's petition to set a bond and authorize the reinstatement of the Vessel's departure clearance.  At the hearing, the government reiterated its position, contrary to the requirements of 33 U.S.C. § 1904(h), that there was no requirement for the Coast Guard to be reasonable in the first instance with respect to the quantum of the bond to be posted or its requirements in determining what would be "surety satisfactory to the Secretary." *See* 33 U.S.C. § 1908(e).

49.     The government's position was clearly set forth by its counsel during the hearing held before USDJ Doumar.  The following exchange between the Court and AUSA DiLauro, counsel for the government, took place:

| | |
|---|---|
| The Court: | So the Coast Guard doesn't have to be reasonable, do they? They can do anything they want, can't they? |
| Mr. Dilauro: | I think they can - - |
| The Court: | They could set a bond for $200 million couldn't they? |
| Mr. Dilauro: | I believe that's correct, Your Honor. |

*See* 2:13-cv-237, May 6, 2013 Transcript, p. 28, ln. 7-14. Excerpt attached hereto as **Exhibit 5**.

50.     Midway through the hearing, the District Court urged the parties to try to negotiate a final resolution on the quantum of the bond amount.  An agreement-in-principle was concluded between Angelex and LCDR Andrew Grant, lead Coast Guard counsel assigned to the

matter from the Coast Guard Fifth District Legal Office.   Counsel negotiated an agreement whereby the Vessel's departure clearance was to be reinstated.

51.      However, once the hearing resumed, AUSA Dilauro, from DOJ Headquarters in D.C. advised that Court that an agreement could not be reached as Coast Guard "Headquarters" would not accept anything below USD 2,500,000, previously demanded plus all other terms and conditions previously sought from Angelex and Kassian jointly and severally.

52.      On May 8, 2013, District Judge Doumar issued an Order and Opinion setting a bond at USD 1,500,000 for the reinstatement of the departure clearance of the M/V ANTONIS G. PAPPADAKIS.

53.      The District Court made several findings of fact which succinctly outlined the unreasonableness of the position by the government to condition the release of the Vessel upon the posting of an unattainable USD 2,500,000 bond.   These included *inter alia*, (1) seeking to impose conditions which were not designed to assure payment of a fine or penalty, but to facilitate prosecution of a criminal (or civil) case; (2) requiring a bond in excess of the maximum statutory fine which could be imposed even if convicted (and well beyond any likely fine to be imposed even assuming convictions on all APPS counts); (3) requiring a bond which was excessive and unreasonable in light of the known financial capabilities of Angelex as Owner to post a bond; and (4) requiring a bond which would "substantially jeopardize" the continued viability of a lawful business.

54.      The government did not challenge any of these conclusions and findings of fact by Judge Doumar in its appeal to the Fourth Circuit and this issue is now *res judicata*.

55.      The District Court concluded that the unreasonable position of the Coast Guard and advocated by the government was "repugnant to the Constitution" and that "[i]n more than

thirty years on the bench, this Court can recall seeing no greater disregard for due process, <u>nor</u> <u>any</u> <u>more</u> <u>egregious</u> <u>abdication</u> <u>of</u> <u>the</u> <u>reasonable</u> <u>exercise</u> <u>of</u> <u>discretion</u>." *See Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013)(emphasis added). Neither of these factual findings were challenged by the government on appeal to the Fourth Circuit.

**<u>Government's Emergency Appeal</u>**

56.     On May 9, 2013, the government filed an emergency application with the Fourth Circuit Court of Appeals seeking to stay the Order of Judge Doumar and further unreasonably delayed the Vessel.

57.     The Fourth Circuit Court of Appeals set the matter for expedited briefing and consideration and held oral argument on the appeal at a special session of the Fourth Circuit in Lewisburg, West Virginia on June 25, 2013.

58.     Ultimately, the Fourth Circuit Court of Appeals reversed the District Court, finding the Coast Guard had authority in the first instance to detain the Vessel, but cautioned the government and confirmed that Angelex is entitled to seek the "after the fact" statutory remedy hereunder applied for, to wit, to receive compensation payable under 33 U.S.C. 1908(e) for unreasonable delay and/or detention. *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. 2013).

