# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGELEX LTD.,                          :
                                       :
    Plaintiff,           :        Civil Action No.:      15-0056 (RC)
                                       :
    v.                   :        Re Document No.:       6
                                       :
UNITED STATES OF AMERICA,              :
                                       :
    Defendant.           :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Plaintiff Angelex Ltd. ("Angelex"), the owner of the foreign-flagged M/V ANTONIS G. PAPPADAKIS (the "Pappadakis"), filed his action against Defendant the United States of America (the "Government") under 33 U.S.C. § 1904(h) seeking compensation for losses and damages that Angelex incurred as a result of what it alleges was an unreasonable detention and delay of the Pappadakis by the Government from April to September 2013 during the Government's investigation and criminal prosecution of Angelex, the operator of the Pappadakis, and the Chief Engineer of the Pappadakis relating to the unlawful disposal of oily bilge waste at sea. *See* Complaint, ECF No. 3.[1]

This is not the first action that Angelex has filed against the Government in connection with the detention and delay of the Pappadakis. While the Pappadakis was detained in 2013,

---

[1]    The Complaint, though styled as the "Original Complaint," is an amended version of the complaint that was originally filed. *See* Original Complaint, ECF No. 1. The Complaint, however, references exhibits that were only provided with the originally filed version. The Court treats the amended version as the operative complaint in this action and treats it as incorporating the exhibits to the originally filed complaint, as the Government appears to have done in its motion to dismiss. The Court's treatment does not change the outcome of its analysis.

Angelex filed an emergency petition in the Eastern District of Virginia seeking a court order fixing terms of surety for release of the Pappadakis. *See Angelex Ltd. v. United States*, No. 2:13-cv-237, 2013 WL 1934490 (E.D. Va. May 8, 2013) ("*Angelex I*"). Though the district court in that action ordered the Government to release the Pappadakis upon the filing of a penal bond with certain conditions specified by the court, the Fourth Circuit stayed the order and, on appeal, reversed the decision and remanded the petition for dismissal for lack of subject matter jurisdiction. *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. 2013) ("*Angelex II*").

Following the Fourth Circuit's decision and the Government's eventual release of the Pappadakis in September 2013 after the conclusion of the criminal trial, Angelex filed this action for compensation. The Government has filed a motion to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Angelex's claim as to the terms of the Pappadakis's detention and surety is barred under the doctrine of *res judicata* and that Angelex has not pleaded a plausible claim as to the withdrawal of the Pappadakis's departure clearance. *See* Def.'s Mot. Dismiss, ECF No. 6. For the reasons explained below, the Court will grant the Government's motion in part and deny the motion in part.

## I. BACKGROUND

Angelex is a foreign corporation with a registered office address in Malta. *See* Compl. ¶ 1. The Pappadakis, an ocean-going bulk carrier registered in Malta, is Angelex's sole fee-earning asset. *See id.* ¶¶ 1, 6, 8. At all relevant times, Kassian Maritime Navigation Agency, Ltd. ("Kassian"), a foreign corporation operating in Greece, managed the Pappadakis pursuant to a contractual agreement with Angelex. *See id.* ¶¶ 9–10. Though Kassian managed the Pappadakis, Angelex, through employment contracts, was the employer of its crew members. *See id.* ¶ 7.

On or about April 14, 2013, the Pappadakis arrived at the Norfolk Southern terminal within the Port of Virginia to load a cargo of coal.  *See id.* ¶ 13.  On April 15, 2013, U.S. Coast Guard officers conducted a routine inspection onboard the Pappadakis.  *See id.* ¶ 14.  After the inspection, a member of the Pappadakis crew passed a note to Coast Guard personnel alleging that the Pappadakis had a so-called "magic pipe," meaning a temporary modification of the Pappadakis's systems intended to bypass the ship's pollution prevention equipment, known as an Oil Water Separator.  *See id.* ¶ 15.  This tip led the Coast Guard to conduct an expanded investigation concerning the Pappadakis's compliance with the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901, *et seq.  See id.* ¶ 19.

## A.  The Legal Framework

Congress enacted APPS in order to implement two related marine environmental treaties to which the United States is a party, jointly referred to as "MARPOL":  (1) the 1973 International Convention for the Prevention of Pollution from Ships; and (2) the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships.  *See United States v. Jho*, 534 F.3d 398, 401 (5th Cir. 2008).  MARPOL is aimed at preventing discharges of oily waste at sea, and, accordingly, it places limitations on how ocean-going vessels may dispose of waste.  Regulations promulgated under APPS, consistent with MARPOL, require that, in order to monitor pollution from oil discharges, vessels over a certain tonnage must maintain an Oil Record Book.  *See* 33 C.F.R. § 151.25.  The Oil Record Book must contain, among other things, an accurate record of discharges of bilge water, sludge, and oily mixtures.  *See* 33 C.F.R. § 151.25(d).  The Oil Record Book must also be readily available for inspection at all reasonable times.  *See* 33 C.F.R. § 151.25(i).  Under APPS, it is a felony for any person to knowingly violate MARPOL, APPS, or regulations promulgated under APPS.  *See* 33 U.S.C. § 1908(a).

APPS also provides for civil penalties for any violation, whether knowing or not.  *See* 33 U.S.C.

§ 1908(b).  In addition, any ship operating in violation of MARPOL, APPS, or APPS regulations

is liable *in rem* for any criminal fine imposed under Section 1908(a) or civil penalty assessed

under Section 1908(b).  *See* 33 U.S.C. § 1908(d).  The Coast Guard has authority to board

vessels and inspect them for compliance with MARPOL, APPS, and APPS regulations.  *See* 14

U.S.C. § 89(a); 33 C.F.R. § 151.23(a).  The Coast Guard's inspection authority includes the

ability to examine the Oil Record Book kept by the vessel.  *See* 33 C.F.R. § 151.23(c).

