## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------X
ANGELEX LTD.,                      :     C.A.   15-CV-56
                                   :
        Plaintiff,                 :
v.                                 :
                                   :
UNITED STATES OF AMERICA,          :
                                   :
        Defendant.                 :
-----------------------------------------------------X
```

## FIRST AMENDED COMPLAINT

**COMES NOW**, PLAINTIFF ANGELEX LTD. ("Plaintiff" or "Angelex"), owner of the

M/V ANTONIS G. PAPPADAKIS ("the Vessel"), by and through undersigned counsel, and

files this Complaint for compensation for, *inter alia*, losses, expenses, damages, and costs

incurred as a result of the unreasonable detention and delay of the M/V ANTONIS G.

PAPPADAKIS which the Defendant UNITED STATES OF AMERICA ("defendant" or "the

government"), caused by and through its agencies including but not limited to, the Department of

Homeland Security ("DHS"), the United States Coast Guard ("USCG" or "Coast Guard"), the

United States Customs and Border Protection Agency ("CBP"), and the Department of Justice

("DOJ").  This action for Plaintiff's losses, expenses, damages and costs is expressly authorized

by 33 U.S.C. § 1904(h), which provides in relevant part: "A ship unreasonably detained or

delayed by the Secretary[1] acting under the authority of this chapter is entitled to compensation

for any loss or damage suffered thereby."

---

[1] The term "Secretary" is defined as the Secretary of the department in which the Coast Guard is operating. 33 U.S.C.S. § 1901(a)(11).  At all times material herein, the Coast Guard has operated under the Department of Homeland Security, where it has been since 2003. *See* http://www.uscg.mil/top/missions/.

The statutory compensation prayed for in this suit is an appropriate remedy for Plaintiff's losses and damages sustained as a result of the Vessel's prolonged and unreasonable detention and delay at Norfolk, Virginia. In addition, in prior proceedings between the parties, the Fourth Circuit Court of Appeals expressly held that Plaintiff Angelex is entitled to pursue a claim for compensation pursuant to 33 U.S.C. § 1904(h). *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. 2013) ("This provision is, as the government asserts, an 'after the fact damages remedy against the United States for unreasonable detention or delay.' Appellant's Br. 37. This safeguard gives [Angelex] a remedy . . ."). In support of this action, Plaintiff states as follows:

### THE PARTIES

1.      At all relevant times, Plaintiff Angelex was a foreign corporation with a registered office address in Malta. At all relevant times, Angelex was the owner of the M/V ANTONIS G. PAPPADAKIS and the employer of crew members working onboard the Vessel. The ANTONIS G. PAPPADAKIS is the only fee earning or otherwise income generating asset of Angelex.

2.      The defendant is the United States of America.

### JURISDICTION AND VENUE

3.      This Complaint states claims for compensation for, *inter alia*, losses, expenses, damages, and costs caused by the unreasonable detention and delay of the M/V ANTONIS G. PAPPADAKIS by the government.

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and in accordance with 33 U.S.C. § 1904(h).

5.      Although not specifically required pursuant to 33 U.S.C. § 1904(h), and in an abundance of caution, Plaintiff has also complied with the commencement conditions set forth pursuant to 33 U.S.C. § 1910(b). *See* May 1, 2014 Notice Letter attached as **Exhibit 1**.

6.      Venue is proper in the United States District Court for the District of Columbia pursuant to 33 U.S.C. § 1910(c)(4).

## FACTS AND PRIOR LITIGATION BETWEEN THE PARTIES

### *The Vessel*

7.      The M/V ANTONIS G. PAPPADAKIS, was a 73,538 metric ton, bulk carrier built in 1995.

8.      Pursuant to the written employment contracts by and between Plaintiff and its employees, Angelex is the employer of each of the foreign seafarers who worked onboard the ship at all relevant times.

9.      At all relevant times, the Vessel operated pursuant to the laws of Malta, her Flag State[2] and was certified by Lloyd's Register, her Classification Society.[3]

10.     At all relevant times, the Vessel was managed by Kassian Maritime Navigation Agency, Ltd. ("Kassian" or "ISM Manager"), pursuant to a contract with Angelex and in accordance with the International Management Safety ("ISM") Code.[4]

11.     At all relevant times, Kassian was a foreign corporation with an office in Athens, Greece.

12.     Kassian had no proprietary interest in the Vessel.

13.     Kassian was not and has never been subject to the jurisdiction of the United States District Court for the Eastern District of Virginia.

---

[2] "[T]he law of the flag doctrine ... provides that a merchant ship is part of the territory of the country whose flag she flies, and that actions aboard that ship are subject to the laws of the flag state." *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008).

[3] A classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of ships and offshore structures. *See* http://www.iacs.org.uk/.

[4] The ISM Code is an international standard for the safe management and operation of ships and for pollution prevention. *See* www.imo.org.

*Detention of the Vessel*

14.     On or about April 14, 2013, the M/V ANTONIS G. PAPPADAKIS arrived at the Norfolk Southern terminal within the Port of Norfolk to load a cargo of coal.

15.     On April 15, 2013, at approximately 9:00 a.m., Coast Guard officers attended onboard to conduct a Port State Control Inspection of the Vessel.  During the inspection, no deficiencies were observed and/or identified by any Coast Guard or other inspection authority.

16.     Thereafter, a crew member passed a note to Coast Guard personnel, alleging that there was a "magic pipe"; meaning an alleged temporary modification of the Vessel's systems intended for use to bypass one piece of the ship's pollution prevention equipment, known as an Oil Water Separator ("OWS").

17.     The hoses which were alleged to have been used to create the bypass were not illegal, rather they were authorized shipboard hoses which were properly accounted for onboard and had various legitimate and ordinary uses in the engine room including, but not limited to, the proper and authorized transfer of fuel oil when changing consumption from regular to low sulfur diesel as per various applicable laws, regulations, and/or port practices.

18.     The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901-1915, *et seq*. is the United States codification of the international MARPOL treaty.

19.     MARPOL refers to two a multi-national treaties to which the United States is a party: (1) the 1973 International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, 1340 U.N.T. S. 184, and (2) the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, Feb. 17, 1978, 1340 U.N.T.S. 61.

20.     MARPOL is not a self-executing treaty; instead, each party agrees to "give effect" to it. MARPOL, art. 1(1), 1340 U.N.T.S. at 63, 184.  In particular, each party to the treaty agrees

to set up rules for ships that fly that party's flag and for ships that visit various port states around the world. *Id.* Art. 4(1), 1340 U.N.T.S. at 185-87.

21.    APPS provides for a cooperating witness to be rewarded by way of a cash payment of up to one-half (½) of a fine or penalty to be assessed.  *See* 33 U.S.C. 1908(a).

22.    In response to the "tip received from a crew member", the Coast Guard conducted an expanded MARPOL inspection to investigate the allegations.  Numerous additional Coast Guard officers and agents, including agents from the Coast Guard Investigative Service ("CGIS")[5], boarded the vessel and conducted parallel administrative and criminal investigations.

23.    Multiple interviews of the Vessel's crew were conducted onboard the Vessel by, among others, Coast Guard and CGIS agents.

24.    Throughout the course of the afternoon and evening of April 15, 2013, approximately ten (10) to twelve (12) USCG agents, officers, and/or inspectors attended and remained on board the Vessel until approximately 3:30 a.m. on Tuesday, April 16, 2013.

25.    The Coast Guard and CGIS boarding teams exercised immediate control over the Vessel; including taking over control of the Vessel's crew and the engine room.

26.    Additional comprehensive interviews of the Vessel's crew members were completed during the period of April 15 – April 16, 2013.

27.    During each and every interview conducted, the crew members consistently and unequivocally confirmed that any alleged illegal activity had been purposefully and specifically hidden from, among others, the Plaintiff (*i.e.* – the Owner of the Vessel), the Vessel's ISM Manager Kassian, the Captain (as the person in charge of the vessel), the Vessel's Designated

---

[5] The Coast Guard Investigative Service is a federal law enforcement agency established to carry out the Coast Guard's internal and external criminal investigations.  *See* www.uscg.mil/hq/cg2/cgis/.

Person Ashore[6], as well as the crew members' own employment manning agent(s) and trade union representatives.

28.     No evidence was obtained from any crewmember to suggest, let alone establish, that the alleged misconduct and corresponding record keeping violations were done at the request of Plaintiff or otherwise in the course and scope of any of the crew members' employment.

29.      No evidence was obtained from any crewmember to suggest, let alone establish, that the alleged misconduct and corresponding record keeping violations were done at the request of Plaintiff or otherwise with the intent to benefit the crew members' employer, Plaintiff Angelex.

30.     Over the next three (3) days, Wednesday April 17 to Friday April 19, 2013, the government, through its agents and employees, which among other agencies included the Coast Guard and CGIS continued its investigations and completed additional rounds of crew member interviews.

31.     The shipboard investigation and crew interview process was completed on or about April 19, 2013.   After this time, neither the Coast Guard nor CGIS nor any other government agent returned to the Vessel again to investigate the alleged shipboard misconduct.