59.     The M/V ANTONIS G. PAPPADAKIS was unreasonably forced by the government to remain within the port of Norfolk throughout the summer of 2013 with a full load of coal on board, for over 170 days; wasting as an asset with her Owner incurring significant daily losses, fees, expenses, and costs as a result.

60.     The government continued to detain the Vessel while pursuing the unsuccessful vicarious prosecution of Angelex (<u>and</u> the unsuccessful prosecution of Kassian) in spite of the

express knowledge and ample evidence[12] at its disposal  that there was no reasonable basis to pursue a vicarious prosecution at all given the facts and circumstances known to the goverment.

61.    The government unreasonably refused to reconsider its position on the prosecution despite many requests by Angelex to do so throughout the unreasonable delay and detention.

62.    On September 13, 2013, following a nine (9) day trial and two (2) days of deliberations, the jury returned not-guilty verdicts on all eight (8) felony counts against Angelex. Kassian was also acquitted of the same eight (8) felony counts pursued by the government against it.  The jury further acquitted the Chief Engineer of conspiring with Angelex (and/or Kassian).[13]

63.    Three days later, on September 16, 2013, the Coast Guard finally confirmed that the Vessel's departure clearance was reinstated, and that the Vessel could depart the jurisdiction.

64.    As a result of the unreasonable detention and delay, the Vessel earned no fees and was off-hire from April 16, 2013 – October 3, 2013, when she was finally put back into sea service and able to continue her journey and trade.   In addition, Angelex, as owner was forced to incur substantial costs, fees, expenses, including a significant claim for damages by the owner of the cargo onboard the Vessel.

---

[12] Evidence which included the rough notes of interviews with cooperating witness crew members from April 15 – 19, 2013 which showed without any ambiguity that none of the bad conduct alleged by the government was done within the course and scope of the crew members' employment and was not done with intent to benefit Angelex. Plaintiff was required to seek the production of these notes through formal motion and over the objection of the government.  Once ordered by the Court to produce, the rough notes confirmed that the government knew from the beginning; that its detention of the Vessel was unreasonable as the prosecution of Angelex was destined to fail since the government could not meet the standard for criminal vicarious liability.

[13] The Chief Engineer was convicted on seven (7) other charges for his failure to maintain an accurate ORB and obstruction of justice (for his falsification of the ORB and directing the crew members not to cooperate with the Coast Guard).  At sentencing, the counts were grouped and the Chief Engineer received a sentence of one (1) year of probation to be served concurrently for all seven (7) counts and as a special condition of probation requiring that he serve four (4) months in community confinement at Rehabilitation Services Inc., in Norfolk, Virginia. Thereafter, he returned to Greece. *See USA v Katsipis*, Doc. 119, 13-cr-70 (E.D.Va. Dec. 12, 2013).

15

## UNREASONABLE DELAY AND DETENTION

65.     Plaintiff incorporates by reference and re-alleges as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

66.     Plaintiff is the Owner of the M/V ANTONIS G. PAPPADAKIS, which was unreasonably detained and delayed pursuant to the Coast Guard's "egregious abdication of the reasonable exercise of discretion" (*See Angelex Ltd.*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013)), under 33 U.S.C. § 1908(e) for the period of April 15, 2013 – September 16, 2013. This factual finding is the law of the case.  No appeal of Judge Doumar's factual finding(s)was ever pursued by the government.

67.     Plaintiff is pursuing this action for compensation as authorized by statute, 33 U.S.C. § 1904(h); acknowledged by the government to be available as an "after-the-fact" remedy; and approved by the Fourth Circuit Court of Appeals as the appropriate remedy under the facts and circumstances of this matter.

68.     Plaintiff has complied with the commencement requirements of 33 U.S.C. § 1910(b) by providing written notice of its claim for compensation to the Coast Guard on May 1, 2014.  *See* **Exhibit 1**.

69.     At the request of the Coast Guard Office of Claims and Litigation, Plaintiff provided a Supplemental Letter on July 21, 2014, summarizing Plaintiff's claim, including *inter alia*, losses of contractual daily revenue, other earnings, incurred expenses, and costs in an amount calculated to be approximately **USD 4,179,907.44** (exclusive of interest, costs, and fees in pursuing this claim).  A copy of Plaintiff's July 21, 2014 Letter summarizing Plaintiff's losses, costs, and expenses caused by the unreasonable detention and delay of the Vessel is attached as **Exhibit 6**.