Importantly, APPS provides that "if reasonable cause exists to believe that the ship, its

owner, operator, or person in charge may be subject to a fine or civil penalty" under Section

1908, then the Secretary of Homeland Security[2] may refuse or revoke the ship's departure

clearance.  33 U.S.C. § 1908(e).  Without the clearance, a foreign vessel may not depart a United

States port.  *See* 46 U.S.C. § 60105(b).  A ship's clearance may be granted or reinstated "upon

the filing of a bond or other surety satisfactory to the Secretary" of Homeland Security.  33

U.S.C. § 1908(e).  The Secretary of Homeland Security has delegated authority to detain or deny

entry to ships to the Coast Guard.  *See* 33 C.F.R. § 151.07.  U.S. Customs and Border Protection

("CBP") is responsible for refusing, revoking, and granting a ship's departure clearance upon the

request of the Coast Guard.  *See* 19 C.F.R. § 4.66c(a).  Regulations provide that if the Coast

Guard requests that CBP refuse or revoke the clearance for the reasons stated in Section 1908(e),

then CBP must do so.  *See id.*  The regulation also states that "[c]learance or a permit to proceed

---

[2]        As other courts have noted, while the text of the statute speaks in terms of the Secretary
of the Treasury refusing or revoking a ship's departure clearance upon the request of the
Secretary of Homeland Security, Congress reassigned responsibility for issuing departure
clearances to the Secretary of Homeland Security without updating the language of Section
1908(e).  *See Monarch Shipping Co. v. United States*, Civ. No. 13-80661, 2013 WL 5741836 at
*5 n.4 (S.D. Fla. Aug. 15, 2013).

may be granted when [CBP] is informed that a bond or other security satisfactory to the Coast Guard has been filed." *Id.*

Most relevant to this case, APPS also provides that "[a] ship unreasonably detained or delayed by the Secretary [of Homeland Security] acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby." 33 U.S.C. § 1904(h). A separate section of the statute, titled "Legal Actions," specifically provides for causes of action under APPS with certain limitations. *See* 33 U.S.C. § 1910. Section 1910(a) provides four grounds for any person having an adversely affected interest to bring an action: (1) against "any person alleged to be in violation of the provisions" of APPS or its regulations; (2) against the Secretary of Homeland Security "where there is alleged a failure of the Secretary to perform any act or duty under this chapter which is not discretionary with the Secretary"; (3) against the Administrator of the Environmental Protection Agency "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary"; and (4) against the Secretary of the Treasury where there is an alleged failure of the Secretary to take action under Section 1908(e). 33 U.S.C. § 1910(a). The Section also requires that the plaintiff must give notice, in writing and under oath, to "the alleged violator, the Secretary concerned or the Administrator, and the Attorney General" of the plaintiff's claim more than 60 days before commencing an action under Section 1910(a). 33 U.S.C. § 1910(b)(1).

### B. Initial Withdrawal of Departure Clearance and Surety Demands

The Coast Guard's investigation of the Pappadakis began soon after it received the tip from one of the Pappadakis's crewmembers. In the days that immediately followed, Coast Guard officers and agents took control of the Pappadakis, performed inspections, and conducted several rounds of interviews of crewmembers. *See* Compl. ¶¶ 19–24. The Coast Guard

completed its onboard investigation on April 19, 2013.  *See id.* ¶ 24.  The same day, the Coast

Guard's Captain of the Port for the Hampton Roads Sector sent a letter to Angelex and Kassian

informing them that the Coast Guard had collected evidence "establishing reasonable grounds to

believe" that the Pappadakis had violated MARPOL and APPS.  Letter (Apr. 19, 2013), Compl.

Ex. 2 at 13, ECF No. 1-1.[3]  The letter also stated that, pursuant to 33 U.S.C. § 1908(e), the Coast

Guard had requested that CBP withhold the Customs departure clearance required for the

Pappadakis to depart the port.  *See id.*  The letter stated that, pursuant to APPS, "[w]hen adequate

surety has been provided to this office, we will notify CBP and request they grant departure

clearance" for the Pappadakis.  *Id.*

Discussions between Angelex and the Coast Guard concerning the terms of a surety that

would be satisfactory to the Coast Guard began soon thereafter.  During these discussions, the

Coast Guard made a number of demands that Angelex alleges were unreasonable and unrelated

to ensuring the payment of a potential fine or penalty.  *See* Compl. ¶¶ 30–31.  The Coast Guard

demanded, for example, that Angelex and Kassian jointly and severally post a bond in the

amount of $3 million.  *See id.* ¶ 38.  The Coast Guard also demanded that Angelex agree to

several non-monetary conditions, including expressly waiving all jurisdictional defenses, paying

the salaries and expenses for several crewmembers to remain in the Eastern District of Virginia,

stipulating to the authenticity of all documents and items seized from the Pappadakis, and

assisting the Government in effecting service on foreign citizens not located in the United States.

*See id.* ¶¶ 33 n.8.  Angelex alleges that the demands were "grossly disproportionate and wholly

---

[3]      Angelex filed all of the exhibits to its original complaint, which, as discussed, *supra*, the
Court treats as incorporated into Angelex's amended complaint, as one attachment.  *See* ECF No.
1-1.  The Court's page citations to exhibits to the Complaint are to the page numbers of that
attachment, rather than the page numbers of the individual exhibits.

unreasonable." *Id.* ¶ 39. The Coast Guard refused to negotiate on the amount of the bond and rebuffed Angelex's counter-offers. *See id.* ¶ 40.