32.     Ultimately, the United States, acting by and through the Coast Guard, CGIS, and others, alleged that there was *inter alia*, a bypass of the Oily Water Separator ("OWS") while in international waters, which was not recorded in the ship's Oil Record Book ("ORB").[7]

---

[6] Designated Person Ashore ("DPA") is an ISM mandated requirement to have an individual serve as the link between a vessel and shore-side staff.  The DPA is responsible for, *inter alia*, the verification of the implementation of the safety management system onboard the vessel.

[7] The U.S. does not have jurisdiction over the alleged discharge of untreated bilge water occurring in international waters.  The activity which runs afoul of United States law is the knowing failure to maintain an accurate ORB

33.     The government's investigation into the alleged conduct and interviews of all crew members, including those detained by the government and/or otherwise identified by the government as "cooperating witnesses," consistently and repeatedly testified:

    a.   None of the alleged bad acts were done in the course and scope of any of the crew members' employment;

    b.   None of the alleged bad acts were done by the crew members with the intent to benefit their employer Plaintiff Angelex;

    c.   All of the alleged bad acts were purposely hidden from Plaintiff as Owner of the Vessel, the ISM Manager Kassian, the Captain (as the person in charge of the Vessel), as well as superintendents, technical advisors, and other representatives of the Owner and ISM Manager of the Vessel;

    d.   That the alleged bad conduct was done with express knowledge that it was illegal, in contravention of the requirements of their employment contracts and in violation of the extensive training provided to each crew member both before and after going onboard to begin working, which included above industry standard MARPOL training, and the well-established shipboard policies, practices, and procedures implemented onboard the M/V ANTONIS G. PAPPADAKIS;

    e.   That the alleged bad acts were in contravention to their anti-pollution pledges which all crew members signed and agreed to report bad conduct, which could be done through various means (*i.e.* - phone call to the Vessel's designated person ashore or anonymous reporting box onboard the ship, etc.), without fear of retaliation or negative consequences;

    f.   That if the alleged bad acts were discovered by the Vessel's Captain or Owner, the offending individual(s) would be subject to in severe disciplinary action, including but not limited to termination and other additional personal consequences such as loss of licenses, arrest, and incarceration.

34.     Subsequent meetings and interviews of the crewmembers were conducted by DOJ attorneys and CGIS officers[8] over the course of the next few months.

---

while in United States waters.  *See* 33 U.S.C. §§ 1901-1915, *et seq.*, The Act to Prevent Pollution from Ships ("APPS").

[8] Plaintiff is aware of at least one (1) case agent, Special Agent Maria Milbourne.

35.     During all interviews, none of the crew member witnesses ever wavered on the fact that the alleged bad acts were purposefully hidden from the Owner Plaintiff Angelex, the ISM Manager, the Captain, the Vessel's DPA, the crew's own employment and manning agent, and trade union representatives, <u>and</u> that none of the alleged activity was done within the course and scope of their employment <u>and</u> was not done to benefit Plaintiff, Angelex (or Kassian).

36.     Notwithstanding the clear absence of **<u>any</u>** evidence to vicariously implicate Plaintiff[9] for either civil or criminal liability, the Captain of the Port gave notice, by letter dated April 19, 2013, that the Vessel was being detained pursuant to 33 U.S.C. § 1908(e) and that the departure clearance[10] for the Vessel could be reinstated only once "*. . . adequate surety has been provided to this office, we will notify CBP and request they grant departure clearance for M/V ANTONIS G. PAPPADAKIS."*  *See* copy of Captain of the Port Letter attached as **Exhibit 2**.

37.     When Plaintiff attempted to communicate with the Coast Guard's Fifth District Legal Office to make arrangements for security, Plaintiff was informed that no one had the necessary authority to discuss or negotiate the required bond or other "surety" satisfactory to the Secretary at that time.

### *<u>Surety Negotiations</u>*

38.     The government's conduct evinced no intention of timely and/or meaningfully *negotiating* "surety" that would serve the stated purpose of APPS, *i.e.* to ensure the payment of a

---

[9] Although Kassian was also charged and indicted, there was no personal jurisdiction over Kassian (*see* ¶¶ 10-13, *supra*) and the crew members were clearly the employees of Plaintiff Angelex, as reflected in the employee contracts which the government demanded and Plaintiff readily provided.  Kassian timely moved to dismiss the indictment for lack of jurisdiction.  The District Court reserved decision on the motion, which was ultimately rendered moot once the jury acquitted Kassian. *USA v. Kassian, et al.*, 13-cr-70, Doc. 24 (E.D. Va. 2013).

[10] Pursuant to 46 U.S.C. § 60105(b) (2014), a foreign-flagged ship must maintain its departure clearance from CBP before it may depart a U.S. port. The Coast Guard may request CBP to withhold such clearance when reasonable grounds exist to suspect an APPS violation and CBP "shall refuse or revoke the clearance required by section 60105 of title 46. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." *See* 33 U.S.C. § 1908(e).

potential fine or penalty.  *See* Legislative History of APPS, House Report No. 96-1224 reprinted in 1980 U.S.C.C.A.N. 4849, 4864 (To ensure payment of any fine or civil penalties that might be incurred upon completion of criminal proceedings or civil penalty actions, the Secretary of Treasury is required to refuse or revoke clearance to any ship upon the request of the Secretary of Transportation. However, clearance may be granted upon filing a bond or other satisfactory security).

39.    Rather, the government's proposed "Agreement on Security" sought the purported "agreement" of Angelex (the owner of the Vessel and employer of the crew), and Kassian to unauthorized, unreasonable, and excessive terms and conditions.

40.    The quantum of the demanded bond was unreasonable as, *inter alia*, it grossly exceeded the maximum potential criminal fine or civil penalty that Angelex would have been required to pay even if found vicariously liable for the alleged APPS violation.

41.    The quantum demanded was also well in excess of Angelex's financial ability to pay (essentially asking for a pretrial sanction that the Court itself could not have imposed even if Angelex had been found guilty).

42.    The government further unreasonably conditioned the return of the Vessel's departure clearance on the agreement of a third-party, Kassian, voluntarily submitting to the jurisdiction of the Court and agreeing to be jointly and severally liable to all terms and conditions in the Security Agreement demanded by the government despite the fact that there was no jurisdiction over Kassian; it had no ownership interest in the Vessel; it was not the employer of the crew; and no evidence existed that Kassian had any involvement or knowledge of the alleged bad act(s).

43.     The government further demanded Angelex (and Kassian) to "agree" to  several other non-negotiable and unreasonable terms and conditions, including *inter alia*,:

    a.  Requiring Angelex to interfere with the rights and personal liberties of the crew members by forcing seven foreign national seafarers (with no ties to the United States) to disembark the Vessel, surrender their passports, and remain in the Eastern District of Virginia to be detained for an unspecified and unlimited amount of time at the pleasure of the government;

    b.  Requiring Angelex to agree to house the crew members during the pendency of the action;

    c.  Requiring Angelex to provide a grossly disproportionate daily food per diem (*i.e.* 75.00 per day) for each of the crew members during the pendency of the action;

    d.  Requiring Angelex to continue to pay "total wages" (including basic wages, fixed and guaranteed overtime, supplemental wages, holiday pay, etc.); provide benefits and healthcare; and to employ the crew members to be detained by the government for an indefinite and unlimited amount of time (all without regard or respect to the terms and conditions of their individual employment contracts) who were all potential targets and/or witnesses for the government's investigation;

    e.  Requiring Angelex to bear the costs and expenses of repatriation of each detained crew member at the government's direction;

    f.  Requiring an express waiver of available jurisdictional defenses by Angelex;

    g.  Requiring an express waiver of available jurisdictional defenses by Kassian;

h.  Requiring Angelex to agree to bring a custodian of records to the United States to testify before a grand jury;

i.  Requiring Kassian to agree to bring a custodian of records to the United States to testify before a grand jury;

j.  Requiring Angelex to waive challenges to the authenticity of <u>all</u> documents, physical evidence, and other items seized from the Vessel as business records of Plaintiff and Kassian;

k.  Requiring Kassian to waive challenges to the authenticity of <u>all</u> documents, physical evidence, and other items seized from the Vessel as business records of Plaintiff and Kassian;

l.   Requiring Angelex to agree to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and were not in the United States at the time the subpoenas are issued;

m.  Requiring third-party Kassian to agree to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and were not in the United States at the time the subpoenas are issued;

44.    None of these unreasonable terms and conditions demanded in the Agreement on Security fall within the legislative history and/or otherwise furthers the purpose of APPS (or had anything to do with securing the payment of a fine or civil penalty).

45.     Rather, the non-negotiable terms demanded were accommodations to facilitate the government's prosecution of Angelex, one or more of its employee(s), and Kassian (an entity for which no jurisdiction existed).

46.     Plaintiff Angelex provided the government with documentation concerning its financial status and its limited financial means.  *See* correspondence providing financial documents to government attached as **Exhibit 3**.

47.     Specifically, Plaintiff provided copies of its corporate financial and tax documents, which demonstrated Angelex's lack of ability to meet the unreasonable and excessive fiscal security demanded by the Coast Guard. *Id*.

48.     Angelex also provided an uncontested copy of a valuation of the Vessel which demonstrated that the 1995 Vessel was worth approximately USD 6,500,000 and evidence of an outstanding and preferred ship mortgage[11] in the amount of USD 10,950,000 (approximately) encumbered the Vessel.