70.     As will be set out in greater detail at trial, the government's detention and delay of

the M/V ANTONIS G. PAPPADAKIS was unreasonable for numerous reasons, including but

not limited to the following:

A.     The government withdrew and refused to reinstate the Vessel's departure clearance unless the Vessel's owner Angelex and a third-party Kassian (as ISM Manager pursuant to a contract with Angelex) acceded to several non-negotiable demands wholly unrelated to monetary security for the payment of civil penalties or fines, contrary to the requirements of the statute that authorizes both the detention and the release against security.

B.     The government conditioned the reinstatement of the Vessel's departure clearance on the posting of a bond in the excessive amount of USD 2,500,000 which as the District Court properly found, was "beyond the financial wherewithal" of Angelex as set out in the persuasive evidence included in the record and which far exceeded the maximum fines imposed in similar cases.

C.     The government conditioned the reinstatement of the Vessel's departure clearance upon the posting of a bond in excess of the maximum fine which could have been imposed upon the Vessel, even if the alleged acts were proven in a criminal trial.

D.     The Coast Guard refused to approve a negotiated amount of security recommended by the government's own trial counsel in the midst of the emergency hearing held before District Judge Doumar on May 6, 2013.

E.     The government unreasonably abused the authority to detain a Vessel and release upon the filing of a bond or other surety satisfactory to the Secretary to ensure payment of any fine or penalty to be imposed against the Vessel owner, by arbitrarily refusing to make a reasonable demand for security and in doing so exercising undue economic coercion by blocking and shutting down the only income earning asset of Angelex, without due process of law .

F.     The government conditioned the reinstatement of the Vessel's departure clearance on the requirement that Kassian  jointly and severally be included in the bond despite the fact that: 1) Kassian had no proprietary interest in the Vessel; and 2) there was no personal jurisdiction over Kassian.

G.     The government continued to detain the Vessel to pursue charges for criminal vicarious liability in spite of  clear and incontrovertible evidence that there was no good faith facts or basis to pursue a vicarious liability prosecution.

H.     The government had evidence that all alleged acts were purposefully concealed from Angelex (and Kassian), including all of their respective representatives, superintendents, supervisors, inspectors, etc.

I.      The government refused to reconsider the prosecution and evidence when it became clear that there was no evidence that a criminal conviction for vicarious liability could be attained since all of the crew members acknowledged that the alleged acts were not done within the course and scope of their employment and were not done with the intent to benefit their employer Angelex.

71.      The actions of the Department of Homeland Security, the United States Coast Guard, the Customs and Border Protection Agency, and the Department of Justice are attributable to the United States.

72.      On September 19, 2014, the Coast Guard Office of Claims and Litigation denied Plaintiff's claim and confirmed that the decision was "the final agency action" on the claim.  The United States has not provided Plaintiff with just compensation for the unreasonable delay and detention of the M/V ANTONIS G. PAPPADAKIS, despite due demand. *See* **Exhibit 1** and **Exhibit 6**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on their behalf, against the defendant, adjudging and decreeing that:

A.  Defendant unreasonably detained and/or delayed Plaintiff's Vessel the M/V ANTONIS G. PAPPADAKIS;

B.  Judgment be entered against the defendant and in favor of Plaintiff for compensation for the losses, expenses, damages, and costs as a result of the unreasonable detention and delay of the Vessel, together with the costs of suit, including reasonable attorneys' fees (*see* 33 U.S.C. § 1910(d));

C.  Plaintiff be awarded just compensation for its losses, expenses, and costs;

D.  Plaintiff be granted such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

18

Dated: January 14, 2015
      Oyster Bay, New York

Respectfully submitted,

**CHALOS & CO, P.C.**

/s/ George M. Chalos
George M. Chalos
Bar ID 1011459
55 Hamilton Ave,
Oyster Bay, NY 11771
Tel:    516-714-4300
Fax:    516-750-9051
Email: gmc@chaloslaw.com

*Attorneys for Plaintiff Angelex Ltd.*