### C. Litigation in the Fourth Circuit

Unwilling or unable to meet the Coast Guard's demands, and with the Pappadakis unable to leave the port, Angelex filed an "Emergency Petition" against the Government, the Coast Guard, and CBP in the District Court for the Eastern District of Virginia on April 25, 2013 seeking a court order "set[ting] an appropriate bond for the reinstatement of the [Pappadakis's] departure clearance." *Id.* ¶ 42. *See also Angelex I* at *3. After Angelex filed the emergency petition and before the district court held a hearing, the Coast Guard lowered its monetary demand for the bond to $2.5 million but maintained its other, non-monetary demands. *See* Compl. ¶ 43. Angelex counter-proposed a bond of $1.5 million but was rebuffed. *See id.* ¶ 44.

District Judge Robert Doumar of the Eastern District of Virginia held a hearing on Angelex's emergency petition on May 6, 2013. *See id.* ¶ 48; *Angelex I* at *3. During the hearing, the court recessed for a period in order to permit the parties to negotiate further. *See* Compl. ¶ 50; *Angelex I* at *3. Though during the recess the party representatives reached an agreement in principle for a bond of $1.5 million, plus certain non-monetary conditions, subject to approval from Coast Guard headquarters, when the court reconvened, the Government informed the court that Coast Guard headquarters had rejected the settlement and refused to accept less than the $2.5 million bond it had previously offered. *See* Compl. ¶ 50; *Angelex I* at *3. At the hearing, the Government took the position that the Coast Guard could set any bond amount that it wanted. *See* Compl. ¶ 49; Compl. Ex. 5 at 22. Judge Doumar disagreed and, after first finding that the court had subject matter jurisdiction to hear Angelex's emergency petition under both the Administrative Procedure Act ("APA") and the court's admiralty jurisdiction,

held that the Coast Guard abused its discretion in demanding a bond of $2.5 million and the imposition of non-monetary conditions. *See Angelex I* at *9. In reaching his holding, Judge Doumar stated that the Coast Guard's position and approach was "simply repugnant to the Constitution" and stated that "[i]n more than thirty years on the bench, this Court can recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion." *Id.* The court then entered an order setting a bond of $1.5 million with several specific non-monetary conditions. *See Angelex II* at 504–05. The Government requested that the district court temporarily stay its order and simultaneously filed a notice of appeal and requested a stay from the Fourth Circuit. *See id.* at 505. The district court denied the stay motion, but the Fourth Circuit granted it and implemented an expedited briefing schedule. *See id.*

In its brief on appeal to the Fourth Circuit, the Government argued, in part, that the APA did not permit judicial review of the Coast Guard's surety demands, because APPS commits the determination of whether and under what conditions a vessel may be granted permission to leave a United States port to agency discretion. *See* Pet.'s Br., Pl.'s Opp. Mot. Dismiss Ex. 3 at 4–7, ECF No. 8-3. As support, the Government argued:

> Congress in APPS authorized an after-the-fact remedy for obtaining compensation from the government, further suggesting that it did not intend Coast Guard offers of surety to be judicially reviewable. Under 33 U.S.C. § 1904(h), "[a] ship unreasonably detained or delayed by the Secretary acting under the authority of this Act [sic] is entitled to compensation for any loss or damage suffered thereby." Congress thus did not leave vessel owners without recourse against unreasonable denials of clearance. But rather than providing for judicial review of surety negotiations, it authorized an independent damages action, separate from the enforcement proceedings against the vessel.

*Id.* at 7. The Government made a similar argument to the Fourth Circuit at oral argument held on June 25, 2013. *See* Pl.'s Opp. Mot. Dismiss. at 17–18, ECF No. 8 (citing Pl.'s Opp. Ex. 2).

The Fourth Circuit reversed the district court's decision in its entirety on July 22, 2013, holding that the district court lacked subject matter jurisdiction to hear Angelex's emergency petition.  *See Angelex II* at 502.  The Fourth Circuit held that, under the APA's provision that agency actions committed to agency discretion by law are not subject to judicial review, the Coast Guard's position on the terms for the Pappadakis's release was unreviewable.  *See id.* at 506–09.  Most relevant to this action, the court agreed with the Government's argument on appeal that Section 1904(h) of APPS provided a remedy for vessel owners such as Angelex against unreasonable denials of clearance:

> Finally, APPS contains a built-in safeguard to governmental abuses, which further convinces us that Angelex's Petition is out of place and time.  In addition to the criminal and civil penalties that APPS authorizes the United States to seek, APPS provides for compensation for loss or damage as a result of unreasonable detention by the Coast Guard.  Section 1904(h) provides, "A ship unreasonably detained or delayed by the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby." 33 U.S.C. § 1904(h).  This provision is, as the government asserts, an "after-the-fact damages remedy against the United States for unreasonable detention or delay." Appellant's Br. 37.  This safeguard gives Appellees a remedy, distinct from the unauthorized injunctive relief they now seek.

*Angelex II* at 508–09.  Accordingly, the court held, "the district court thereby did not possess subject matter jurisdiction under the APA."  *Id.* at 509.  After concluding that admiralty jurisdiction was inapplicable, the court remanded to the district court for dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See id.* at 509–10.

### D.  Criminal Trial and Release of the Pappadakis

The Government's investigation concerning the Pappadakis's compliance with MARPOL and APPS continued during the litigation of Angelex's emergency petition, and, prior to the Fourth Circuit's decision, a grand jury in the Eastern District of Virginia returned an indictment against Angelex, Kassian, and Lambros Katsipis, the Pappadakis's Chief Engineer, charging

them with conspiracy, falsification of records, failure to maintain an accurate Oil Record Book, and obstruction of justice. *See* Indictment, Def.'s Mot. Dismiss Ex. 1, ECF No. 6-2. A jury trial was conducted from August 30, 2013 to September 13, 2013. *See United States v. Kassian Maritime Navigation Agency, Ltd., et al.*, Crim. No. 2:13-cr-70 (E.D. Va.) ("Crim"), ECF Nos. 80–89 (Minute Entries). On September 13, 2013, Angelex and Kassian were both acquitted of all charges. *See* Crim. ECF No. 91 (Kassian acquittal); Crim. ECF No. 92 (Angelex acquittal). Mr. Katsipis was convicted on all counts, except conspiracy. *See* Judgment, Def.'s Mot. Dismiss Ex. 2, ECF No. 6-3.