49.     At the request of the Coast Guard, Kassian also voluntarily provided its corporate financial records.

50.     Kassian's financials also clearly evinced its inability to meet the security quantum demanded and inability to be jointly and severally liable for the other monetary and non-monetary terms demanded.

51.     Notwithstanding, the Coast Guard issued a "take-it-or-leave-it" demand that the purported Agreement on Security be agreed by Angelex and Kassian and that the bond in the

---

[11] As District Judge Doumar held, "Even if it was able to auction the vessel and recover full appraisal value (approximately $6.5 million), the Coast Guard still would not recover any fines or civil penalties owed. After any expenses of justice during *custodia legis*, any seamen's wage liens, and satisfaction of the outstanding $10.65 million preferred mortgage lien on the ship, there would be nothing left to pay any fine or civil penalties assessed for violation of federal statutes." *Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846, *16 (E.D. Va. 2013) (citations omitted).

amount of Three Million Dollars (USD 3,000,000.00)[12] be posted jointly and severally (and all other unreasonable and objectionable terms to be joint and several obligations) as security for the reinstatement of the Vessel's departure clearance.

52.     The quantum of financial security demanded was grossly disproportionate and wholly unreasonable considering:  Plaintiff's financial assets;  the value of the Vessel; the mortgage encumbrance on the Vessel; the fact that the maximum APPS fine or penalty which could have been enforced against the Vessel's Owner was statutorily capped at USD 1,500,000 (and amount which is grossly disproportionate to the likely fine which would have been imposed, assuming conviction on all possible APPS counts);[13] Kassian was not the employer; Kassain was not subject to the Court's personal jurisdiction; and Kassian had no proprietary interest in the Vessel (or crew).

53.     The Coast Guard refused to negotiate on the quantum of the bond; refused to negotiate on any other unreasonable and objectionable terms; and rebuffed all offers by Angelex to obtain the release of the Vessel.

54.     The Coast Guard was put on notice that the unreasonable delay and detention of the Vessel due to the unreasonable requirements demanded, including but not limited to the disproportionate and unattainable bond and other unreasonable and objectionable terms, was causing Angelex significant losses, expenses, and costs each day that the Vessel remained fully

---

[12] The demand for a "surety bond" in the amount of USD 3,000,000 is the equivalent of requiring cash to be deposited into the Registry of the Court.  Specifically, International Sureties, the premier maritime bonding company that arranges for U.S. Treasury approved sureties to provide an acceptable bond, requires cash collateral equal to the value of the bond.   This policy has been standard procedure for sureties since the financial crisis of 2008.  Said another way, the only way to obtain a bond is by actually having the cash on hand in an amount equivalent to the bond, plus the annual premium (normally 1% to 2% per annum depending on the amount of the bond).

[13] *See USA v. Diana Shipping Services S.A.*, Doc. 146, 149, 13-cr-40 (E.D.Va. Dec. 6, 2013) (District Judge Mark Davis, the District Judge assigned to the underlying criminal case, subsequently sentenced a convicted shipping company - Diana Shipping - to a USD 100,000.00 fine for each of the three (3) APPS counts (as well as each of the other eight (8) felony counts the company was convicted)).

laden with cargo yet sitting idle in Norfolk and unable to engage in her regularly scheduled voyage and trade, as the M/V ANTONIS G. PAPPADAKIS was the only income earning asset of Plaintiff Angelex.  *See* **Exhibit 4**.

### *District Court Proceedings:*

55.    Unable to progress any sort of meaningful negotiation, given the Coast Guard's "take-it-or-leave-it" demand for surety,  and having reached an impasse, on or about April 25, 2013 Plaintiff had no option but to file an Emergency Petition with the District Court for the Eastern District of Virginia to set an appropriate bond for the reinstatement of the Vessel's departure clearance.

56.    Following the filing of the Emergency Petition, the Coast Guard made its one and only concession in lowering the quantum demanded for the security bond to the still unattainable amount of USD 2,500,000 along with the demand that it be posted jointly and severally by Angelex and Kassian.

57.    All other unreasonable demands remained; including insistence that defenses be waived (including Kassian's personal jurisdiction defense), and that Angelex (and Kassian) interfere with the rights and liberties of certain members of the crew.

58.    Plaintiff countered in good faith to provide a surety bond in the amount of USD 1,500,000 and agreed to accept all of the other unreasonable terms and conditions, but the Coast Guard again unreasonably refused to accept the USD 1,500,000 as substitute security and continued to insist, *inter alia*, that Kassian be jointly and severally included in the agreement and expressly waive all jurisdictional defenses.

59.    The refusal by the Coast Guard to accept a bond posted by the Owner in the amount of USD 1,500,000 was facially unreasonable.

60.     Angelex's offer represented the absolute maximum fine which could have been imposed on Angelex in the (very) unlikely event that Angelex would be vicariously convicted on each MARPOL/APPS counts alleged and assuming that the Court would fail to group any of the charges, which it must do and would actually impose a maximum penalty.[14]

61.     The government unreasonably maintained its opposition to Plaintiff's petition on the argument that the minimum acceptable bond for security was USD 2,500,000, as security had to be jointly and severally posted on behalf of both Angelex (as Owner) and Kassian, the ISM Manager (as "Operator"); and it was necessary for Kassian to waive personal jurisdiction defenses, even though it was clear Kassian had no proprietary interest in the Vessel, was not the employer of the crew members, the Court had no personal jurisdiction over Kassian as Manager, and there was no evidence to implicate either Angelex or Kassian.

62.     District Judge Robert Doumar held a hearing on May 6, 2013 on Angelex's emergent petition to set a bond and authorize the reinstatement of the Vessel's departure clearance.

63.     At the hearing, the government reiterated its position, contrary to the requirements of 33 U.S.C. § 1904(h), that there was no requirement for the Coast Guard to be reasonable in the first instance with respect to the quantum of the bond to be posted or its requirements in determining what would be "surety satisfactory to the Secretary." *See* 33 U.S.C. § 1908(e).

---

[14] APPS provides that the maximum civil penalty for a false record book is USD 5,000, or a maximum criminal fine up to USD 500,000 per violation. *See* 33 U.S.C. 1908(a).  Under 33 U.S.C. 1908(a), it is a class D felony to knowingly violate the provisions of MARPOL. "A Class D felony is punishable by…a fine of up to USD 250,000 for an individual, and USD 500,000 for a corporation." *See* U.S.C. § 1908 (a); 18 U.S.C. § 3559(a)(4); 18 U.S.C. § 3571(b)(3); 18 U.S.C. § 3571(c)(3).  Angelex would have been a first time offender and there have been no cases which went to trial which resulted in a maximum fine for any first time offender.

64.     The government's position was clearly set forth by its counsel during the hearing held before USDJ Doumar.  The following exchange between the Court and AUSA DiLauro, counsel for the government, took place:

> The Court:      So the Coast Guard doesn't have to be reasonable, do they? They can do anything they want, can't they?
> Mr. Dilauro:   I think they can - -
> The Court:      They could set a bond for $200 million couldn't they?
> Mr. Dilauro:   I believe that's correct, Your Honor.

*See* 2:13-cv-237, May 6, 2013 Transcript, p. 28, ln. 7-14. Excerpt attached hereto as **Exhibit 5**.

65.     At the hearing, the District Court urged and re-urged the parties to try to negotiate a resolution.

66.     After a break in the proceedings to allow the parties to progress negotiations, an agreement-in-principle was concluded between Angelex and LCDR Andrew Grant, the lead Coast Guard counsel assigned to the matter from the Coast Guard Fifth District Legal Office. Counsel negotiated an agreement whereby the Vessel's departure clearance was to be reinstated.

67.     However, once the hearing resumed, AUSA Dilauro, from DOJ Headquarters in Washington D.C. advised that Court that an agreement could not be reached as Coast Guard "Headquarters" would not accept anything below USD 2,500,000, previously demanded plus all other terms and conditions previously sought from Angelex and Kassian jointly and severally.

68.     The government acted unreasonably when it rejected resolution of the terms to be included in the Agreement on Security which were recommended by District Judge Doumar.

69.     On May 8, 2013, District Judge Doumar issued an Order and Opinion setting a bond at USD 1,500,000 for the reinstatement of the departure clearance of the M/V ANTONIS G. PAPPADAKIS.

70.     The District Court made several findings of fact and conclusions of law which succinctly outlined the unreasonableness of the position by the government to condition the release of the Vessel upon the posting of an unattainable USD 2,500,000 bond.  These included *inter alia*, (1) the government's efforts to seek to impose conditions which were not designed to assure payment of a fine or penalty, but rather to facilitate prosecution of a criminal or civil case; (2) requiring a bond in excess of the maximum statutory fine which could be imposed even if convicted (and well beyond any likely fine to be imposed even assuming convictions on all APPS counts); (3) requiring a bond which was excessive and unreasonable in light of the known financial capabilities of Angelex as Owner to post a bond; and (4) requiring a bond which would "substantially jeopardize" the continued viability of a lawful business. *Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846, *27-28 (E.D. Va. 2013).

71.     The government did not challenge any of these findings of fact and/or conclusions of law by Judge Doumar either at the time of the hearing or in its appeal to the Fourth Circuit Court of Appeals.