Angelex did not meet the Coast Guard's surety demands, and the Coast Guard and CBP continued to withhold the Pappadakis's departure clearance until after the conclusion of the criminal trial. *See* Compl. ¶¶ 60–63. On September 16, 2013, the Coast Guard confirmed to Angelex that the Pappadakis's departure clearance had been reinstated and that the Pappadakis was permitted to depart. *See id.* ¶ 63. The Pappadakis was not put back into sea until October 3, 2013. *See id.* ¶ 64.

### E. Angelex's Present Claim for Compensation

In a letter dated May 1, 2014 and addressed to the Attorney General, the Secretary of Homeland Security, and the Commandant of the Coast Guard, Angelex provided written notice of its claim for compensation under Section 1904(h) for what it alleged was the unreasonable detention and delay of the Pappadakis. *See* Notice Letter, Compl. Ex. 1 at 2–11. Angelex alleged that, as a result of the Coast Guard's unreasonable detention of the Pappadakis from April 15, 2013 to September 16, 2013, Angelex incurred "damages, losses, and costs in an amount estimated to be no less than USD 3,608,375.62" and attached a spreadsheet setting forth its calculation of damages. *Id.* At the request of the Coast Guard Office of Claims and

Litigation, Angelex provided a supplemental letter on July 21, 2014, providing further detail

regarding its claim.  *See* Letter (July 21, 2014), Compl. Ex. 6 at 24–27.  In this letter, Angelex

calculated that its total claim for compensation, exclusive of interest, costs, and fees in pursuing

the matter, was no less than $4,179,907.44.  *See id.*

In a letter dated September 19, 2014, the Coast Guard Office of Claims and Litigation

denied Angelex's claim for compensation and stated that its decision was the "final agency

action" on the claim.  Compl. ¶ 72; Letter (Sept. 19, 2014), Def.'s Mot. Dismiss Ex. 4, ECF No.

6-5.  The Coast Guard's letter noted that Angelex's letter was "the first § 1904(h) claim

presented to the Coast Guard."  Letter (Sept. 19, 2014), Def.'s Mot. Dismiss Ex. 4 at 1.  In this

letter, the Coast Guard took the position that, pursuant to Section 1908(e), there was reasonable

cause sufficient to revoke the Pappadakis's departure clearance in April 2013.  *See id.* at 3–5.

With respect to the terms of surety, the Coast Guard first stated that "there is some question as to

whether § 1904(h) covers such a claim as opposed to being limited to claim for an unreasonable

detention" and that "there does not appear to be a right to release from detention."  *Id.* at 5–6.

The Coast Guard then explained its position that, nevertheless, the terms of surety it had

demanded were reasonable.  *See id.* 6–7.

On January 14, 2015, Angelex commenced the present action in this Court, stating that

the action is authorized by 33 U.S.C. § 1904(h).[4]  *See* Compl. at 2.  Without filing an Answer to

---

[4]      It is unclear whether Angelex brings its action pursuant to 33 U.S.C. § 1910, which
authorizes actions against the Secretary of Homeland Security, the Administrator of the EPA, the
Secretary of the Treasury, and "any person," or whether it is asserting that Section 1904(h)
independently confers a right of action against the United States.  Though the Complaint makes
no direct mention of the four grounds for a cause of action provided by Section 1910(a) and
names the United States as the defendant, it states that Angelex's May 1, 2014 notice letter was
sent in satisfaction of Section 1910(b)'s conditions for commencing an action under Section
1910(a) and that venue in this Court is proper under Section 1910(c)(4).  *See* Compl. ¶¶ 4–5.
The Government does not argue that Angelex's claim falls outside of the grounds authorized by

the Complaint, the Government moved to dismiss the Complaint in its entirety under Rule

12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim upon which relief can

be granted.  *See* Mot. Dismiss.

## II.  ANALYSIS

The Government presents two related arguments in support of its motion to dismiss the

Complaint in its entirety.  First, the Government argues that, under the doctrine of *res judicata*,

the Fourth Circuit's decision in *Angelex II* precludes Angelex's claim here with respect to the

terms of surety that the Coast Guard imposed.  *See* Def.'s Mem. Supp. Mot. Dismiss at 14–16,

ECF No. 6-1.  Second, the Government argues that, assuming the preclusive effect of the Fourth

Circuit's decision, the only remaining aspect of Angelex's claim concerns whether the Coast

Guard's request that CBP withdraw the Pappadakis's departure clearance on April 19, 2013 was

reasonable and Angelex has failed to state a facially plausible claim that it was not.  *See id.* at

16–23.  The Court first discusses the legal standard for considering a motion to dismiss and then

addresses each of the Government's arguments in turn.

### A.  Legal Standard

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain

statement of the claim" in order to give the defendant fair notice of the claim and the grounds

upon which it rests.  Fed. R. Civ. P. 8(a)(2).  *Accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

(per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate

likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim.

---

Section 1910(a) or that Section 1904(h) does not confer a right of action separate from Section
1910(a).  Nor does it argue that Angelex's notice letter failed to meet the requirements of Section
1910(b), which, among other things, requires the notice to be made under oath.  The Court will
not address these issues on its own.