72.     The District Court further concluded that the unreasonable position of the Coast Guard and advocated by the government was "repugnant to the Constitution" and that "[i]n more than thirty years on the bench, this Court can recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion." *See Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013)(emphasis added). Again, neither of these factual findings were challenged by the government either before the District Court or on appeal to the Fourth Circuit.

17

**Government's Emergency Appeal**

73.     On May 9, 2013, the government filed an emergency application with the Fourth Circuit Court of Appeals seeking to stay the Order of District Judge Doumar and further unreasonably delayed the Vessel.

74.     The Fourth Circuit Court of Appeals set the matter for expedited briefing and consideration and held oral argument on the appeal at a special session of the Fourth Circuit in Lewisburg, West Virginia on June 25, 2013.

75.     Ultimately, the Fourth Circuit Court of Appeals reversed the District Court, finding the Coast Guard had authority in the first instance to detain the Vessel, but cautioned the government that it must act reasonably and confirmed that Angelex is entitled to seek the "after the fact" statutory remedy hereunder applied for, to wit, to receive compensation payable under 33 U.S.C. 1908(e) for unreasonable delay and/or detention. *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. 2013).

76.     The M/V ANTONIS G. PAPPADAKIS was unreasonably detained and delayed by the government within the port of Norfolk throughout the summer of 2013 with a full load of coal on board, for over 170 days; wasting as an asset with her Owner incurring significant daily losses, fees, expenses, and costs as a result.

77.     The continued detention of the fully laden vessel under the facts and circumstances known to the government at the completion of its onboard investigation, during the surety negotiations and beyond was unreasonable as it caused damages and costs to not only Angelex as Owner of the Vessel, but the Vessel's time charterer, the shipper of the cargo of coal, and the third party beneficiaries, receivers, and end users of the cargo abroad.

78.     The government continued to detain the Vessel while pursuing the unsuccessful vicarious prosecution of Angelex (and the unsuccessful prosecution of Kassian) in spite of the express knowledge and ample evidence at its disposal that there was no reasonable basis to pursue a vicarious prosecution at all, as the government would not have been able to obtain and sustain any vicarious claim against Plaintiff (or Kassian).

79.     Specifically, the government had in its possession the evidence from interviews with crew members during the week of April 15-19, 2013, evidence which included the rough notes of interviews with cooperating witness crew members from April 15 – 19, 2013, which showed without ambiguity that none of the alleged bad conduct was done within the course and scope of the crew members' employment and none was done with intent to benefit Angelex.[15]

80.     The government unreasonably refused to reconsider its position despite many requests by Angelex to do so throughout the unreasonable delay and detention of the Vessel.

81.     On September 13, 2013, following a nine (9) day trial and two (2) days of deliberations, the jury returned not-guilty verdicts on all eight (8) felony counts vicariously pursued against Angelex.   Kassian was also acquitted of the same eight (8) felony counts vicariously pursued by the government against it.   The jury further acquitted the Chief Engineer of conspiring with Angelex (and/or Kassian).[16]

---

[15] Plaintiff was required to seek the production of these notes through formal motion and over the objection of the government.   Once ordered by the Court to produce, the rough notes confirmed that the government knew from the beginning; that its detention of the Vessel was unreasonable as the prosecution of Angelex was destined to fail since the government could not meet the standard for criminal vicarious liability.

[16] The Chief Engineer was convicted on seven (7) other charges for his failure to maintain an accurate ORB and obstruction of justice (for his falsification of the ORB and directing the crew members not to cooperate with the Coast Guard).   At sentencing, the counts were grouped and the Chief Engineer received a sentence of one (1) year of probation to be served concurrently for all seven (7) counts and as a special condition of probation requiring that he serve four (4) months in community confinement at Rehabilitation Services Inc., in Norfolk, Virginia. Thereafter, he returned to Greece. *See USA v Katsipis*, Doc. 119, 13-cr-70 (E.D.Va. Dec. 12, 2013).

82.     Three (3) days later, on September 16, 2013, the Coast Guard finally confirmed that the Vessel's departure clearance would be reinstated, and that the Vessel could depart the jurisdiction.

83.     As a result of the unreasonable detention and delay, the Vessel earned no fees and was off-hire from April 16, 2013 – October 3, 2013, when she was finally put back into sea service and able to continue her journey and trade.

84.     In addition, Angelex, as owner was forced to incur substantial costs, fees, expenses, including significant damages claimed by the owner of the cargo onboard the Vessel.

## UNREASONABLE DELAY AND DETENTION

85.     Plaintiff incorporates by reference and re-alleges as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

86.     Plaintiff is the Owner of the M/V ANTONIS G. PAPPADAKIS, which was unreasonably detained and delayed pursuant to the Coast Guard's "egregious abdication of the reasonable exercise of discretion" (*See Angelex Ltd.*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013)), under 33 U.S.C. § 1908(e) for the period of 154 days running from at least April 15, 2013 – September 16, 2013.

87.     Plaintiff is pursuing this action for compensation as authorized by statute, 33 U.S.C. § 1904(h); acknowledged by the government to be available as an "after-the-fact" remedy; and approved by the Fourth Circuit Court of Appeals as the appropriate remedy under the facts and circumstances of this matter.

88.     If even required, Plaintiff has complied with the commencement requirements of 33 U.S.C. § 1910(b) by providing written notice of its claim for compensation to the Coast Guard on May 1, 2014.  *See* **Exhibit 1**.

89.     At the request of the Coast Guard Office of Claims and Litigation, Plaintiff provided a Supplemental Letter on July 21, 2014, summarizing Plaintiff's claim, including *inter alia*, losses of contractual daily revenue, other earnings, incurred expenses, and costs in an amount calculated to be approximately **USD 4,179,907.44** (exclusive of interest, costs, and fees in pursuing this claim).  A copy of Plaintiff's July 21, 2014 Letter summarizing Plaintiff's losses, costs, and expenses caused by the unreasonable detention and delay of the Vessel is attached as **Exhibit 6**.

90.     As will be set out in greater detail at trial, the government's detention and delay of the M/V ANTONIS G. PAPPADAKIS was unreasonable for numerous reasons, including but not limited to the following:

A.     The government withdrew and refused to reinstate the Vessel's departure clearance unless the Vessel's owner Angelex and a third-party Kassian (as ISM Manager pursuant to a contract with Angelex) acceded to several non-negotiable demands wholly unrelated to monetary security for the payment of civil penalties or fines, contrary to the requirements of the statute that authorizes both the detention and the release against security.  These unreasonable requirements included:

1.   Requiring Angelex to interfere with the rights and personal liberties of the crew members by forcing seven foreign national seafarers (with no ties to the United States) to disembark the Vessel, surrender their passports, and remain in the Eastern District of Virginia to be detained for an unspecified and unlimited amount of time at the pleasure of the government;

2.   Requiring Angelex to agree to house the crew members during the pendency of the action;

3.   Requiring Angelex to provide a grossly disproportionate daily food per diem (*i.e.* 75.00 per day) for each of the crew members during the pendency of the action;

4.   Requiring Angelex to continue to pay "total wages" (including basic wages, fixed and guaranteed overtime, supplemental wages, holiday pay, etc.); provide benefits and healthcare; and to employ the crew members to be detained by the government for an indefinite and unlimited amount of time (all without regard or respect to the terms and conditions of their individual employment contracts) who were all potential targets and/or witnesses for the government's investigation;

5. Requiring Angelex to bear the costs and expenses of repatriation of each detained crew member at the government's direction;

6. Requiring an express waiver of available jurisdictional defenses by Angelex;

7. Requiring an express waiver of available jurisdictional defenses by Kassian;

8. Requiring Angelex to agree to bring a custodian of records to the United States to testify before a grand jury;

9. Requiring Kassian to agree to bring a custodian of records to the United States to testify before a grand jury;

10. Requiring Angelex to waive challenges to the authenticity of <u>all</u> documents, physical evidence, and other items seized from the Vessel as business records of Plaintiff and Kassian;

11. Requiring Kassian to waive challenges to the authenticity of <u>all</u> documents, physical evidence, and other items seized from the Vessel as business records of Plaintiff and Kassian;

12. Requiring Angelex to agree to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and were not in the United States at the time the subpoenas are issued;

13. Requiring third-party Kassian to agree to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and were not in the United States at the time the subpoenas are issued;

B.      The government conditioned the reinstatement of the Vessel's departure clearance on the posting of a bond in the excessive amount of USD 2,500,000 which as the District Court properly found, was "beyond the financial wherewithal" of Angelex (and Kassian) as set out in the persuasive evidence included in the record and which far exceeded the maximum fines imposed in similar cases.

C.      The government conditioned the reinstatement of the Vessel's departure clearance upon the posting of a bond in excess of the maximum fine which could have been imposed upon the Vessel, even if the alleged acts were proven in a criminal trial.

D.      The Coast Guard refused to approve a negotiated amount of security recommended by the government's own trial counsel in the midst of the emergency hearing held before District Judge Doumar on May 6, 2013.

E.      The government unreasonably abused the authority to detain a Vessel and release upon the filing of a bond or other surety satisfactory to the Secretary to ensure payment

of any fine or penalty to be imposed against the Vessel owner, by arbitrarily refusing to make a reasonable demand for security and in doing so exercising undue economic coercion by blocking and shutting down the only income earning asset of Angelex, without due process of law.