*See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotation omitted).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

### B.  *Res Judicata*

The Government argues that the Fourth Circuit's decision in *Angelex II* precludes Angelex's claim here with respect to the terms of surety that the Coast Guard imposed as a prerequisite to granting the Pappadakis departure clearance under Section 1908(e) of APPS.[5]

---

[5]     Relatedly, the Government also challenges the Complaint's legal conclusion that Judge Doumar's opinion in *Angelex I* that the Coast Guard's surety demands constituted an "egregious abdication of the reasonable exercise of discretion" is the "law of the case."  Compl. ¶ 66 (quoting *Angelex I* at *9).  The Court need not reach this legal issue on the Government's motion to dismiss, because the Complaint does not rest solely on this legal conclusion but rather alleges,

The Government's argument is somewhat muddled, referring to two distinct, yet similar, types of preclusion that are collectively referred to as *res judicata*.  It is therefore necessary to provide an overview of the doctrine of *res judicata*.

In modern parlance, "[t]he doctrine of *res judicata* 'usually is parsed into claim preclusion and issue preclusion.'"  *NextWave Personal Comm's Inc. v. FCC*, 254 F.3d 130, 143 (D.C. Cir. 2001) (quoting *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983)).  *See also Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as '*res judicata*.'"); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4402 (2d ed. 2015) (discussing the evolution of the terminology of *res judicata*).  Under claim preclusion, which was traditionally considered synonymous with the term *res judicata*, "a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"  *Taylor*, 553 U.S. at 892 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).  By contrast, issue preclusion, which was traditionally considered distinct from the term *res judicata* and alternatively referred to as "collateral estoppel," "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  *Id.* (quoting *New Hampshire*, 532 U.S. at 748–49).

---

separate from the opinion in *Angelex I*, that the Coast Guard's surety demands were unreasonable.  Nevertheless, the Court observes that Angelex's legal argument is highly dubious, as the Fourth Circuit held that the district court lacked subject matter jurisdiction to hear Angelex's emergency petition and reversed the decision in its entirety.  *See Angelex II* at 510.

It is not entirely clear whether the Government's argument concerns claim preclusion or issue preclusion. In its memorandum in support of its motion, the Government refers to both "the same issue" and "claim preclusion" and cites the standard for a finding of claim preclusion. *See* Def.'s Mem. Supp. at 14–15. In its reply to Angelex's opposition to the motion, however, the Government abandons its usage of the term "claim preclusion," instead using the term "issue preclusion, also referred to as collateral estoppel" and citing the standard for a finding of issue preclusion. Def.'s Reply at 6–7, ECF No. 9. "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008) (citing *Herbert v. Nat'l Academy of Sciences,* 974 F.2d 192, 196 (D.C. Cir. 1992)). In this case, the Court generously interprets the Government as arguing that both claim preclusion and issue preclusion foreclose Angelex's claim with respect to the terms of surety the Coast Guard imposed.[6]

### 1. Claim Preclusion

A subsequent lawsuit will be barred under claim preclusion "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). "[A] party invoking claim preclusion has the burden of establishing its elements." *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003) (citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 158 (3d Cir. 2001)).

---

[6]     The Court observes that Angelex appears to have made the same interpretation in its opposition to the Government's motion to dismiss. *See, e.g.,* Pl.'s Opp. at 11 (discussing the distinction between the "[t]he claims and issues" at issue before the Fourth Circuit and at issue here).

An analysis of the first element is dispositive of the Government's argument, because the Government has failed to establish that Angelex's Complaint involves the same claim as the prior litigation in the Fourth Circuit.  Angelex's prior claim was an emergency petition brought under the APA and admiralty jurisdiction that sought a court order "set[ting] an appropriate bond for the reinstatement of the [Pappadakis's] departure clearance."  Compl. ¶ 42.  *See also Angelex I* at *3.  Here, by contrast, Angelex is seeking compensation as an after-the-fact remedy for the Pappadakis's allegedly unreasonable detention or delay pursuant to Section 1904(h) without reference to the APA or admiralty jurisdiction.  Angelex did not seek compensation or otherwise invoke Section 1904(h) in its prior litigation.  In the prior litigation, in fact, the Fourth Circuit explicitly discussed a potential claim under Section 1904(h) as *distinct* from the case before it. *See Angelex II* at 509 (stating that Section 1904(h) "gives Appellees a remedy, distinct from the unauthorized injunctive relief they now seek").

That Angelex's current claim arises out of largely the same facts that were at issue in the prior litigation does not change the Court's analysis, because the current claim could not have been brought during the prior litigation.  As the Fourth Circuit stated, quoting the Government's argument, Section 1904(h) provides an "after-the-fact damages remedy."  *Angelex II* at 509. Angelex could not have pursued a claim under Section 1904(h) in the prior litigation, which took place *during* the Government's detention of the Pappadakis.  *See Angelex II* at 508 (stating that Angelex's emergency petition was "out of place and time").  Moreover, Angelex's current claim encompasses the Government's conduct following the Fourth Circuit's decision on July 22, 2013, specifically, the Government's continued detention of the Pappadakis until the conclusion of the criminal trial in September 2013.  *See, e.g.,* Compl. ¶ 70(G) (alleging that the detention and delay was unreasonable because it "continued to detain the Vessel to pursue charges for

criminal vicarious liability in spite of clear and incontrovertible evidence that there was [sic] no good faith facts or basis to pursue a vicarious liability prosecution"); *id.* ¶ 70(H) (alleging that the detention and delay was unreasonable because the Government "had evidence that all alleged acts were purposefully concealed from Angelex (and Kassian)"); *id.* ¶ 70(I) (alleging that the detention and delay was unreasonable because the Government "refused to reconsider the prosecution and evidence when it became clear that there was no evidence that a criminal conviction for vicarious liability could be attained").