F.      The government conditioned the reinstatement of the Vessel's departure clearance on the requirement that Kassian jointly and severally be included in the bond despite the fact that: 1) Kassian had no proprietary interest in the Vessel; and 2) there was no personal jurisdiction over Kassian.

G.      The government continued to detain the Vessel to pursue charges for criminal vicarious liability in spite of clear and incontrovertible evidence that there was no good faith facts or basis to pursue a vicarious liability prosecution.

H.      The government had evidence that all alleged acts were purposefully concealed from Angelex (and Kassian), including all of their respective representatives, superintendents, supervisors, inspectors, etc.

I.      The government refused to reconsider the prosecution and evidence when it became clear that there was no evidence that a criminal conviction for vicarious liability could be attained since all of the crew members acknowledged that the alleged acts were not done within the course and scope of their employment **and** were not done with the intent to benefit their employer Angelex.

91.     The actions of the Department of Homeland Security, the United States Coast Guard, the Customs and Border Protection Agency, and the Department of Justice are attributable to the United States.

92.     On September 19, 2014, the Coast Guard Office of Claims and Litigation denied Plaintiff's claim and confirmed that the decision was "the final agency action" on the claim.  The United States has not provided Plaintiff with just compensation for the unreasonable delay and detention of the M/V ANTONIS G. PAPPADAKIS, despite due demand. *See* **Exhibit 1** and **Exhibit 6**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on their behalf, against the defendant, adjudging and decreeing that:

A. Defendant unreasonably detained and/or delayed Plaintiff's Vessel the M/V ANTONIS G. PAPPADAKIS;

B. Judgment be entered against the defendant and in favor of Plaintiff for compensation for the losses, expenses, damages, and costs as a result of the unreasonable detention and delay of the Vessel, together with the costs of suit, including reasonable attorneys' fees (*see* 33 U.S.C. § 1910(d));

C. Plaintiff be awarded just compensation for its losses, expenses, and costs;

D. Plaintiff be granted such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: October 16, 2015
      Oyster Bay, New York

Respectfully submitted,

**CHALOS & CO, P.C.**

/s/ George M. Chalos
George M. Chalos
Bar ID 1011459
55 Hamilton Ave,
Oyster Bay, NY 11771
Tel:    516-714-4300
Fax:   516-750-9051
Email: gmc@chaloslaw.com

*Attorneys for Plaintiff Angelex Ltd.*

# Exhibit 1



**CHALOS & CO. P.C.**
International Law Firm

55 Hamilton Avenue, Oyster Bay, New York 11771
TEL: +1-516-714-4300 • FAX: +1-516-750-9051 • WEB: www.chaloslaw.com • EMAIL: info@chaloslaw.com

<u>May 1, 2014</u>

*Via Federal Express and Email*

To:   **The Honorable Eric H. Holder, Jr.**
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington D.C. 20530

**The Honorable Jeh Charles Johnson**
Secretary of Homeland Security
U.S. Department of Homeland Security
Washington D.C. 20528

**Commandant Robert J. Papp, Jr.**
United States Coast Guard
Coast Guard Headquarters
2100 Second Street, SW, Stop 7000
Washington D.C. 20593-7000

Re:   **In Re MV ANTONIS G. PAPPADAKIS**
Unreasonably Detained and/or Delayed at Sector Norfolk from April 15, 2013 –
September 16, 2013

Dear Sirs:

     We, on behalf of our client, Angelex Ltd. (hereinafter "Owner"), Owner of the M/V
ANTONIS G. PAPPADAKIS, IMO number 9087271, call sign 9HVT8, and Maltese Flag ("the
Vessel"), do hereby put the government on notice that our client will be pursuing a claim for
compensation for the unreasonable detention of the Vessel during the period of April 15, 2013 –
September 16, 2013. Owner's claim is made pursuant to, The Act for the Prevention of Pollution
from Ships (hereinafter "APPS"), 33 U.S.C. § 1901 *et seq.*, at 33 U.S.C. § 1904(h), which
provides in relevant part: "A ship unreasonably detained or delayed by the Secretary acting under
the authority of this chapter is entitled to compensation for any loss or damage suffered thereby."
*Id.*

1



The government's detention and delay of the M/V ANTONIS G. PAPPADAKIS was unreasonable for numerous reasons, including but are not limited to:

A. The government withdrew and refused to reinstate the Vessel's departure clearance unless Angelex and her ISM Manager acceded to several non-negotiable and unreasonable terms and conditions (which have nothing to do with payment of fine or civil penalty and do not serve to stand as a substitute for the continued presence of the vessel and/or witnesses within the jurisdiction). These conditions included:

    1. Forcing seven foreign national crewmembers (with no ties to the United States) to disembark from the vessel and remain in the Eastern District of Virginia to be detained for an unspecified and unlimited amount of time;

    2. Angelex agreeing to house, feed, continue to pay (including total wages, benefits, and healthcare), and employ the crewmembers (irrespective of the terms and conditions of their individual employment contracts) who were potential targets and witnesses for the government's investigation;

    3. Angelex agreeing to bear the costs and expenses of repatriation of the crewmembers;

    4. Angelex agreeing to bring a custodian of records to the United States;

    5. Angelex agreeing to stipulate to the authenticity of all documents and items seized from the vessel;

    6. Angelex agreeing to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and not in the United States at the time the subpoenas are issued;

    7. Angelex agreeing to waive all jurisdictional defenses;

B. The government conditioned the reinstatement of the Vessel's departure clearance on the posting of a bond in an unattainable amount of USD 3,000,000, which was subsequently nominally lowered to the still unattainable[1] amount of USD 2,500,000.

C. The government conditioned the reinstatement of the Vessel's departure clearance upon the posting of a bond well beyond the quantum of the fines imposed in similar cases.

D. The government conditioned the reinstatement of the Vessel's departure clearance upon the posting of a bond in excess of the maximum fine which could have been imposed upon the Vessel, even if the alleged acts were proven.

E. Coast Guard Headquarters refused to approve settlement terms agreed by trial counsel for the government during the emergency hearing held before District Judge Doumar on May 6, 2013.

---

[1] The Coast Guard and the Department of Justice were provided with comprehensive financial records for both Angelex and the ISM Manager; all of which demonstrated that the bond quantum sought was unreasonable and unattainable, as well as disproportionate to the conduct at issue and corresponding fine/penalty to be imposed, assuming *arguendo* liability.

2



CHALOS & CO, P.C.
International Law Firm

F.  The government contested Angelex' challenge to the final agency action of the Coast Guard and maintaining the position that Angelex must pursue a lengthy (at least one (1) year) and futile administrative appeal process; when the decision on the terms of the surety demand were dictated by the highest level of Coast Guard Headquarters, specifically, the Chief of Maritime and International Law Division.

G.  The government exercised economic coercion by detaining the Vessel which was the only income earning asset of Angelex, without due process.

H.  The government conditioned the reinstatement of the Vessel's departure clearance on the requirement that the ISM Manager jointly and severally be included in the bond despite the fact that: 1) The ISM Manager had no proprietary interest in the vessel; and 2) That there was no personal jurisdiction the ISM Manager. *See In re: MS "ANGELN" GMBH & CO. KG v. Bernuth Lines Ltd.*, 2013 U.S. App. LEXIS 2378 (2d Cir. 2013); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 128 (2d Cir. 2008).

I.  The government continued to detain the Vessel to pursue charges for criminal vicarious liability despite receiving clear and incontrovertible evidence that there was no basis to pursue a vicarious liability prosecution.

J.  The government continued to detain the Vessel while pursuing the criminal charges despite the government's lack of a good faith basis or evidentiary support for vicarious charges given the government's investigation which revealed that all witnesses, including the government whistleblower witnesses, confirmed *inter alia*: 1) that the alleged activities were not done, if at all, as part of their employment and/or with the intent to benefit Angelex; 2) if done, were hidden from the Owner, the ISM Manager, the Captain and third party representatives including superintendents, technical advisors, and other representatives of the Owner and Manager of the Vessel; and 3) were in direct contravention to the training provided to each crewmember and the well-established shipboard policies, practices, and procedures.

K.  The government continued to detain the Vessel and pursue criminal charges despite the failure to preserve critical communications between the government investigators and the purported lead whistleblower during the investigation.

The foregoing is a representative sample of the conduct supporting a finding that the detention of the vessel was unreasonable and that Angelex is entitled to compensation for its damages. We encourage the government to take these allegations seriously and to contact the undersigned to attempt to amicably resolve this matter. As the government has itself advocated on the record and the Fourth Circuit Court of Appeals confirmed, Angelex is entitled to pursue this after-the-fact remedy in order to recover its damages incurred as a result of the unreasonable detention of the Vessel. *See Angelex Ltd. v. United States*, 723 F.3d 500 (4th Cir. Va. 2013) (citing 33 U.S.C. § 1904(h) and holding: **"This provision is, as the government asserts, an "after-the-fact damages remedy against the United States for unreasonable detention or delay."** Appellant's Br. 37. **This safeguard gives Appellees a remedy . . .")** (emphasis added)). Should trial become unavoidable, we have no doubt that the unreasonable and cavalier manner in which the government acted will be established both by the relevant facts and circumstances and

3



CHALOS & CO. P.C.