Moreover, even if Angelex's current claim could somehow be construed as involving the same claim as the prior action, the Fourth Circuit's decision that the district court lacked subject matter jurisdiction to hear the claim would not have a preclusive effect under claim preclusion, which applies only to decisions made "on the merits." "The basic rule that dismissal for lack of subject-matter jurisdiction does not preclude a second action on the same claim is well settled."[7] 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4436 (2d ed. 2015). *See also* Fed. R. Civ. P. 41(b) (providing that a dismissal for lack of jurisdiction does not operate as an adjudication on the merits).

---

[7]     The preclusive effect of a dismissal for lack of subject matter jurisdiction is different with respect to issue preclusion.  *See GAF Corp. v. United States*, 818 F.2d 901, 912–13 (D.C. Cir. 1987) ("It is ordinarily the case that a judgment dismissing an action for lack of jurisdiction will have no preclusive effect on the cause of action originally raised. . . .  The judgment ordering dismissal will, however, have preclusive effect as to matters actually adjudicated; it will, for example, preclude relitigation of the precise issue of jurisdiction that led to the initial dismissal."); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4436 (2d ed. 2015) ("Dismissals for want of justiciability are controlled by the same principles as apply to want of subject-matter jurisdiction.  The decision should preclude relitigation of the very issue of justiciability actually determined, but does not preclude a second action on the same claim if the justiciability problem can be overcome.").

2. Issue Preclusion

With respect to issue preclusion, "[t]he standards for establishing the preclusive effect of a prior holding are:  First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case.  Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992).  Like claim preclusion, the party seeking to invoke issue preclusion bears the burden of establishing its elements.  *See Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 303 (D.D.C. 2011).  The Government has failed to establish that the issue raised by Angelex's Complaint with respect to the terms of surety imposed by the Coast Guard is identical to the issue that was previously litigated by the parties and decided by the Fourth Circuit.

As a preliminary matter, it is somewhat difficult for the Court to identify the precise issue that the Government argues is precluded.  In the introductory section of its memorandum in support of its motion, the Government argues that the Fourth Circuit held in *Angelex II* that "the terms of vessel detention . . . . were committed to agency discretion by law" and that holding is preclusive.  Def.'s Mem. Supp. at 2.  *See also* Def.'s Reply at 6 ("Inasmuch as the Fourth Circuit has found the matter to be committed to agency discretion by law, that question is not on the table.").  In the argument section of its memorandum, however, the Government argues more broadly that "the question of what surety conditions the United States could impose before agreeing to release the vessel has already been resolved."  Def.'s Mem. Supp. at 15.  The Court understands the Government to argue that the issue of whether the terms of a vessel's detention and release are committed to agency discretion by law and therefore unreviewable by a court in any context is precluded.

The Fourth Circuit's decision on this issue, however, specifically concerned whether the district court had subject matter jurisdiction to hear the emergency petition under the APA, which is not at issue here.  The Fourth Circuit's analysis of the issue was in the context of the APA's exceptions to judicial review of agency actions when "statutes preclude judicial review" or when "agency action is committed to agency discretion by law."  *Angelex II* at 506 (quoting 5 U.S.C. § 701(a)(2)).  The Fourth Circuit held that the district court lacked subject matter jurisdiction under the APA to review the Coast Guard's position during the negotiations between the Coast Guard and Angelex of the terms of surety.  *See id.* at 509 ("For these reasons, the Coast Guard's decisions regarding bond conditions with regard to the Pappadakis are unreviewable, and the district court thereby did not possess subject matter jurisdiction under the APA.").  The Fourth Circuit did not foreclose any sort of judicial review outside of that context.  On the contrary, immediately preceding its holding, the court explicitly left open the possibility of judicial review through Section 1904(h) of APPS, which it characterized, quoting the Government's brief on appeal, as "an 'after-the-fact damages remedy against the United States' . . . . distinct from the unauthorized injunctive relief [Angelex] now seek[s]."  *Angelex II* at 509.  Angelex's Complaint does not seek review of the Coast Guard's decisions under the APA; rather, Angelex's Complaint purports to bring a claim directly under Section 1904(h) of APPS and separate from the APA.  The parties have never litigated the issue potentially presented by this case as to whether a ship owner injured by allegedly unreasonable demands by the Coast Guard on surety terms may bring an action under Section 1904(h) to recover compensation.[8]

---

[8]    The Court observes that the Government does not argue that the Court should hold on its own that Angelex may not bring an action directly under Section 1904(h) to recover compensation for the Coast Guard's allegedly unreasonable demands on the terms of surety.  The Court will not address this issue absent any argument by the Government and therefore does not consider Angelex's arguments in opposition to the Government's motion that its cause of action

### C. Reasonableness of Departure Clearance Withdrawal

The Government states that, assuming the preclusive effect of the Fourth Circuit's decision with respect to the terms of surety demanded by the Coast Guard as a condition of releasing the Pappadakis, the only remaining aspect of Angelex's claim concerns whether the Coast Guard's decision to request that CBP withdraw the Pappadakis's departure clearance on April 19, 2013 was reasonable and argues that Angelex has failed to state a facially plausible claim that the Coast Guard did not.  *See* Def.'s Mem. Supp. at 16–23.