International Law Firm

the purposeful tactics employed by the government, which wholly disregarded Angelex' right to due process.

As a result of the unreasonable detention of the M/V ANTONIS G. PAPPADAKIS at Norfolk for the period of April 15, 2013 – September 16, 2013, Angelex Ltd. was caused damages, losses, and costs in an amount estimated to be no less than **USD 3,608,375.62**. *A spreadsheet of the compensatory damages caused by the unreasonable detention of the Vessel is attached hereto as Annex 1.* In accordance with the requirements of 33 U.S.C. § 1910, prior to the commencement of legal action, we, on behalf of Angelex, call upon the United States of America to respond to this demand and/or otherwise settle Angelex's claims on or before Monday, **June 30, 2014**.

The foregoing is without prejudice or waiver of Angelex Ltd.'s rights and claims, whether stated or unstated, for the unreasonable detention and delay of the M/V ANTONIS G. PAPPADAKIS and the damages sought, all of which are subject to revision up to and including the time of trial. We trust you will be guided accordingly.

Sincerely,

CHALOS & CO, P.C.

George M. Chalos
Briton P. Sparkman

cc:     **District Five Command Center**
        **United States Coast Guard**
        LCDR Andrew P. Grant, USCG
        LT Gretal G. Kinney, USCG
        LT Elizabeth A. Oliveira,
        District Five Legal
        431 Crawford Street
        Portsmouth, VA 23704-5004
        Email: Andrew.P.Grant@uscg.mil
               Gretal.G.Kinney@uscg.mil
               Elizabeth.A.Oliveira@uscg.mil


        **U.S. Department of Justice**
        **Environmental Crimes Section**
        Kenneth Nelson, Esq.
        Stephen DaPonte, Esq.
        P.O. Box 23985
        L'Enfant Plaza Station
        Washington, D.C. 20026-3985
        Email: Kenneth.Nelson3@usdoj.gov
               Stephen.DaPonte@usdoj.gov

4


CHALOS & CO, P.C.
International Law Firm

**U.S. Department of Justice**
**Civil Division – Trial Attorney**
Michael A. DiLauro, Esq.
1425 New York Ave. NW, Suite 10100
Washington, DC 20005
Email: Michael.DiLauro@usdoj.gov

**U.S. Department of Justice**
**Civil Division – Appellate Staff**
Matthew Collette, Esq.
Anne Murphy, Esq.
950 Pennsylvania Avenue, Room 7644
Washington, D.C. 20530
Email: Matthew.Collette@usdoj.gov
         Anne.Murphy@usdoj.gov

5

# ANNEX 1

| | | |
|---|---|---|
| Running costs | $ | 700,453.93 |
| Extra running costs | $ | 1,518,599.00 |
| Loss of Hire and Bunkers | $ | 2,163,475.77 |
| Usiminas Cargo Claim | $ | 531,520.83 |
| Speed Claim Brazil China | $ | 86,048.38 |
| Off Hire deductions in Brazil | $ | 9,185.57 |
| | | |
| Total | $ | 3,608,375.62 |

RUNNING COST 16/4-3/10/2013  M/V AGP

| | Item | Voucher # | | Amount $ |
|---|---|---|---|---|
| 1 | WAGES | Jan-16 | $ | 402,350.00 |
| 2 | NAT OWNER CONTRIBUTION | 15 | $ | 18,226.00 |
| 3 | VICTUALLING | 16-25 | $ | 39,394.41 |
| 4 | CREW TRAVELLING EXPS | 26-38 | $ | 14,626.00 |
| 5 | CREW  AGENT FEES | 39-44 | $ | 9,476.16 |
| 6 | MEDICAL EXPENSES | 45-46 | $ | 605.00 |
| 7 | ENGINE STORES | 47-51 | $ | 11,561.08 |
| 8 | CABIN STORES | 52-55 | $ | 4,261.20 |
| 9 | CHEMICALS | 56 | $ | 3,243.98 |
| 10 | ROPES | 57 | $ | 2,689.20 |
| 11 | ENGINE SPARES | 58-68 | $ | 10,952.45 |
| 12 | FORWARDING EXPENSES | 69-74 | $ | 2,302.11 |
| 13 | LUBRICANTS | 75-77 | $ | 6,275.50 |
| 14 | CLASSIFICATION | 78-81 | $ | 13,760.00 |
| 15 | MACHINERY | 82-93 | $ | 3,758.39 |
| 16 | CREW INSURANCE | 84-95 | $ | 2,520.00 |
| 17 | TICKETS/TRAVELLING | 96 | $ | 294.89 |
| 18 | DECK /NAVIGATION STORES | 97-104 | $ | 11,419.20 |
| 19 | CHARTS-PUBLICATIONS | 105-112 | $ | 1,734.84 |
| 20 | REPAIRS NAVIGATION | 113-114 | $ | 3,025.40 |
| 21 | REPAIRS/MANIT.SAFETY | 115-123 | $ | 7,988.42 |
| 22 | PROBATION EXPENSES | 124-133 | $ | 8,805.74 |
| 23 | SUNDRY GENERAL EXPS | 134-142 | $ | 669.08 |
| 24 | ISM/ISPS EXPENSES | 143-152 | $ | 5,142.10 |
| 25 | VESSELS CABLES | 153-163 | $ | 7,811.96 |
| 26 | VESSELS SUBSCRIPTIONS | 164-167 | $ | 1,371.82 |
| 27 | INSURANCES | | $ | 106,189.00 |
| | | | | |
| | TOTAL | | $ | 700,453.93 |

EXTRA RUNNING COSTS

| Item | Voucher# | Amount $ |
|---|---|---|
| WAGES | | $      54,649.00 |
| TRAVEL/ACCOMODATION | | $      79,257.00 |
| OTHER EXPS | | $      32,146.00 |
| ISM/ISPS EXPENSES | | $        6,879.00 |
| LEGAL EXPENSES | | $    564,344.00 |
| CONSULTANTS | | $      89,260.00 |
| CLASSIFICATION | | $      12,587.00 |
| MARPOL | | $        6,599.00 |
| ACCRUALS | | $      25,278.00 |
| AGENTS | | $    497,600.00 |
| EXTRA D/D EXPENSES | | $    150,000.00 |
| | | |
| TOTAL | | $ 1,518,599.00 |

|  | Debit | Credit |
|---|---|---|
| OH  at norfolk 16/04/13 0632-03/10/13 1435 170.33542ds @ $ 12,000.00 |  | $2,044,025.04 |
| 5% commission | $102,201.25 |  |
| cve |  | $7,000.09 |
| Floating Rate for 53rd hire period 28/09/2013-12/10/2013 3ds @ $ 1,693.30ds |  | $5,079.90 |
| 5% commission | $253.99 |  |
| lsfo 253.33mt @ $ 714.17 |  | $180,920.48 |
| lsfo 44.47mt @ $ 650.00 |  | $28,905.50 |
|  |  |  |
| Totals | $102,455.24 | $2,265,931.01 |
|  |  |  |
| Grand Total OH |  | $2,163,475.77 |

| OH Brazil |  |  |
|---|---|---|
| Lloyds Surveyor attendance Santos 08/11/2013 0200 - 08/11/2013 1400 |  |  |
| 0.5 days @ $12,000 |  | $6,000.00 |
| 5% commission | $300.00 |  |
| cve |  | $20.55 |
| Hull Cleaning Vitoria  28/11/13 1230 - 28/11/13 1900 |  |  |
| 0.270833 days @ $12,000 |  | $3,250.00 |
| 5% commission | $162.50 |  |
| IFO 0.52 mt @ $704.59 |  | $366.39 |
| CVE |  | $11.13 |
|  |  |  |
| Total | $462.50 | $9,648.07 |
|  |  |  |
| Grand Total OH |  | $9,185.57 |

# Exhibit 2

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Sector Hampton Roads

4000 Coast Guard Boulevard
Portsmouth, VA 23703
Staff Symbol: (s)
Phone: (757) 668-5555
Fax: (757) 483-8641

16200
April 19, 2013

Owner/Operator of M/V ANTONIS G. PAPPADAKIS, IMO 9087271,
ANGELEX LTD/KASSIAN MARITIME NAVIGATION AGENCY LTD,
c/o Eric Holland, Agent
 CAPES SHIPPING
1128 W Olney Road
Norfolk, VA23507

Dear Mr. Holland:

On or about April 15, 2013, the U.S. Coast Guard conducted a Port State Control examination on the M/V ANTONIS G. PAPPADAKIS at the Norfolk Southern terminal in Norfolk, Virginia. During the course of this examination, evidence was collected establishing reasonable grounds to believe that the M/V ANTONIS G. PAPPADAKIS violated the MARPOL Protocol, the Act to Prevention Pollution from Ships, 33 U.S.C. §1901 *et seq*.

A Federal District Court may assess a criminal penalty of not more than $500,000 in connection with each violation pursuant to 33 CFR 151.04(c) and 18 USC 3571(c) and (d) against the vessel *in rem* or against its owner or operator *in personam*. In accordance with 33 U.S.C. §1908(e), I requested that U.S. Customs and Border Protection (CBP) withhold the Customs departure clearance required by 46 U.S.C. §60105, (previously 46 U.S.C App. §91), for M/V ANTONIS G. PAPPADAKIS until this office receives surety satisfactory to the Secretary of Homeland Security. That Customs hold was approved by CBP on April 19, 2013.