Before assessing the sufficiency of Angelex's Complaint, the Court must first address the Government's premise that if Angelex has failed to state a claim with respect to the withdrawal of the Pappadakis's departure clearance, then the Complaint should be dismissed in its entirety. This premise is incorrect for two reasons.  First, regardless of whether the Complaint has stated a claim with respect to the withdrawal of the departure clearance, Angelex's claim with respect to the terms of surety demanded by the Coast Guard remains, given the Court's holding, *supra*, that the Fourth Circuit's decision has no preclusive effect on this litigation.  Second, Angelex's claim concerns more than the reasonableness of the initial withdrawal of the Pappadakis's departure clearance in April 2013 and the terms of surety demanded by the Coast Guard.  Rather, Angelex's claim encompasses the Coast Guard's continued detention of the Pappadakis from April to September 2013, which the Complaint alleges was unreasonable in light of the evidence and the circumstances.  *See, e.g.,* Compl. ¶ 70; Pl.'s Opp. at 12–13 ("Plaintiff's complaint specifically details the numerous unreasonable actions by the Coast Guard and government

---

is authorized by Section 1904(h) and ripe for determination by this Court, *see* Pl.'s Opp. at 7–10, and that the Government is judicially estopped from now arguing that Angelex is not entitled to pursue its claim because it "changed its position with respect to the availability of relief" under Section 1904(h).  *Id.* at 19–21.

amounting to unreasonable detention and delay of the Vessel, not just during the initial week of the Coast Guard investigation in April 2013, but throughout the next five (5) months . . . .").  The Government's argument does not concern the remainder of these allegations, and the Government does not argue that, as a matter of law, claims for compensation brought under Section 1904(h) must be limited to the reasonableness of the initial withdrawal of a vessel's departure clearance.

The Court now turns to the issue of whether Angelex has stated a facially plausible claim as to whether the Coast Guard's decision to request that CBP withdraw the Pappadakis's departure clearance on April 19, 2013 was unreasonable under Section 1904(h) of APPS.  The Coast Guard's relevant statutory authority derives from Section 1908(e) of APPS.  Under Section 1908(e) and its regulations, the Coast Guard has the authority to refuse or revoke a ship's departure clearance "if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty" under Section 1908.  *See* 33 U.S.C. § 1908(e).  The Government argues that the Coast Guard had reasonable cause to believe that the Pappadakis, Angelex, Kassian, and the Pappadakis's Chief Engineer were in violation of APPS and therefore reasonably requested that CBP withdraw the Pappadakis's departure clearance. *See* Def.'s Mem. Supp. at 16–23.  Angelex's arguments in opposition are limited.  It argues that "[t]he government improperly equates 'reasonableness' of the delay and detention of the Vessel, with the right of the government to investigate, pursue, and prosecute individuals and companies for alleged criminal misconduct."  Pl.'s Opp. at 12.  Angelex misses the point of the Government's argument, which is grounded in the text of Section 1908(e)'s grant of authority to withdraw a ship's departure clearance if there is reasonable cause.  Though Angelex does not flesh out its argument, Angelex appears to be arguing that the Coast Guard could correctly

determine that there is reasonable cause to believe that a vessel is in violation of MARPOL or APPS and may be subject to a criminal fine or civil penalty and request that CBP withdraw the vessel's departure clearance as authorized by Section 1908(e) and yet still be unreasonable in doing so under Section 1904(h).[9]  Angelex provides no basis for such a tortured reading of Section 1904(h), which, like Section 1908(e), speaks in terms of reasonableness.  Nor does Angelex offer the Court with any alternative standard for determining whether withdrawal of a departure clearance is reasonable.  The Court finds that whether the Coast Guard had reasonable cause under Section 1908(e) is at the heart of whether the withdrawal of the Pappadakis's departure clearance was reasonable under Section 1904(h).

APPS does not provide a definition for "reasonable cause" for purposes of Section 1908(e).  The Government argues that the term "reasonable cause" is often used interchangeably with "reasonable suspicion" and that, in the analogous criminal context, "[r]easonable suspicion exists when a law enforcement officer can point to 'specific and articulable facts,' which, considered together with rational inferences from those facts, suggest that criminal activity 'may be afoot.'"  Def.'s Mem. Supp. at 20–21 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  *See also Monarch Shipping Co. v. United States*, Civ. No. 13-80661, 2013 WL 5741836, at *9 (S.D. Fla. Aug. 15, 2013) (discussing, *in dictum*, application of a similar definition for purposes of Section 1908(e)).  The Coast Guard also appears to have considered the meaning of the term outside the criminal context under the National Labor Relations Act.  *See* Letter (Sept. 19, 2014),

---

[9]    Angelex's contention may also be read as related to its only other argument in opposition that whether the Coast Guard had reasonable cause "does not address the crux of Plaintiff's claim in this matter."  Pl.'s Opp. at 13–14.  As discussed, *supra*, the Court agrees that Angelex's claim encompasses the Coast Guard's continued detention of the Pappadakis from April to September 2013 and that, therefore, the entire Complaint is not subject to dismissal solely on this ground.  The issue is, however, determinative of whether Angelex can maintain its claim with respect to the Coast Guard's initial withdrawal of the departure clearance.

Def.'s Mot. Dismiss Ex. 4, at 4 (discussing *Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013 (1st Cir. 1995)).  Angelex, in its attempt to dodge the issue of reasonable cause entirely, does not offer any standard or contest the Government's standards.