I request that you forward my requirements of surety to the owner and/or operator of the M/V ANTONIS G. PAPPADAKIS or to their designated representative. When adequate surety has been provided to this office, we will notify CBP and request they grant departure clearance for M/V ANTONIS G. PAPPADAKIS.

If you have questions concerning our security requirements, please contact Lieutenant Elizabeth Oliveira of the Coast Guard's Fifth District Legal Office at (757) 398-6550.

Sincerely,

J. K. LITTLE
Captain, U. S. Coast Guard
Captain of the Port, Hampton Roads

Copy:   Commander, Fifth Coast Guard District (dl)
        U.S. Customs and Border Protection

# Exhibit 3

| | |
|---|---|
| **From:** | George M. Chalos <gmc@chaloslaw.com> |
| **Sent:** | Monday, April 22, 2013 10:28 AM |
| **To:** | elizabeth.a.oliveira@uscg.mil; andrew.p.grant@uscg.mil |
| **Cc:** | Briton Sparkman; 'George A. Gaitas' |
| **Subject:** | ANTONIS G PAPPADAKIS - at Norfolk - (URGENT ATTENTION & RESPONSE REQUIRED) |
| **Attachments:** | angelex.pdf; AG Pappadakis valuation.pdf |

<u>**URGENT ATTENTION REQUIRED**</u>

**WITHOUT PREJUDICE - FOR SETTLEMENT PURPOSES**

Dear Liz & Andrew –

I write further to my earlier telecon with Liz.  We continue to await the USCG's affirmative statement as to what, precisely, the USCG believes to be 'satisfactory surety'.  We are mindful of Liz's comments that she expects the USCG will request that the entire engine room staff and Master be disembarked and maintained by Owners and/or Operators within the District, as well as require a surety bond in the range of USD 3 mil – 4 million (among other terms to be discussed).

The investigation is now in its eighth day and the continued inability of the USCG to articulate its demands with any modicum of precision is now grossly unreasonable.  I remind you that the vessel is fully laden with cargo and all alleged deficiencies have or shortly will be fully rectified.  Again, we request the government's immediate attention to the matter.

As discussed, there is no way the Owner and/or Operator can meet the sort of demands Liz has articulated.  As I have shared with each of you, the Owner, Angelex Ltd, is in a dire financial condition.  We have received the most recent financial statements (attached) from Angelex for your immediate review and consideration.  As you will note, the company has merely USD 174k in free cash reserves on hand; has debts of over USD 10.5 million; and continues to endure the detritus of operating in a declining market for vessels of this particular type, design, build and age.  Additionally, we attach a vessel valuation prepared by Messrs. ICAP Shipping, a global leading ship brokerage company (www.icapshipping.com).  As you will note, the vessel has an estimated market value of USD 6.5 million and operates with a mortgage indebtedness of nearly twice such amount.

Finally, as we have discussed, the operator, Kassian Maritime Navigation Agency Ltd, owns no significant assets and, on balance, makes no significant net annual profit. Kassian provides vessel management services to vessel owners and, at present, operates eight (8) vessels for eight (8) customers.  In simple terms, Kassian, ostensibly, 'breaks even.'

We trust the foregoing and attached are clear and encourage the USCG to be reasonable both in its demands and expectations.  Again, we request your most urgent attention and clear statement of what, precisely, the USCG believes to be 'satisfactory surety.'

Time is of the essence.

Brgds/George

George M. Chalos, Esq.
CHALOS & Co, P.C. - International Law Firm

1

New York | Houston | Miami | Athens | Cyprus

55 Hamilton Avenue, Oyster Bay, New York 11771
Tel:  + 1 516 714 4300
Dir:  + 1 516 714 3040
Mob: + 1 516 721 4076
Fax: + 1 516 750 9051
Email: gmc@chaloslaw.com

Please visit our website at:  www.chaloslaw.com

# Exhibit 4

| | |
|---|---|
| **From:** | George M. Chalos <gmc@chaloslaw.com> |
| **Sent:** | Tuesday, April 23, 2013 9:11 PM |
| **To:** | elizabeth.a.oliveira@uscg.mil; andrew.p.grant@uscg.mil |
| **Cc:** | Briton Sparkman; 'George A. Gaitas' |
| **Subject:** | ANTONIS G PAPPADAKIS (Urgent Attention & Response Required) |

Hi Liz –

The matter has become quite serious, as it is clear that the USCG is acting arbitrarily and capriciously and unfairly punitive. The sort of 'rough justice' being extracted is completely out of order and unacceptable in all respects. As you know, the USCG case agent contacted the vessel's local agent early this morning in regards to paroling seven (7) crewmembers. After your office received our client's good faith proposal, the agent received another phone call from the USCG case agent advising that crew member paroles have been postponed indefinitely for "unknown reasons." What, precisely, was the reason? To delay the ship further and to commercially bully our clients to concede the USCG's demands?

As you know, our clients worked very hard overnight last night, April 22, to be able to make their best offer to you with a view towards amicably concluding an agreement on security. Their good faith efforts have not been reciprocated. A clear draft agreement (in track-change format) was sent to you this morning. The amended terms of the agreement were substantial similar to other agreements concluded with the USCG. Nevertheless, your purported response was received after office hours in the US and in the middle of the night abroad. Whilst our clients appreciate that there is an internal process you must follow, the delays are unreasonably long and unacceptable.

To be clear, we note that 'version 3' of the purported "agreement" you provided after hours this evening is simply the same as initial draft you initially proposed. The USCG has agreed to absolutely none of the terms our clients have proposed; save for correcting the place of Owner's office and the CG's mistaken identification of our law firm as "agent" as opposed to 'counsel' for the Owner and Operator. In your most recent message, you have confirmed that you 'cannot change' the agreement. Previously, you confirmed that you are receiving your instructions from the USCG headquarters. Regretfully, it appears that an irreconcilable impasse has been reached between our respective clients.

To that end, please accept this message as an emergent request for reconsideration of our clients' prior offer by the highest level of review within your chain of command. We look forward to confirmation that the USCG has accepted our client's proposal at or before 1000 hours tomorrow, April 24th; failing which our clients will have no choice but to pursue judicial intervention.


**George M. Chalos, Esq.**
CHALOS & Co, P.C. - International Law Firm
New York | Houston | Miami | Athens | Cyprus

55 Hamilton Avenue, Oyster Bay, New York 11771
Tel: + 1 516 714 4300
Dir: + 1 516 714 3040
Mob: + 1 516 721 4076
Fax: + 1 516 750 9051
Email: gmc@chaloslaw.com

Please visit our website at: www.chaloslaw.com

| | |
|---|---|
| **From:** | George M. Chalos <gmc@chaloslaw.com> |
| **Sent:** | Wednesday, April 24, 2013 10:44 AM |
| **To:** | elizabeth.a.oliveira@uscg.mil; andrew.p.grant@uscg.mil |
| **Cc:** | Briton Sparkman; 'George A. Gaitas' |
| **Subject:** | ANTONIS G PAPPADAKIS |
| **Attachments:** | Angelex Financial Statements - as of 4.22.13.pdf; agp-cp 30 may 2011 - ubci.pdf; AG Pappadakis valuation.pdf |

Liz –

Per our telecon and as per your request, attached please find the current charter party.  The agreed hire rate is significantly above today's market rate for a vessel of her age, design and build.  If Owners lose this charter, the current market will not support the vessel's daily running costs.  The market is simply 'that bad.' Parenthetically, the current charter party is due to expire in approximately two (2) months; following which the vessel is scheduled to go to dry dock.  Said another way, the financial future for this ship is very bleak.

Also, attached is the Angelex financial statements as of April 22.  There is approx. $770k in free cash on hand. As I have shared many times with you, our clients have put forward their very best proposal.  Specifically, our clients have proposed a $500k bond and have ear-marked the rest for the crew obligations the USCG has insisted upon and, as you have explained, 'cannot be changed.'

You are aware that the vessel's market value has been estimated to be approximately $6.5 million under a best case scenario.  As a courtesy, I attach another copy of the ICAP valuation.  As before, and as set out in the financials provided, this vessel is encumbered with $10.95 million in mortgage indebtedness.  Even the most unsophisticated financial analysis readily reveals the disparity between what has been demanded and what is, in fact, possible.

Again, our clients encourage you to 'check it out' for yourselves.  Here, none of the allegations have been proven and, in our view, the information learned during our continuing investigation suggests the allegations will prove to be unfounded . Notwithstanding, even assuming there is a conviction and a fine imposed in excess of $500k, it can only be satisfied if the company remains in business and can generate income.  We are confident that it is not the government's goal to put the Owner and/or Operator out of business at this stage of the proceeding.  Doing so would not further the USCG's stated goals and would serve absolutely no purpose at all except to render the hard work put in by both sides to date to be meaningless.

Please do the necessary on your end to obtain the requisite authority to appreciate the facts and circumstances of this particular matter, as a failure to do so could result in disasterous results for all concerned.