The Court need not define here the precise contours of reasonable cause under Section 1908(e), because Angelex fails to allege in its Complaint that the Coast Guard lacked reasonable cause—under any standard—to believe that the Pappadakis might be subject to a fine or civil penalty for violating MARPOL or APPS.  Angelex repeatedly alleges facts in its Complaint suggesting that the Coast Guard lacked reasonable cause to believe that Angelex or Kassian were in violation of MARPOL or APPS.  *See, e.g.*, Compl. ¶ 26 (alleging that all interviewed crew members confirmed to the Coast Guard that, among other things, "the alleged bad acts" were purposely hidden from Angelex, Kassian, and the Pappadakis's Captain and not done in the course of their employment); *id.* ¶ 28 (alleging that the Coast Guard requested withdrawal of the Pappadakis's departure clearance "[n]otwithstanding the clear absence of any evidence to vicariously implicate Plaintiff for criminal liability"); *id.* ¶ 60 n.12 (alleging that the "detention of the Vessel was unreasonable as the prosecution of Angelex was destined to fail since the government could not meet the standard for criminal vicarious liability").  The Coast Guard, however, did not need reasonable cause to believe that Angelex or Kassian were in violation of MARPOL or APPS in order to initially detain the Pappadakis, because the statute specifically provides that the Coast Guard may do so if it has reasonable cause to believe that the vessel itself may be subject to a criminal fine or a civil penalty.[10]  *See* 33 U.S.C. § 1908(e) ("[I]f reasonable cause exists to believe that the ship . . . may be subject to a fine or civil penalty . . . .").  The

---

[10]    The Government nevertheless argues that the Coast Guard had reasonable cause to believe that both Angelex and Kassian were vicariously liable.  *See* Def.'s Mem. Supp. at 17–19. The Court need not reach this issue.

statute provides that "[a] ship operated in violation" of MARPOL, APPS, or APPS regulations is liable *in rem* for any criminal fine imposed under Section 1908(a) or any civil penalty assessed under Section 1908(b), which, in turn, provide for liability for any person violating MARPOL, APPS, or APPS regulations.  33 U.S.C. § 1908.

Here, the Coast Guard's stated reason for requesting that CBP withdraw the Pappadakis's departure clearance was that the Coast Guard had collected evidence "establishing reasonable grounds to believe" that the Pappadakis violated MARPOL and APPS.  Letter (Apr. 19, 2013). Yet the Complaint is devoid of any allegation that the Coast Guard lacked reasonable cause to believe that the Pappadakis was operating in violation of MARPOL or APPS and might be subject to a criminal fine or civil penalty, regardless of whether Angelex or Kassian were aware of or vicariously liable for the violation.  On the contrary, the Complaint actually alleges facts *supporting* the Coast Guard's finding of reasonable cause to believe that the Pappadakis was in violation and might be subject to a criminal fine or civil penalty.  *See* Compl. ¶ 15 (alleging that the Coast Guard received a tip from a crew member informing them that the Pappadakis's equipment had been modified to bypass the ship's pollution prevention equipment).  Moreover, while the Complaint references and quotes from the Coast Guard's letter responding to its demand for compensation, it does not make any allegations concerning the Coast Guard's statements in the letter that, among other things:  the whistleblowing crew member provided the Coast Guard with photographs of the modification and led investigators to it; four other crew members confirmed to the Coast Guard "that the crew had bypassed the oily water separator and discharged oily bilge water into the ocean at the direction of the Chief Engineer, Lambros Katsipis"; crew members were unable to get the oily water separator to work; and the Coast

Guard's examination of the Oil Record Book revealed discrepancies and incorrect entries.[11]

Letter (Sept. 19, 2014), Def.'s Mot. Dismiss Ex. 4, at 2–3.  Even in its opposition to the

Government's motion to dismiss, Angelex ignores entirely the issue of whether the Coast Guard

had reasonable cause to believe that the Pappadakis was in violation of MARPOL or APPS and

might be subject to a criminal fine or civil penalty when it requested that CBP withdraw its

departure clearance.[12]

　　　The Complaint fails to allege sufficient facts that, if true, state a plausible claim that the

Coast Guard's request that CBP withdraw the Pappadakis's departure clearance was

unreasonable.  Thus, the Complaint must be dismissed as to the withdrawal of the departure

clearance on April 19, 2013.[13]

---

[11]　　Although a court generally cannot consider matters beyond the pleadings at the motion to dismiss stage, it may consider "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal citations and quotations omitted).

[12]　　The Government also argues that the Coast Guard had reasonable cause to believe that Lambros Katsipis, the Chief Engineer of the Pappadakis, might be subject to a criminal fine or civil penalty and that Mr. Katsipis was a "person in charge" under Section 1908(e).  *See* Def.'s Mem. Supp. at 16–17.  The Complaint fails to allege that the Coast Guard lacked reasonable cause to believe that Mr. Katsipis might be subject to a criminal fine or civil penalty.  The Court need not determine whether a vessel's Chief Engineer is, by law, a "person in charge" under Section 1908(e), because Angelex offers no response to the Government's argument that Mr. Katsipis was a person in charge in its opposition to the motion to dismiss.

[13]　　In its opposition to the Government's motion to dismiss, Angelex requests leave to amend the Complaint "in the event this Court finds Plaintiff's Complaint insufficient in any way."  Pl.'s Opp. at 14–15.  The Court is unable to consider Angelex's request, given that it was made prior to the resolution of the Government's motion to dismiss.  Moreover, Local Civil Rule 7(i) requires a party seeking leave to file an amended pleading to provide the Court with "an original of the proposed pleading as amended."  D.D.C. Civ. R. 7(i).  Angelex may file a formal motion seeking leave to amend its Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure and Local Civil Rule 7(i) in light of this ruling.

**D.  Angelex's Request for Attorney's Fees**

Finally, Angelex requests that the Court award it attorney's fees for needing to respond to what it argues is a "frivolous motion to dismiss."  Pl.'s Opp. at 16–19.  Rule 11 of the Federal Rules of Civil Procedure, which Angelex does not reference, provides for the imposition of sanctions against a party who makes a frivolous argument in violation of the Rule's certification requirements.  *See* Fed. R. Civ. P. 11.  Given that the Court grants the Government's motion in part, the Court finds that the Government's motion was not frivolous and that the imposition of sanctions would be inappropriate.

## III.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Government's Motion to Dismiss (ECF No. 6).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 24, 2015                                         RUDOLPH CONTRERAS
                                                               United States District Judge