**George M. Chalos, Esq.**
CHALOS & Co, P.C. - International Law Firm
New York | Houston | Miami | Athens | Cyprus

55 Hamilton Avenue, Oyster Bay, New York 11771
Tel:  + 1 516 714 4300
Dir:  + 1 516 714 3040
Mob: + 1 516 721 4076
Fax: + 1 516 750 9051
Email: gmc@chaloslaw.com

Please visit our website at:  www.chaloslaw.com

# Exhibit 5

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                   Norfolk Division

3    - - - - - - - - - - - - - - - - - -
     ANGELEX LTD., as owner of the    )
4    M/V ANTONIS G. PAPPADAKIS, and    )
     the M/V/ ANTONIS G. PAPPADAKIS    )
5    in rem,                          )        CIVIL CASE NO.
                                      )           2:13cr237
6         Petitioners,                )
                                      )
7    v.                               )
                                      )
8    UNITED STATES OF AMERICA,         )
     et al.                           )
9                                      )
          Respondents.                )
10   - - - - - - - - - - - - - - - - - -

11

12                TRANSCRIPT OF PROCEEDINGS

13               Newport News, Virginia

14                    May 6, 2013

15

16   BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
               United States District Judge
17

18   APPEARANCES:

19            UNITED STATES ATTORNEY'S OFFICE
              By:  George M. Kelley, III, Esquire
20            and
              U.S. Department of Justice
21            By:  Michael DiLauro, Esquire
                   Counsel for the Petitioners
22
              CHALOS & CO., P.C.
23            By:  George M. Chalos, Esquire
              and
24            DAVEY & BROGAN, P.C.
              By:  Patrick M. Brogan, Esquire
25                 Counsel for the Respondents

```
 1    being reasonable in declining to release their the vessel.
 2    That's why we're here.
 3              THE COURT:  So you say -- I didn't know it was a
 4    question of reasonableness.  Is it?
 5              MR. DILAURO:  I don't know that it is, either, but
 6    that's the argument.
 7              THE COURT:  So the Coast Guard doesn't have to be
 8    reasonable, do they?  They can do anything they want, can't
 9    they?
10              MR. DILAURO:  I think they can --
11              THE COURT:  They could set a bond for $200 million,
12    couldn't they?
13              MR. DILAURO:  I believe that's correct, Your Honor.
14              THE COURT:  I think so, too.  If we adopt your
15    position, they could.
16              MR. DILAURO:  Well --
17              THE COURT:  They could set a bond for $300 million.
18    What difference does it make?
19              MR. DILAURO:  Well, I presume it makes --
20              THE COURT:  Except for one thing:  Most people
21    wouldn't accept that.  Obviously, if they set a bond for
22    $300 million or 300 whatever then I or some other court would
23    say, maybe that's a little high.  Wouldn't you think so?
24              MR. DILAURO:  Oh, I think that's entirely possible.
25              THE COURT:  Then is there some reason that it must
```

# Exhibit 6

# CHALOS & CO. P.C.
International Law Firm

55 Hamilton Avenue, Oyster Bay, New York 11771
TEL: +1-516-714-4300 • FAX: +1-516-750-9051 • WEB: www.chaloslaw.com • EMAIL: info@chaloslaw.com

**July 21, 2014**

*Via Email and Federal Express*

United States Coast Guard
2703 Martin Luther King Jr., Ave., SE,
Stop 7213
Washington, DC 20593-7213
(202) 372-3733

Attn:   Brian Judge
        Brian.Judge@uscg.mil

**Re:    MV ANTONIS G. PAPPADAKIS**
        Unreasonably Detained and/or Delayed at Sector Norfolk from April 15, 2013 –
        September 16, 2013

Dear Mr. Judge –

Further to our earlier telephone correspondence, we confirm receipt of your letter dated June 4, 2014 asserting that Angelex Ltd.'s ("Angelex") claim for compensation for the unreasonable delay and detention of the M/V ANTONIS G. PAPPADAKIS has been referred to your office for handling.   This action is a statutory claim for compensation, specifically authorized by Act of Congress and acknowledged by the government and Fourth Circuit Court of Appeals, for the unreasonable delay or detention of the vessel, and the losses, expenses, and costs sustained by the Owner as a result thereof.  *See* 33 U.S.C. § 1904(h).   For the avoidance of doubt, this is not an administrative claim, nor a claim under the Federal Tort Claims Act. Accordingly, neither SF-95 (which is approved under 28 CFR § 14.2[1]) nor the statutory procedure requirements of 28 U.S.C. §§ 2674 and 2675 are applicable to this matter.

As per your request and in an effort to expeditiously amicably conclude this matter, we provide (enclosed) the following claims summary with supporting documentation.

---

[1] 28 CFR § 14.2 also makes clear that the SF-95 is not a mandatory form in any event, it is simply a form that has been approved for use by a party asserting an administrative claim.



**A.** Off Hire (Norfolk): **USD 2,163,475.77**

Pursuant to a time charter party agreement with United Bulk Carriers International Madeira dated June 7, 2011, the M/V ANTONIS G. PAPPADAKIS was chartered out at a daily hire rate of USD 12,000, per day (less 5% commission). The Vessel was put off-hire by the charterers for a total period of 170.33542 days, from April 16, 2013 until October 3, 2013, as a result of the unreasonable delay and detention. In addition to the hire calculations, there were additional costs and expenses which had to be covered by Angelex under the charter party during this period including, *inter alia*, bunkers which were consumed during this time.

In support of this figure, please find enclosed as **Annex 1** the calculations summary. Attached as **Annex 2** is a copy of the Charter Party Agreement and as **Annex 3** the Notices of off hire and on hire.

**B.** Off Hire (Brazil): **USD 9,185.57**

The vessel was put off hire again in Brazil due to an additional survey and hull cleaning which had to be completed as a result of marine growth on the hull due to the Vessel's prolonged and unreasonable delay and detention in Norfolk. *See* Annex 1 and Annex 3.

**C.** Additional Costs, Expenses, and Losses: **USD 2,007,246.10**

Angelex is also seeking compensation for the losses, costs, and expenses which were incurred as a direct result of the unreasonable delay and detention of the vessel; all while its only fee earning asset, the ANTONIS G. PAPPADAKIS was sitting as a wasting asset at the Portsmouth Marine Terminal in Norfolk. These additional items are categorized below in a summary list format. The vouchers and receipts supporting these amounts are enclosed hereto on a CD containing documents bearing batesnumbers AGP00001-00190; AGP00268-00619.

1. USD 49,652.63      Double Crew Wages incurred for replacement Master and Chief Engineer required during period of detention and delay. *See* AGP0001-00006

2. USD 79,179.01      Travel and Accommodation costs for additional crew, the Designated Person Ashore, Superintendents, technicians, etc. *See* AGP0007-AGP00092

3. USD 48,610.46      Miscellaneous Expenses and Costs incurred during unreasonable detention. *See* AGP00093-00146.

4. USD 6,880.04      ISM/ISPS Expenses for Special Audit required by USCG. See AGP00147-00150

5. USD 101,595.65      Technical and Expert Consultants. *See* AGP00151-00186.



CHALOS & CO, P.C.
International Law Firm

6. USD 12,587.50     Lloyd's Register Classification. *See* AGP00187-00189.

7. USD 6,599.64     London Offshore Consultants, MARPOL expert consult. *See* AGP00190.

8. USD 540,015.85     Legal Expenses for defense costs and fees. A redacted copy of the legal invoices will be provided once the Coast Guard confirms it will accept liability and that all claims will be reimbursed. AGP00191-00267 omitted as privileged attorney client privilege.

9. USD 493,568.76     Agent Costs including port expenses, agency services, DA. *See* AGP00268-00271 (for summary breakdown of costs) and AGP00272-00544 for applicable vouchers/receipts.

10. USD 47,057.00     Additional dry dock expenses due to delay and detention. See AGP00545-00584.

11. USD 531,520.83     Usiminas Cargo Claim. *See* AGP00585-00587.[2]

12. USD 86,048.38     Speed Claim from Charterers due to underperformance of vessel following delay and detention. *See* AGP00588-00589.

13. USD 3,930.35     Brazil disbursements account for surveyor and technical experts attendance. *See* AGP00590-00619.

Accordingly, Angelex's claim for compensation is no less than **USD 4,179,907.44**, exclusive of interest, costs, and fees in pursuing this matter. The foregoing is without prejudice or waiver of Angelex Ltd.'s rights and claims, whether stated or unstated, for the unreasonable detention and delay of the M/V ANTONIS G. PAPPADAKIS and the compensation sought for losses, costs, and expenses, all of which are subject to revision up to and including the time of trial.

Finally, the foregoing response is intended as a good faith effort to resolve the matter and without prejudice to Angelex's right to commence litigation on or after July 1, 2014 (*i.e.* following the expiration of the sixty (60) day notice period set forth in 33 U.S.C. § 1910). We trust you will be guided accordingly.

Sincerely,

Chalos & Co, P.C.

George M. Chalos
Briton P. Sparkman

---

[2] This claim has been presented, but has not yet been finalized/concluded.



CHALOS & CO. P.C.
International Law Firm

**Enc.**

On CD Only - Annex 1-3; CD with AGP001-00190; AGP00268-00619.