**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANGELEX LTD.,** | : | **Case No. 15-cv-56** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

# ANGELEX LTD.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

**CHALOS & CO, P.C.**

George M. Chalos, Esq.
Briton P. Sparkman, Esq.
55 Hamilton Avenue
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516) 750-9051
Email: gmc@chaloslaw.com

**COMES NOW**, Plaintiff, Angelex Ltd. ("Plaintiff" or "Angelex"), by and through undersigned counsel, respectfully submits this opposition to Defendant, United States of America's ("Defendant" or the "government") motion for summary judgment (Doc. 22 and 38) and cross-moves for summary judgment, as the delay of the M/V ANTONIS G. PAPPADAKIS ("the Vessel") at Norfolk from April 19, 2013 to at least September 17, 2013 was unreasonable as a matter of undisputed fact. In support thereof, Plaintiff submits herein its statement of genuine issues in response to the government's statement of material facts (Doc. 22-2 and 38-2) and statement of material facts in support of its cross-motion for summary judgment, along with corresponding exhibits from the evidence in the record.[1]

Although the present motions may, at first blush, appear to be competing arguments seeking the Court to weight the evidence concerning the government's "reasonableness" (or lack thereof) in delaying and detaining the M/V ANTONIS G. PAPPADAKIS at Norfolk, it is respectfully submitted that there are significant differences between the government's motion and Plaintiff's cross-motion. The government improperly asks the Court to assess the evidence and prematurely make credibility determinations and factual findings about the nature and character of the conduct of government actors. In such circumstances, summary judgment cannot be entered as a matter of disputed fact and law. By contrast, Plaintiff's cross-motion, is firmly based on undisputed facts that the government witnesses admitted during depositions. Plaintiff's cross-motion sets forth no less than twenty-three (23) unreasonable demands, acts, and/or omissions by the government; any one of which would be sufficient to enter judgment in Plaintiff's favor. Taken

[1] For consistency in citations and the Court's ease of reference, Plaintiff will refer to the government's exhibits submitted in support of summary judgment by docket number and exhibit number. All documents, materials, and transcripts from the record cited throughout Plaintiff's Opposition and Cross-Motion (and pleadings in support) will be labeled "PL EX." and begin with the number 1.

together, it is clear that the delay and detention of the M/V ANTONIS G. PAPPADAKIS was unreasonable and Plaintiff is entitled to entry of judgment on its claims. In further support, Plaintiff respectfully shows as follows:

**PROCEDURAL BACKGROUND**

Plaintiff's claim is statutory in nature and arises under the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1904(h), for damages resulting from the unreasonable delay and detention of its Vessel for at least one hundred and sixty-five (165) days at Norfolk, Virginia in 2013. *Angelex Ltd. v. United States,* 123 F. Supp. 3d 66, 68 (D.D.C. 2015). As a result of the government's unreasonable detention of the Vessel in April 2013, Plaintiff commenced emergency civil proceedings in the Eastern District of Virginia seeking injunctive relief from the District Court and requesting the Court to set a bond and other conditions for the release of the Vessel. On April 24, 2013, Plaintiff Angelex filed an emergency petition and motion to set bond. *See Angelex Ltd. v. United States of America, et al.*, 13-cv-237-RGD (E.D. Va. 2013); *see also* Complaint, Doc. 20, at ¶¶ 13-55. Following briefing and oral argument on the petition on May 6, 2013, District Judge Doumar of the Eastern District of Virginia set conditions for a bond to allow the fully loaded[2] bulk carrier to sail from Norfolk to continue her journey and trade. District Judge Doumar made the following unchallenged factual findings concerning the Coast Guard's conduct:

> The idea that by imposition of an unreasonable bond demand, the Coast Guard might accomplish what it cannot do through prosecution of the underlying criminal offense—the extinguishment of a lawful business, to the detriment of its principals, its employees, its creditors, and its customers, but to the advantage of no one—

---

[2] The Vessel was owned at all times by Angelex Ltd. *See* Doc. 38-2, ¶ 92. The Vessel was at the Port of Norfolk in order to load a cargo of coal. Doc. 22-2, ¶ 5. The Vessel was under long term time charter with a wholly unrelated third party who had use of the Vessel for a specific period of time in exchange for a specific hire rate. PL EX. 1. The Coast Guard was told promptly and repeatedly by Angelex that the full load of coal onboard did not belong to Angelex or Kassian and that the continued delay of the Vessel would lead to serious and potentially catastrophic damages. *Id.* The government was provided with a copy of the charter party on April 24, 2013 and it was explained that the rate of hire being earned under the contract was higher than was available on the market rate. *Id*. The government unreasonably failed, neglected, and/or refused to investigate or consider these issues when refusing to reconsider the bond amount required for the reinstatement of the Vessel departure clearance. Spolidoro Dep., 66:21 – 67:18.

> without due process is simply repugnant to the Constitution. In more than thirty years on the bench, this Court can recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion.

*Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013).

Thereafter, the government only challenged the District Court's subject matter jurisdiction arguing that Angelex's action was premature **and** the only permissible remedy would be an "after-the-fact" Federal Court action for damages pursuant to 33 U.S.C. § 1904(h). No challenge to District Court's findings of fact was ever made by the government. The Fourth Circuit Court of Appeals accepted the government's argument and expressly held that 33 U.S.C. § 1904(h) provides a "safeguard", which gives Angelex a distinct after-the-fact "remedy." *Angelex Ltd. v. United States*, 723 F.3d 500, 509 (4th Cir. 2013).

Angelex commenced these proceedings on January 14, 2015, by the filing of its original Complaint. *See* Doc. 1.[3] Angelex is owner of the Vessel, which is its only income earning asset. Doc 22-2, ¶ 1. Angelex is the only party with ownership and equitable interest in the Vessel and was the employer of all crewmembers working and living onboard. U.S. Exhibit 5. On February 24, 2015, the government filed a pre-answer motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). Doc. 6. Angelex opposed the motion on March 17, 2015 (Doc. 8) and the government replied a week later (Doc. 9). On August 24, 2015, this Court issued a Memorandum Opinion and Order denying the government's motion to dismiss, in part, and granting the motion in part . *See* Doc. 10, 11; reported at *Angelex v. United States*, 123 F. Supp. 3d 66, 83 (D.D.C. 2015). Specifically, the only portion of Plaintiff's claim which was dismissed related strictly to the "reasonableness of

[3] This Court granted Plaintiff's unopposed Motion for Leave to File First Amended Complaint on October 21, 2015, and an Amended Complaint was filed that same day. *See* Doc. 20. The government filed its answer to Plaintiff's Amended Complaint on November 3, 2015 (Doc. 21).

the withdrawal of the M/V ANTONIS G. PAPPADAKIS' departure clearance[4] on April 19, 2013." *Id*. This Honorable Court expressly held: "Defendant's motion is otherwise denied." *Id.*

Despite this unambiguous ruling, the government's motion for summary judgment repeatedly returns to its legally insufficient argument. The government claims it had reasonable suspicion to believe that there *could* be sustainable criminal or civil charges (against Angelex, the Vessel's Manager Kassian Maritime Navigation Agency, Ltd. ("Kassian"), and/or the Vessel *in rem*), and then awkwardly leaps to the conclusion that all other actions taken by the government were justified, without regard to the specific facts and circumstances of this case. *See* Doc. 22-1, pp. 1-3, 4-5, 15-17; Doc. 38-1, p. 1, 7-14. The government's argument is illogical, unsupported by both the law and the facts of this case, and unsupported by this Court's prior opinion, sustaining all of Plaintiff's other claims for compensation for the unreasonable delay and detention of Plaintiff's Vessel. In denying the government's flawed analysis and argument, this Honorable Court held in its prior memorandum opinion the following:

> First, regardless of whether the Complaint has stated a claim with respect to the withdrawal of the departure clearance, Angelex's claim with respect to the terms of surety demanded by the Coast Guard remains, given the Court's holding, *supra*, that the Fourth Circuit's decision has no preclusive effect on this litigation. Second, Angelex's claim concerns more than the reasonableness of the initial withdrawal of the Pappadakis's departure clearance in April 2013 and the terms of surety demanded by the Coast Guard. Rather, ***Angelex's claim encompasses the Coast Guard's continued detention of the Pappadakis from April to September 2013***, which the Complaint alleges was unreasonable in light of the evidence and the circumstances.

*Angelex Ltd. v. United States*, 123 F. Supp. 3d at 79 (citations omitted)(emphasis added).

[4] Pursuant to 46 U.S.C. § 60105(b) (2014), a foreign-flagged ship must maintain its departure clearance from CBP before it may depart a U.S. port. The Coast Guard may request CBP to withhold such clearance when reasonable grounds exist to suspect an APPS violation and CBP "shall refuse or revoke the clearance required by section 60105 of title 46. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." *See* 33 U.S.C. § 1908(e).

As more fully set out herein, the facts adduced during discovery amply prove the government's demands and conditions for security to reinstate the Vessel's departure clearance and the continued detention of the Vessel throughout the entirety of the failed prosecution were unreasonable. Accordingly, Angelex respectfully submits that the Court should deny the government's motion in its entirety and grant Angelex's Cross-Motion for Summary Judgment.

## SUMMARY OF THE FACTS

For the sake of brevity, Plaintiff's Statement of Genuine Issues ("SGI") and Statement of Material Facts ("SMF") with accompanying citations to the record and exhibits are respectfully incorporated as if set forth in the memorandum and will be cited throughout. Plaintiff briefly summarizes the salient undisputed material facts and evidence in the record which establish that Plaintiff is entitled to judgment in its favor as a matter of law pursuant to 33 U.S.C. § 1904(h), as the lengthy 165+ day delay and detention of the M/V ANTONIS G. PAPPADAKIS were unreasonable. In addition to the exchange of written discovery, Plaintiff deposed the following government witnesses: (1) Area Port Director Mark Laria, Customs and Border Protection ("CBP"); (2) Special Agent Maria Milbourne, Coast Guard Investigative Service ("CGIS")[5]; (3) Captain Jerry Barnes, U.S. Coast Guard, Chief of Prevention – Sector Hampton Roads; (4) Admiral Melissa Bert, U.S. Coast Guard, Office of International and Maritime Law at Coast Guard Headquarters; (5) Captain John Little, U.S. Coast Guard, Captain of the Port and Commander – Sector Hampton Roads; (6) Commander Laurina Spolidoro, U.S. Coast Guard, Staff Judge Advocate, Fifth Coast Guard District. The government elected to forego depositions of Angelex's witnesses.

[5] The Coast Guard Investigative Service is a federal law enforcement agency established to carry out the Coast Guard's internal and external criminal investigations. *See* www.uscg.mil/hq/cg2/cgis/.

On April 14, 2013, the Vessel arrived at Norfolk Southern terminal within the Port of Norfolk in the Eastern District of Virginia to load a cargo of coal. 22-2, ¶ 5. The Vessel was fully loaded with cargo loaded by the Vessel's charterer when the departure clearance was revoked and withdrawn by the government. PL EX. The Court is familiar with the factual background which led to the initial withdrawal of the Vessel's departure clearance on April 19, 2013 and these facts are neither in dispute, nor do they have bearing on the present motion. *Angelex Ltd. v. United States*, 123 F. Supp. 3d at 79 (citations omitted).

The government, acting by and through the Coast Guard and CBP, unreasonably conditioned the return and issuance of the Vessel's departure clearance by requiring Angelex and third-party Kassian[6] to submit to each of the following unreasonable demands:

1. Imposing numerous nonnegotiable demands wholly unrelated to monetary security for the payment of a fine or penalty, contrary to the requirements of 33 U.S.C. § 1908(e). SMF, ¶¶ 27-28.

2. Requiring Angelex and Kassian to interfere with the rights and personal liberties of the crew members by forcing seven foreign national seafarers (with no ties to the United States) to disembark the Vessel and remain functionally detained in the Eastern District of Virginia for an unspecified and unlimited amount of time at the pleasure of the government all while requiring Angelex (and Kassian) to be jointly and severally responsible to house, feed, and pay "total wages", including contractual allowable overtime for these crewmembers. *Id.*; Spolidoro Dep. I 71:3-8.

3. Requiring an express waiver of otherwise available defenses by Angelex; *Id.*

4. Requiring an express waiver of jurisdiction defense by Kassian (a third party with no ownership or equitable interest in the Vessel; was not the employer of the crew; and which the Court clearly lacked personal jurisdiction). *Id.*, at ¶¶ 1-3; *see also* Bert Dep. 65:4-7.

5. Requiring Angelex (and Kassian) to agree to bear the cost and consent to bring custodian(s) of record to the United States to testify before a grand jury, deposition, trial, and any other proceedings at the government's request. *Id.*, at ¶¶ 27-28; Spolidoro Dep. I 40:10-41:10; Little Dep. 86:19-87:4, 90:8-13.

---

[6] Kassian was the ISM manager; not the owner of the vessel; had no equity interest in the vessel; and was not the employer of the crew and was not properly subject to the jurisdiction of the Court. SMF, ¶¶ 1-5.

6. Requiring Angelex (and Kassian) to stipulate to the authenticity of all documents and items seized from the Vessel as business records of the Owner and Operator. *Id.*, at ¶¶ 27-28.

7. Requiring Angelex (and Kassian) to agree to "assist" the United States in effecting service of federal grand jury, deposition, and/or trial subpoenas on person(s) who are not United States citizens and were not in the United States at the time the subpoenas were issued. *Id.*

8. Requiring the posting of a bond in an amount 167% greater than required in an identical case in the same district just weeks before. *Id.*, at ¶ 25.

9. Requiring the posting of a bond in the excessive amount of USD 2,500,000, which as District Judge Doumar previously found, was "beyond the financial wherewithal" of Angelex (and Kassian). *Id.*, at ¶¶ 20-21.

10. Requiring the posting of an excessive bond in an amount which far exceeded the maximum fines imposed in similar cases at that time. *Id.*, at ¶ 24.

11. Requiring the posting of an excessive bond which exceeded the maximum fine which could have been imposed upon the Vessel *in rem*, even if the alleged acts were proven in a criminal trial. *Id.*, at ¶ 26.

12. Requiring Kassian to be jointly and severally included in the bond (and other Security Agreement terms), despite the fact that Kassian had no proprietary interest in the Vessel. *Id.*, at ¶¶ 1-4.

Perhaps even worse, the government's continued detention of the Vessel from April 19, 2013 through September 17, 2013 was unreasonable based on the following undisputed acts and/or omissions by the government:

13. The failure by CBP to exercise any due diligence to make sure the continued delay and detention of the Vessel was reasonable before interfering with Plaintiff's only income earning asset's ability to continue her journey and trade. SMF ¶¶ 5-7; 23.

14. The Coast Guard's refusal to reconsider the quantum of the bond demanded, despite being provided with substantial and uncontroverted evidence of Angelex (and Kassian's) limited financial resources and ability to post a bond. *Id.*, ¶¶ 9-11.

15. The Coast Guard insistence that unless a USD 2,500,000 bond was jointly and severally posted by Angelex and Kassian, the Vessel was to remain in the district as "security" for a potential fine or penalty without any consideration of the preferred ship mortgage recorded on the Vessel and without any analysis of the priority of liens if the Vessel were to be liquidated and sold at judicial auction. *Id.*, at ¶¶ 21, 26.

16. The government's failure to consider the Vessel was "on charter" to an unrelated third party United Bulk Carriers International, and was fully loaded with a dangerous exothermic cargo onboard. *Id*., at ¶ 4, 8-9.

17. The government's failure to acknowledge that there was absolutely *no* ability to recover *anything* from the Vessel *in rem*, despite being advised of same by Angelex and District Judge Doumar. *Id*., ¶¶ 21, 26; Spolidoro 60:22-62:21.

18. The Coast Guard unreasonable refusal to accept and approve the negotiated amount of security of USD 1,500,000 recommended by the Coast Guard's Fifth District Legal counsel LCDR Andrew Grant, which was agreed by the government's trial counsel and offered during the emergency hearing before District Judge Doumar on May 6, 2013. The offer was rejected without any contemporaneous or reasonable basis. *Id*., at 14-15.

19. The Coast Guard's continued detention and delay of the Vessel to pursue charges for criminal vicarious liability in spite of clear and incontrovertible evidence obtained by skilled CGIS investigators and experienced, specialized Justice Department prosecutors that there were no facts to support a successful vicarious prosecution against Angelex (and/or Kassian). SGI, ¶¶ 127-128. This was especially egregious considering the government had evidence early in their investigation that all alleged acts were purposefully concealed from Angelex (and Kassian), including all of their respective representatives, superintendents, supervisors, inspectors, and the Master of the Vessel. Milbourne Dep., 53:24 – 54:15.

20. The Coast Guard's refusal to reconsider the prosecution of Angelex and the reinstatement of the Vessel's departure clearance after it became clear that there was ***no*** evidence that a criminal conviction for vicarious liability could be properly obtained and sustained since all of the crew members acknowledged that the alleged acts were not done within the course and scope of their employment, and were not done with the intent to benefit their employer Angelex. *Id*. These facts were later confirmed at trial before District Judge Mark Davis, 13-cr-60 (E.D. Va. 2013). SMF, ¶ 30.

21. Perhaps most embarrassing for the government, its own witnesses gave diametrically opposing testimony as to who had the authority and made critical decisions relating to the continued detention of the Vessel and surety terms demanded. *Id*., at ¶¶ 14-15.

22. At a prior proceeding before District Judge Doumar, the Department of Justice identified the decision-maker to the Court as Captain Melissa Bert[7] from the Coast Guard, what has been exposed to have been untrue. *Id*.

23. Throughout the detention of the Vessel, the government engaged in a persistent pattern of refusing to consider the specific facts and evidence in this case. *Id*., at ¶¶ 5-25. Instead, the Coast Guard insisted repeatedly upon the imposition of a bond and security terms that

[7] Melissa Bert has since been promoted to "Admiral" since 2013. *See* Bert Dep, 163:20 – 164:2.

could not be met by Angelex. *Id.*, The Coast Guard's action and inaction led directly to the unreasonable delay and detention of the M/V ANTONIS G. PAPPADAKIS.

It is respectfully submitted that the undisputed material facts clearly establish that the government's acts and omissions were unreasonable and, as such, this Court should enter judgment in favor of Angelex and award compensation for its losses, damages, and expenses arising from the unreasonable delay and detention of the Vessel, as provided in 33 U.S.C. § 1904(h), in an amount no less than USD 4,179,907.44. SMF, ¶ 33.

## **POINTS AND AUTHORITIES**

### I. APPLICABLE SUMMARY JUDGMENT STANDARD OF REVIEW

A party is entitled to summary judgment when the movant shows there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (U.S. 1986); *see also Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016). On a motion for summary judgment, "the court must avoid weighing the evidence and making credibility determinations [and] instead assume all conflicts would be resolved and all inferences drawn in the nonmoving party's favor and inquire whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party." *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal quotations omitted).

The moving party bears the initial burden of informing the court of not only the basis for its motion, but also the specific parts of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Should the motion for summary judgment be properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. However, the party asserting the existence of an issue of material fact is not required to show that it would

be resolved in its favor. It only needs to show there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial. *Id*. at 248-249.

## II. ANGELEX IS ENTITLED TO HAVE THIS COURT REVIEW THE UNREASONABLE DELAY OF THE VESSEL AND AWARD DAMAGES

Plaintiff's right to recover for the unreasonable delay and detention to the M/V ANTONIS G. PAPPADAKIS is clearly defined by statute. APPS 33 U.S.C. § 1904(h) states:

> Compensation for loss or damage. A ship unreasonably detained or delayed by the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby.

*Id*. The Fourth Circuit Court of Appeals confirmed this provision of the APPS statute is, as the government previously argued, an *"'**after-the-fact damages remedy against the United States for unreasonable detention or delay.**'* Appellant's Br. 37. This safeguard gives Appellees a remedy, distinct from the unauthorized injunctive relief they now seek." *Angelex Ltd. v. United States*, 723 F.3d 500, 508-509 (4th Cir. 2013) (emphasis added). There is no dispute that APPS is the domestic legislation enacting and codifying the MARPOL Treaty, Nov. 2, 1973, modified by the Protocol of 1978, 1340 U.N.T.S. 62, ("MARPOL")[8]. *Angelex Ltd. v. United States*, 123 F. Supp. at 70 (citing *United States v. Jho*, 534 F.3d 398, 401 (5th Cir. 2008)). The APPS protection of shipowners (such as Plaintiff) from unreasonable delay or detention comes from MARPOL, and Congressional intent for the respect of international law, providing in relevant part:

> When exercising control under this regulation all possible efforts shall be made to avoid a ship being unduly detained or delayed. If a ship is thereby unduly detained or delayed it shall be entitled to compensation for any loss or damage suffered.

[8] MARPOL is not a self-executing treaty; instead, each party agrees to "give effect" to it. MARPOL, art. 1(1), 1340 U.N.T.S. at 63, 184. In particular, each party to the treaty agrees to set up rules for ships that fly that party's flag and for ships that visit various port states around the world. Id. Art. 4(1), 1340 U.N.T.S. at 185-87.

*See* MARPOL, Articles 5-6.

The government's citation to and reliance on *Watervale Marine Co., Ltd. v. United States*, 807 F.3d 325 (D.C. Cir. 2015), for the proposition that the Coast Guard enjoys absolute and unreviewable discretion in withholding departure clearance and setting terms of a surety bond, is inapposite. *See* Doc. 38-1, p. 15. The issues in *Watervale* were similar to Angelex's prior challenge in the Eastern District of Virginia and Fourth Circuit Court of Appeals (*i.e*. the plaintiffs in *Watervale* were challenging the scope of the agency's discretionary authority to impose non-financial terms as a condition of a surety bond). The issues here are completely different. The Fourth Circuit has made clear that the relief being sought by Plaintiff is not only available, but is a required statutory safeguard. *Angelex Ltd. v. United States*, 723 F.3d 500, 509 (4th Cir. 2013). Accordingly, *Watervale* has no bearing or preclusive effect on this Court's review of the government's actions in this case and the agency's decision to unreasonably delay the M/V ANTONIS G. PAPPADAKIS. *Angelex Ltd. v. United States*, 123 F. Supp. at 65.

Review by this Court of the Coast Guard's unreasonable conduct is precisely the type of judicial oversight contemplated by 33 U.S.C. § 1904(h) and the type which has been a part of U.S. jurisprudence for hundreds of years in analogous matters. *See Gilchrist v. Collector of Charleston*, 10 F. Cas. 355, 356 (C.C.D.S.C. 1808) ("***The courts will not interfere to prevent the act; because the law authorizes it. But as the law did not authorize it for individual oppression, they will give damages to the individual who suffers by the wanton exercise of a legal power***.") (emphasis added); *see also Sumner v. Philadelphia*, 23 F. Cas. 392, 396 (C.C.E.D. Pa. 1873) (Court held that without the ability to impose compensation and damages upon the government for an unreasonable delay, "there would be practically no restraint upon the most arbitrary and unreasonable detentions.").

This is especially true in this case where District Judge Doumar of the Eastern District of Virginia set conditions for a bond and made the following undisputed (and unappealed)[9] factual findings concerning the Coast Guard's conduct:

> The idea that by ***imposition of an unreasonable bond demand***, the Coast Guard might accomplish what it cannot do through prosecution of the underlying criminal offense—the extinguishment of a lawful business, to the detriment of its principals, its employees, its creditors, and its customers, but to the advantage of no one—***without due process is simply repugnant to the Constitution. In more than thirty years on the bench, this Court can recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion.***

*Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846 (E.D. Va. 2013) *overturned on subject matter jurisdiction grounds* 723 F.3d 500 (4th Cir. 2013).

In the May 2013 proceedings before the Eastern District of Virginia, District Judge Doumar made several findings of fact (all of which were not challenged on appeal) which highlighted the unreasonableness of the Coast Guard's conduct. These factual findings included *inter alia*, (1) the Coast Guard seeking to impose conditions which were not designed to assure payment of a fine or penalty, but to facilitate prosecution of a criminal (or civil) case; (2) the Coast Guard requiring a bond in excess of the maximum statutory fine which might have been imposed on conviction (and well beyond any likely fine to be imposed even assuming convictions on all APPS counts); (3) the Coast Guard requiring a bond which was excessive and unreasonable in light of the known financial capabilities of Angelex as Owner to post a bond; and (4) the Coast Guard requiring a bond which would "substantially jeopardize" the continued viability of a lawful business. *Id*.

Any one of these factual grounds which were identified by District Judge Doumar in his order on May 8, 2013 is sufficient for a finding that the extended delay of the Vessel was

[9] District Judge Doumar's factual findings of the unreasonable actions by the Coast Guard were never appealed by the government and thus are properly decided issues which should be considered as law of the case. At a minimum, Judge Dourmar's previous findings and rulings should be persuasive to this Court.

unreasonable. Here, these facts, coupled with the many additional undisputed facts discussed above and below, make clear that the government's acts and omissions were not merely 'unreasonable', but were "the most egregious abdication of reasonable exercise of discretion" that Judge Doumar, an extremely well-regarded and experienced Senior District Judge, had seen in more than thirty (30) years on the bench. *Id*.

## III. THE FACTS AND EVIDENCE OVERWHELMINGLY DEMONSTRATE THAT THE LENGTHY DELAY OF THE VESSEL WAS UNNECESSARY AND UREASONABLE

### 1. The initial detention of the Vessel does not excuse the Coast Guard's subsequent unreasonable delay and continued detention of the Vessel.

The government spends a large portion of its brief outlining the historic purpose of MARPOL and APPS. *See* Doc. 22-1, pp. 5-11. The legislative and legal goals of MARPOL and APPS are not materially in dispute in this case, nor do they provide a framework under which the Court can excuse the government's conduct in this matter as "reasonable." As the facts and evidence in this case demonstrate, the delay of the Vessel was completely unreasonable. In *Goshorn v. Bar Asso. of District of Columbia*, 152 F. Supp. 300, 305 (D.D.C. 1957), the district court found that just because an objective is commendable, such as the government's argument in support of the enforcement of environmental protection laws here, it does not justify *any* (or all) means of obtaining the goal.

> In other words, they assume that the end justifies the means. But that theory can never be sustained in a court of law. If it were approved, the law would lose its virtue as a social and political bond. We would cease to have a government of and by law. We would then be ruled by the capricious, arbitrary and tyrannous conduct of majorities and those in office. Discipline is an inherent requirement of human nature -- in the individual and in the body politic. History reveals that when discipline is not self-imposed, it must be super-imposed. The life of democracy depends on its observance of the law.

*Id.*; *see also Midwest VideoCorp. v. FCC*, 571 F.2d 1025, 1041-42 (8th Cir. 1978) ("[I]n government as in life, a good end does not justify any and every means.").

There is an obvious and compelling legal distinction between reasonable grounds to pursue criminal prosecution and what is reasonable conduct in delaying the sole income earning asset of a lawful business for over six (6) months. Despite this Court's clear and unequivocal ruling on this legal point in its Order denying the government's Motion to Dismiss, the government repeatedly argues that "reasonable cause" is a low bar for determining whether to detain a Vessel under 33 U.S.C. 1908(e) (or not). *See* Doc. 22-1, pp. 10-12. It appears that the intended purpose of the argument, albeit without citation to authority, is that all of the government's actions that followed the initial detention should also be judged under this lax standard. *See* Doc. 22-1, pp. 10-12, 15-18. To give any credence to the government's interpretation would be to impose a pre-judgment, non-recourse penalty on Angelex, which is not countenanced by the Constitution, MARPOL, APPS, any other applicable statute or regulation, and/or the Fourth Circuit Court of Appeals prior decision concerning this Vessel. *See Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893; 47 L. Ed. 2d 18 (1976) (holding a penalty cannot be imposed by the government until the accused is provided with notice of the alleged violation and a full and fair opportunity to be heard).

As this Court previously held, Plaintiff's claim for unreasonably withholding the Vessel's departure clearance in the first instance under 33 U.S.C. 1908(e) was dismissed. *Angelex Ltd. v. United States*, 123 F. Supp. 3d at 79. Accordingly, the government has already received the benefit of the low threshold 'reasonable cause' or reasonable suspicion standard afforded to the Coast Guard in making the initial determination to withhold the Vessel's departure clearance on April 19, 2013. *Id.* Attempting to apply that same legal standard to the subsequent actions (and inactions) of the government falls flat. As the facts and evidence clearly demonstrate, the

government acting by and through the Coast Guard and CBP failed to act reasonably and as such, the government's motion for summary judgment must be denied in its entirety and judgment entered in favor of Plaintiff.

**2. The role of CBP in the continued delay of the Vessel was unreasonable.**

The April 19, 2013 letter[10] from the Captain of the Port, Captain John Little, informed Angelex that the Vessel's departure clearance had been revoked by CBP at the request of the Coast Guard. Area Port Director for CBP, Mark. Laria, testified that he conducted no investigation into the Vessel on his own and did not instruct anyone else to do so before CBP agreed to withdraw the Vessel's departure clearance. Mark Laria Dep. 33:19-38:10. Similarly, no effort was made to reconsider the position at any time during the 165+ day delay of the Vessel. *Id.*, at 89:2-20. Mr. Laria never inquired or instructed anyone else to inquire into the Coast Guard's investigation, testifying that CBP simply "depend[ed] on the Coast Guard to fulfill their obligations." *Id.* at 37:22-23. This is unreasonable. The USCG Captain of the Port, Captain John Little, confirmed that no one from the Coast Guard ever provided CBP with any basis or factual predicate for the withdrawal of the Vessel's departure clearance. Captain Little Dep., 47:9-14.

Even after reading quotes heavily critical in the local press recounting Judge Doumar's findings from the May 6, 2013 hearing Mr. Laria confirmed that he took no action.

> Q. Now, you read that -- some more quotations from Judge Doumar and he wrote, quote, "In more than 30 years on the bench, this Court can recall seeing no greater disregard for due process nor any more egregious abdication of the reasonable exercise of discretion." Now, did that raise any red flags to you?
>
> A. No. I mean, it surprised me, but it didn't raise a red flag for me, no.
>
> Q. What, if any, investigation did you do into why the judge found that the detention of the ship and the actions of the Government was the worst disregard for due process and the worst egregious abdication of a reasonable exercise of discretion in

[10] PL EX. 2.

> more than 30 years for a very serious, very well-respected senior federal judge here in Norfolk?
>
> A. What's the question?
>
> Q. **What did you do?**
>
> A. **I didn't follow up.**

Mark Laria Dep., p. 89:2-20.[11] (emphasis added).

CBP's failure to investigate the facts, circumstances, and/or basis for the continued delay to the M/V ANTONIS G. PAPPADAKIS and/or the Coast Guard's failure to provide any factual basis for the delay and demands at any time the Vessel was in the Port of Norfolk on CBP's orders, was unreasonable.

**3. The government's investigation found no evidence to obtain and sustain a finding of "vicarious liability."**

A corporation may only "be held criminally liable . . . if its agents were acting within the scope of their employment, which includes a determination of whether the agents were acting for the benefit of the corporation." *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 407 (4th Cir. 1985) (citing *United States v. Cincotta*, 689 F.2d 238, 242 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S. Ct. 347, 74 L. Ed. 2d 387 (1982)); *see also United States v. Singh*, 518 F.3d 236 (4th Cir. 2008) (citing same). To be acting within the scope of his employment, an agent must be "performing acts of the kind which he is authorized to perform, and those acts must be motivated -- at least in part -- by an intent to benefit the corporation." *Automated Medical Laboratories, Inc.*, 770 F.2d at 407 (citing *Cincotta*, *supra* at 241-42.). The government argues, in sum and substance, that the lengthy detention was reasonable because Angelex (and/or Kassian, a third-party with no

[11] Mr. Laria tried to clarify that he sent the article to superiors, but confirmed that he was simply following internal requirements to notify superiors of "media attention in something CBP has done." Mark Laria Dep., 90:1-9. Neither Mr. Laria, nor CBP took any other steps. *Id*.

ownership or equitable interest in the Vessel and otherwise not subject to U.S. jurisdiction) theoretically could be criminally responsible for the suspected misconduct of Chief Engineer Katsipis. *See* Doc. 22-1, pp. 26 – 32; 38-1, pp. 9-14. The government erroneously goes so far as to attempt to re-litigate the essential elements of vicarious criminal liability which was expressly rejected by the jury in the criminal trial. *See* Doc. 22-1, pp. 28-32.

Regretfully for the government, the re-write of its failed prosecution cannot be used at this stage as a substitute for the actual facts and information contemporaneously learned during the shipboard investigation, subsequent grand jury investigation, presented at trial, and/or learned during discovery in this case. Special Agent Maria Milbourne, an experienced criminal investigator, was the lead case agent from CGIS tasked with investigating the alleged conduct onboard the Vessel and preparing the matter for criminal prosecution. Milbourne Dep., 5/24/2016, 53:24-54:15. However, when questioned about the applicable legal standards and factual evidence learned purportedly in support of continuing the delay of the Vessel, she simply did not know and was unable to provide an accurate answer:

> Q. As the lead criminal investigator assigned to this case, what was your understanding of the standards that needed to be met to pursue vicarious charges against the ship owner and the ship manager?
>
> A. I mean, I guess that they had the liability of the ship, so they're responsible for what goes on, on that vessel.
>
> Q. Okay. And did you do anything specific to investigate the basis to vicariously charge Angelex in this case?
>
> A. I don't remember doing anything specifically.
>
> Q. Okay. Are you aware of anyone else from your office being instructed by you or someone else to investigate the vicarious nature of the charge against the ship owner?
>
> A. No.

Maria Milbourne 5/24/2016 Dep. 76:17 - 77:5.

The jury correctly acquitted Angelex (and Kassian), as the crewmembers' testimony corroborated what had been explained to Coast Guard investigators months earlier; namely, that any and all of the bad act(s) were purposely hidden from Angelex as Owner of the Vessel, (and Kassian as ISM Manager), the Captain (as the person in charge of the Vessel), as well as third-party, inspectors, superintendents, technical advisors, and others who attended on board during Mr. Katsipis' service as Chief Engineer. SMF, ¶ 30. Similarly, that there was no evidence of intended benefit to Angelex (or Kassian), but rather that the bad acts were done for the crew's own personal convenience (*i.e.* – to lighten the work that they were trained, expected, and being paid by Plaintiff – as their employer - to properly perform in a professional and honest manner).

**4. The conviction of Chief Engineer Lambros Katsipis does not cure the unreasonable delay of the Vessel.**

The government seeks to justify the unjustifiable by arguing that the Vessel needed to be detained in order to satisfy any potential fine to be imposed. Doc. 38-1. The government's strained argument in support of such a position is not supported by any fact or the law. Under APPS, Chief Engineer Katsipis was not the ship owner, operator, or person in charge of the Vessel and as such, he was not ever an individual with a legal obligation to maintain the Oil Record Book under U.S. law. *See United States v. Fafalios*, 817 F.3d 155 (5th Cir. 2016). In overturning the conviction of an identically-situated foreign chief engineer serving onboard a foreign-flagged vessel, the Fifth Circuit Court of Appeals held: "Under the plain language of the regulations, only the 'master or other person having charge of the ship' is responsible for maintenance of the oil record book. Section 151.25 asserts that each ship is required to maintain an oil record book, and then immediately thereafter explicitly and exclusively designates the 'master' of the ship as the individual 'responsible' for maintaining such a record book. *See* 33 C.F.R. §§ 151.25(a), (j). ***The***

***regulations mention only the 'master' when assigning responsibility for maintaining the oil record book, which plainly indicates that the responsibility does not extend to others on the vessel.***" *Id.*, at 159 (emphasis added). Again, it is undisputed that any and all misconducted was purposefully concealed and hidden from the Master of the Vessel. Accordingly, the government's argument that this Court should find the continued detention of the Vessel warranted as security for a potential conviction of Chief Engineer Katsipis[12] is without merit.

**5. The bond demanded was unreasonable under the facts and circumstances of this case.**

The government circuitously and self-servingly argues that its bond demand was reasonable because the agency's methodology for requiring a bond is "entitled to deference, and the Coast Guard has wide discretion as to the amount of the bond it requires." Doc. 38-1, pp. 21-22. However, the Coast Guard's own witnesses testified (repeatedly) that there was actually *no* true methodology employed in setting the non-negotiable amount at USD 2,500,000.[13] The highest-ranking individual who provided testimony in this case and the third-highest ranking member in the U.S. Coast Guard, Admiral Melissa Bert, testified that the decision on what amount of a bond required to reinstate the Vessel's departure clearance was not based on a specific Coast Guard policy, but instead was based upon discretionary authority resting exclusively with the Captain of the Port, John Little.

> Q. Do you agree that the amount of the bond is a Coast Guard policy call, yes or no?

---

[12] Further undermining the revisionist history with which the government appears to advocate this position is the fact that individuals who have been convicted of APPS violations have largely received probationary or limited sentences of incarceration. The largest fine imposed against an individual convicted of APPS which Angelex has been able to locate was for $15,000, not the millions of dollars sought by the government for a surety bond in this case. *See e.g., United States v. Georgios Stamou*, 09-cr-186, Doc. 19 (E.D. La. Nov. 5, 2009).

[13] The bond demand was initially USD 3,000,0000. Doc. 38-2, ¶ 150. The Coast Guard reduced its demand to USD 2,500,000; but that decision was not based on any consideration of any of the facts or any methodology. As with all of the Coast Guard's negotiations on the quantum of the bond, it was an unreasonable number without any consideration of the facts and circumstances of this case. SMF, ¶¶ 5-25.

A. With the setting of the surety, it's the captain of port's call.

Q. You disagree with me, then?

A. It's not a policy call. It's a[n] (*sic*) operational call by the captain of the port.

Admiral Melissa Bert Dep. 154:13 – 20.

Captain John Little testified that at the time the Vessel's departure clearance was withheld by CBP and Angelex was notified through Captain Little's April 19, 2013 Letter (PL EX. 2), the Coast Guard only contemplated one (1) single violation (which could be fined up to a maximum of $500,000). Captain John Little Dep., 43:8 – 45:25. Captain Little elaborated:

> Q. If you received this letter and it said to you I request that you forward my requirements and you were trying to determine what the requirements were, what would you get from this letter, $500,000, right?
>
> A. For each violation.
>
> Q. Okay. Now, how many violations are there set out in this letter?
>
> A. One.

*Id*., at 45:17-25. Despite Admiral Bert's testimony that all decisions on the amount of surety required for the reinstatement of departure clearance rested with the Captain of the Port, Captain Little testified to the <u>exact</u> <u>opposite</u>. Captain Little testified that he took no role in the decision of what would (or would not) be an acceptable bond amount, as decisions and analysis about what surety would be satisfactory to the Secretary were being made by Coast Guard Fifth District Legal in consultation with Coast Guard Headquarters. *Id*., 54:3 – 55:24.

> Q. And so the ultimate amount that would be accepted as surety satisfactory to you, as the author of this letter, wasn't something that you were deciding on, was it?
>
> A. No, sir.

*Id.*, at 54:16-20.

Commander Laurina Spolidoro from Fifth District Legal testified that, in fact, there was no actual legal analysis conducted by anyone with the Coast Guard as to what would be reasonable requirements for the reinstatement of the Vessel's departure clearance under the facts and circumstances of this case. Commander Laurina Spolidoro Dep. 47:14 – 50:21 (wherein Commander Spolidoro testified that the Coast Guard set the bond amount based on maximum recovery without any analysis of how a sentence might be imposed or charges will be grouped). Even after the indictment was issued and the universe of charges pursued was known, no one from the government followed-up or analyzed the potential sentence amount for convictions under APPS. *Id*., at 52:5 – 53:19. The undisputed and undisputable facts make clear that the Coast Guard did not employ *any* identifiable methodology which took into consideration any of the facts of this case in reaching the decision to set the bond amount at USD 2,500,000. This, coupled with the non-negotiable non-financial conditions demanded, make clear that the delay of the Vessel was unreasonable. When viewed in the context of the totality of the circumstances, government's nonnegotiable demand without regard to any pragmatic consideration was wholly unfair and unreasonable.

**6. The failure to consider other recent surety demands was unreasonable.**

Just prior to the detention of the ANTONIS G. PAPPADAKIS, an unrelated but similarly-situated foreign-flagged vessel was detained in the Eastern District of Virginia (*i.e.* the M/V THETIS), on suspicion of identical misconduct. *U.S. v. Diana Shipping Services, S.A.*, 13-cr-40 (E.D. Va.). In that case, the Coast Guard readily accepted a surety bond in the aggregate of USD 1,500,000. PL EX. 10. Ultimately, in that case, two (2) engineers, as well as the operator of the vessel, were indicted and convicted of eleven (11) felony counts, including three (3) counts of failing to maintain an accurate Oil Record Book (*i.e.*, the same number of APPS charges pursued

against Angelex and Kassian). *United States v. Diana Shipping Services S.A.,* 13-cr-40 (E.D. Va. 2013). Despite the near-identical suspicions, allegations, and investigation and vessel detention occurring in the same judicial district within a matter of months of each other, the Coast Guard has no explanation for the difference in the surety demanded by the highest ranking Coast Guard Officer purportedly in charge of making the decision on what bond terms would be acceptable to the government in this case.

> Q. Now, you know about the THETIS, and I want to understand, what sort of review of the THETIS detention and satisfactory surety did you perform when considering what would be satisfactory surety to you for the PAPPADAKIS?
>
> A. I don't recall any.

Captain John Little Dep. 81:4-9.[14]

**7. The failure to consider the ability to post a bond was unreasonable.**

The Coast Guard repeatedly asserted throughout negotiations and in depositions in this case that the requirement for the surety bond was to ensure satisfaction of a fine or penalty ultimately imposed by a district court. Commander Spolidoro Dep., 48:2 – 49:3. When a court imposes a fine and determines "the amount, time for payment and method of payment," the court must consider, *inter alia*, "the defendant's income, ensuring capacity and financial resources." 18

---

[14] The government has argued in its briefing that Kassian's status as a 'repeat' offender warranted a demand for higher surety. *See* Doc. 38-2, ¶165. However, this argument is advanced by counsel for the government after the fact, and was not a contemporaneous consideration. The facts and evidence make clear that the Coast Guard did not actually do *any* substantive analysis of why it was demanding a USD 2,500,000 bond (or else), other than the fact that the Coast Guard believed it had unlimited and unreviewable discretion to require a surety bond in any amount, or even, no bond at all. *Angelex Ltd. v. United States*, 723 F.3d 500, 508-509 (4th Cir. 2013); *see also* PL EX. 5, excerpts from May 6, 2013 hearing before Judge Doumar:

| | |
|---|---|
| The Court: | So the Coast Guard doesn't have to be reasonable, do they? They can do anything they want, can't they? |
| Mr. Dilauro: | I think they can - - |
| The Court: | They could set a bond for $200 million couldn't they? |
| Mr. Dilauro: | I believe that's correct, Your Honor. |

*See* 2:13-cv-237, May 6, 2013 Transcript, p. 28, ln. 7-14.

U.S.C. § 3572(a)(1); *United States v. Hicks*, 1995 U.S. App. LEXIS 1215 (4th Cir. Jan. 20, 1995) ("Before imposing a fine, the sentencing court must consider and make findings on the factors listed in 18 U.S.C.A. § 3572 concerning the defendant's ability to pay.") (citing *United States v. Arnoldt,* 947 F.2d 1120, 1127 (4th Cir. 1991)). The imposition of a fine so substantial that it wipes out a business organization is an abuse of discretion. S*ee Standard Oil Co. of Indiana v. United States*, 164 F. 376, 386-89 (7th Cir. 1908) ("[T]his is not the punishment of an unlawful business, but the punishment of unlawful practices connected with a lawful business . . . ."); *see also United States v. Drinkwine*, 133 F.3d 203, 204 (2d Cir. 1998) ("it is an incorrect application of the guidelines to impose a fine that a defendant has little chance of paying.") (citations omitted).

Here, the Coast Guard never conducted any review or analysis of Plaintiff's (and/or Kassian's) ability to pay. Captain of the Port John Little testified that he never even requested financials from Angelex and/or the Vessel's manager Kassian.

> Q. Did you ask for a copy of the financials for the owner of the ship, Angelex?
>
> A. No, sir, not that I'm aware of.
>
> Q. Did you ask for copies of the financials for the manager, Kassian Maritime Navigation Agency?
>
> A. No, sir, not that I'm aware of.
>
> Q. Did anyone report to you the contents of the company's financials, which were provided to the Coast Guard?
>
> A. No, sir, not that I'm aware of.
>
> Q. Okay. Did you perform or did you request anyone to perform an investigation of the assets of the owning company –
>
> A. No, sir.

Captain John Little Dep., 77:5 – 25.

Captain Little did not request the financials or review the financials because – simply put - he functionally did not have the decision-making authority to determine the quantum of the bond demanded. Captain Little Dep., 115:5-8 (in discussing what bond quantum would be acceptable, Captain Little testified "It wasn't necessarily unsatisfactory to me. It was just something that I was not authorized if you will, or given the green light to release the ship by the district."); *see also* Barnes Dep. 54:19-57:11. Captain Barnes[15] testified that he did not investigate the financial solvency of Angelex (or Kassian). *Id*. When pressed to elaborate on the financial investigation conducted by him or others at his direction, he testified that his role is limited to advising in matters of crew and vessel safety or executions of detentions. *Id.* Again, Captain Little, the individual purportedly with the ultimate say, did not find USD 1,500,000 bond to be objectionable.

Notwithstanding, the government's blatant lack of interest and disregard of Captain Little's views, Angelex Ltd. voluntarily provided corporate records and financials to the Coast Guard on April 23, 2013. Spolidoro Dep., 52:17 – 25. Commander Spolidoro agreed that the records were presented, but asserted that the Coast Guard had no ability to analyze the documents. *Id*. According to the government's flawed argument, because the Coast Guard chose not to analyze the financial documents presented, its decision to maintain the requirement for a USD 2,500,000 bond should be reasonable. *See* Doc. 38-1, p. 22. This, by definition, is not the standard and, simply put, makes no sense. The repeated failure by the Coast Guard to investigate or consider any of the financial records provided do is, by definition, unreasonable.

Finally, the government seeks to contest Angelex's sworn answer that any surety bond would have required 100% collateral, which is an undisputed fact. *See,* Doc. 38-1. p. 24, citing U.S. Exhibit 32. Previously, Angelex provided this answer to interrogatories on December 7, 2015,

---

[15] Captain Barnes was the chief of the prevention department in sector Hampton Roads, responsible for marine inspection, port state control, and marine investigations among other duties. Barnes Dep, p. 12.

which the government never challenged. *Id*. Moreover, the government chose not to depose George Papadakis who verified the answers under the penalty of perjury. *Id*.; *see also* Declaration of George M. Chalos, ¶¶ 6-10. The government cannot now, as part of its motion for summary judgment, question - without offering any contrary evidence - the requirements imposed by International Sureties for the bond to be fully collateralized.[16]

**8. The refusal to accept the USD 1,500,000 bond amount provisionally agreed by the Coast Guard District Legal Officer in charge of the matter and agreeable to Captain Little on May 6, 2013 was unreasonable.**

During the May 6, 2013 hearing before District Judge Doumar, the parties reached a negotiated agreement, wherein Angelex (and Kassian) would agree to the non-financial terms and other conditions sought in exchange for the Coast Guard accepting a surety bond in the amount of USD 1,500,000. 38-2 ¶156. However, once the parties returned from a short recess, Lt. Comm. Andrew Grant, lead counsel for the Coast Guard, reported that there was no agreement, because Coast Guard Headquarters, specifically Admiral Melissa Bert, rejected the USD 1,500,000 bond conditionally offered by Plaintiff. *Id.*, at Hrg. Transcript 54:17-23, 65:2-6. Again, Admiral Bert denied this at her deposition. Admiral Bert Dep., pp. 28:1 – 29:11. Admiral Bert later explained:

> Q. Were you or weren't you part of the decision-making team at Coast Guard headquarters who rejected the agreement that Lieutenant Commander Andy Grant had negotiated with vessel interest at the courthouse in Portsmith, Virginia?
>
> A. I was never a decision-maker.
>
> Q. That's not my question. Were you part of decision-making team? Yes or no?
>
> A. We were not a decision-making team.

[16] Parenthetically, full collateralization of a surety bond is not uncommon in the industry of surety bonds provided in federal cases. *See e.g., Pittston Warehouse Corp. v. American Motorists Ins. Co.*, 1991 U.S. Dist. LEXIS 7030 (S.D.N.Y. May 23, 1991)

Admiral Melissa Bert Dep., 66:13-23; s*ee also* 67:17-20 ("[I]ts up to the captain of the port and the district commander to determine what they want to do for their agreement."). Captain of the Port John Little testified that in fact he did not have authority to accept any quantum of security less than what was required by Coast Guard Headquarters. Captain John Little Dep., 54:3 – 55:24. Even four (4) years after the fact, the Coast Guard still cannot clearly (and perhaps honestly) articulate who actually made the decision to reject the USD 1,500,000 bond figure; why; and/or identify the grounds contemporaneously considered in making such a decision. For sure, the decision did not come from Captain Little. *Id.*, at 54:16-20. The Coast Guard's continued detention of the Vessel in Norfolk for no contemporaneously identified reason other than that the Coast Guard wanted 'more' is completely unreasonable.

**9. Conditioning release of the Vessel on the agreement of a third party with no ownership of the Vessel is unreasonable.**

All of the Coast Guard's demands for the reinstatement of the Vessel's departure clearance was conditioned on Kassian's joint and several agreement to <u>all</u> terms set out in the Security Agreement, including waiver of its dispositive jurisdictional defense. The Coast Guard demanded these concessions from Kassian despite the fact that it did not own the Vessel, had no equity in the Vessel, did not direct the movements of the Vessel, and was not the employer of the crew. PL EX. 1. Worse yet, this demand was made by the government with the knowledge that the Court clearly lacked personal jurisdiction over Kassian. When questioned about the Coast Guard's legal basis for requiring Kassian to be a signatory to any Agreement on Security, Captain Little testified as follows:

> Q. Okay. Now, what was your knowledge as to the ownership of the vessel? Who owned the ship?
>
> A. The owner would be Angelex.

> Q. Now, and what I want to understand is, what was your thinking in making the condition of the release of the vessel requirements that Kassian, not the owner of the ship, agree to do things like post a bond, house and feed the crew, pay a per diem, waive jurisdictional defenses, agree to send people over? I mean, why did you think that a company that doesn't own the asset would be pressured by holding the asset?
>
> A. I'm not sure other than the fact they're the operator of the vessel so it's their job to operate the vessel safely and –
>
> Q. I understand. Now, let me just go one step further, though. By holding the vessel, what did that do with respect to -- in your mind's eye, what did that do with respect to guaranteeing the payment of a fine if Kassian had gotten convicted and fined and Angelex didn't? Didn't do anything, right?
>
> A. Not that I'm aware of.
>
> Q. It wouldn't. It's not their asset, right?
>
> A. They're the operator, Kassian.
>
> ***Q. But they don't have any equitable interest in the ship, did they?***
>
> ***A. I'm not aware of any. The operator is Kassian. The owner is Angelex, so there is the equity.***

Captain Little Dep. 140:8-141:12 (emphasis added). Pursuant to Captain Little's own testimony, conditioning the Vessel's reinstatement of departure clearance on the agreement by Kassian was unreasonable.

**10. Conditioning reinstatement of departure clearance on Kassian's waiver of its personal jurisdiction defense was unreasonable.**

The government argues that Kassian is an "operator" under APPS and therefore 'personal jurisdiction' over Kassian was never actually in doubt. However, as Kassian argued before the district court in the Eastern District of Virginia, the term "operator" is a Coast Guard colloquialism. Kassian was, at all times pursuant to contract, the Vessel's International Safety Management manager, responsible for ensuring compliance with International Management Code for the Safe Operation of Ships (ISM Code). The ISM Code is a civil remedial legal regime and does not

allocate liabilities for the alleged criminal conduct of crewmembers serving onboard a foreign-flagged vessel. *Eisenberg v. Carnival Corp.*, 2008 U.S. Dist. LEXIS 56573 (S.D. Fla. 2008). Kassian is a foreign company, based in Greece, which performed all of its functions outside of the United States. More to the point, Kassian did not direct or control the Vessel's movements and did not cause or contribute to the Vessel calling at any U.S. port. *See* PL EX. 1. Rather, the Vessel was on "time charter"[17] to yet another unrelated party, United Bulk Carriers International, who directed and controlled the Vessel's movement. The government erroneously attempts to apportion personal jurisdiction over Kassian for alleged criminal conduct under APPS, on the basis that it has agreed to serve as the "company" designated by Angelex to ensure the establishment of policies and procedures are in place pursuant to ISM Code requirements. *See* Doc. 38-1. It does not.

Kassian served as the manager of the Vessel pursuant to a ship management agreement between Kassian and Angelex to perform the duties of the ISM manager in exchange for a monthly fee. PL EX. 1, Doc. 38-2, ¶ 101. Serving as the vessel's manager, as per the ISM Code, is not a basis upon which a court may properly exercise personal jurisdiction. Kassian had no control over the port calls to the United States by the Vessel and did not avail itself of doing business in the United States simply by performing the task of ISM manager. *See In re: MS "ANGELN" GMBH & CO. KG v. Bernuth Lines Ltd.*, 2013 U.S. App. LEXIS 2378 (2d Cir. 2013). In ANGELN, the Second Circuit Court of Appeals held:

[17] "A time charter party is a contract for the use of the carrying capacity of a particular vessel for a specified period of time, *e.g.*, months or years. In this respect, a time charter party differs from a voyage charter party, which typically covers only one voyage. By contrast, during the time period fixed by a time charter party, there may be unlimited voyages. As with a voyage charter party, however, the vessel owner under a time charter party is responsible for the navigation and management of the vessel subject to conditions set out in the charter party. Because a time charterer obtains only the carrying capacity of a vessel, it is not responsible for maintenance or repairs to the vessel. However, time charterers usually are responsible for the expense of operating the vessel. The time charterer bears the expenses connected with each voyage and pays hire to the carrier based upon the time the ship is under charter." *Dun Shipping LTD. v. Amerada Hess Shipping Corp.*, 2005 U.S. Dist. LEXIS 23114 *12-13 (S.D.N.Y. Oct. 5, 2005).

> In *Porina*, this Court found "unilateral activities of third parties – [including] charterers – cannot, in themselves satisfy the requirement of contact with the forum." *Porina*, 521 F.3d at 128. Similarly, as in *Porina*, much of Brise's supposed sales and purchases within the United States were made at the direction of the charterers, which cannot establish jurisdiction. Regardless, these contacts also failed to be continuous and systematic enough to amount to general jurisdiction. **Additionally, Brise did not "purposefully avail" itself of doing business in the United States by serving as ISM manager and ensuring compliance with a U.S. safety code mandated by an international treaty, given that Brise could perform this task without any of its vessels entering the United States.**

*Id.* at * 4-5 (emphasis added).

Complying with an international civil regime does not create personal jurisdiction in the United States for the vicarious prosecution of alleged criminal acts of the employees of a diferrent company. Nor does the Coast Guard's detention of a Vessel which Kassian did not own. Admiral Bert, the highest-ranking Coast Guard legal officer involved in this case really conceded there was no basis for personal jurisdiction over Kassian.

> Q. [H]ow does detaining a ship, in your mind's eye, give personal jurisdiction over anybody associated with the vessel?
>
> …
>
> A. It does not confer personal jurisdiction, but it provides -- it does not confer personal jurisdiction.

Admiral Bert Dep., 72:4-11. Parenthetically, District Judge Mark Davis denied Kassian's motion to dismiss for lack of personal jurisdiction without prejudice for renewal based on the government's less than forthright argument that the issue of personal jurisdiction was a mixed issue of fact and law for which testimony would be presented at trial to demonstrate why personal jurisdiction should be found. *See* PL EX. 16. Although no such evidence was presented at trial, the issue was moot as Kassian was acquitted by the jury. *See* Doc. 22-2, ¶71.

**11. The Presence of the Vessel throughout trial was immaterial to the enforcement of any potential fine.**

The government continues to erroneously contend that the Vessel was required to remain in Norfolk because it was necessary to ensure payment of any potential fine which might have been imposed on Angelex, Kassian, and/or the Vessel *in rem*,[18] pursuant to 33 U.S.C. § 1908(d). *See* Doc. 38-1, pp. 20-21.[19] The government's argument is without merit. In April 2013, Angelex provided evidence to the government demonstrating not only its limited financial resources (point 5, *supra*), but also of the fact that the Vessel was encumbered with a preferred ship mortgage which would prime any potential judgment which could have been obtained by the government. *See* PL EX. 3; *see also Angelex Ltd. v. United States*, 2013 U.S. Dist. LEXIS 65846, *14, 2013 AMC 1217 (E.D. Va. 2013) (Where the evidence before Judge Doumar was undisputed by the government that the Vessel was ". . . burdened by a mortgage that exceeds its present value by nearly double").

It is a well-settled principle of admiralty law that competing maritime claims are ranked according to class under the Commercial Instruments and Maritime Lien Act ("CIMLA"), and that nearly every claim, including those arising out of a preferred ship mortgage held by a mortgagee bank, rank higher in priority than the lien claim that the government could have obtained following the assessment of a fine or penalty for a violation of federal statute. *See e.g.*, *United States v. One 254 Ft. FREIGHTER, M/V ANDORIA*, 570 F. Supp. 413, 415 (E.D. La. 1983), *aff'd*, 768 F.2d 597 (5th Cir. 1985); *Sunrise Shipping, Ltd. v. M/V American Chemist*, 1997 U.S. Dist. LEXIS 16087 (E.D. La. Oct. 8, 1997); *United States v. One (1) 254 Ft. Freighter, the M/V Andoria*, 570 F. Supp.

[18] No criminal charges or penalty proceedings were ever pursued against the Vessel *in rem*.

[19] The Coast Guard has asserted this contention throughout this case. However, when pressed during her deposition, Admiral Melissa Bert could not name a single example of the Coast Guard not being able to collect a fine or penalty in excess of a posted bond amount and/or name any shipping company whose vessel had been released on the posting of security who subsequently failed to pay the applicable fine (or penalty) that was either agreed or imposed. Admiral Bert Dep, 56:17 – 57:16.

413 (E.D. La. 1983); *Liberian Int'l Ship & Corp. Registry, LLC v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 2004 U.S. Dist. LEXIS 366 (S.D.N.Y. Jan. 12, 2004). The Coast Guard neglected, refused, or otherwise unreasonably failed to consider this fundamental principle of admiralty law throughout the lengthy detention of the Vessesl, even after the Coast Guard's erroneous position was specifically articulated by District Judge Doumar (and by undersigned counsel for Angelex).

During her deposition, Admiral Bert sheepishly confirmed that neither she nor anyone else with the government actually looked into the mortgage indebtedness of the Vessel. Admiral Melissa Bert, Dep. 76:9-16. More to the point, no one performed any analysis to determine what, if any, recovery the Coast Guard could even expect to have by requiring the Vessel to remain in the district.

> Q. Let me ask my question again. Based on your legal training, education, background, and experience as a commanding legal officer in a Coast Guard district, are you generally aware of the ranking of liens and claims against vessels?
>
> . . .
>
> A. I do not know what they would be in this case.
>
> Q. Did you ask anybody to brief you or advise you on where any Coast Guard penalty or fine would rank?
>
> A. No.
>
> Q. Did you direct anyone to research that issue?
>
> A. No.

Admiral Melissa Bert, Dep. 77:3-19. No one else from the government did either. *See, e.g.*, Commander Laurina Spolidoro Dep. 61:10-23 (confirming that she did not do any research on the priority of liens and was unfamiliar with the Commercial Instruments and Maritime Lien Act); Captain John Little Dep. 92:13 – 93:11 (unaware of the priority of lien claims and did not recall

obtaining an opinion from the lawyers for the Coast Guard on where such a claim would rank or the ability of the United States to recover a fine or penalty).

Simply put, the delay of the Vessel on the basis it was required as security to enforce a fine was completely unreasonable. It is not only unreasonable, but also completely shocking that no one from the government ever even considered its ability or, more precisely, its inability, to recover a fine (or penalty) against the Vessel during the roughly one hundred and sixty-five (165) days in which it remained in Norfolk.

**12. The Vessel's Presence in Norfolk was Immaterial to the Investigation and Prosecution.**

The evidence affirmatively demonstrates that there was no reasonable *financial* basis for the Coast Guard to keep the Vessel detained in Norfolk where there was no ability to recover from the Vessel even if a criminal conviction was obtained. *See* point 11, *supra*. In addition, the Coast Guard's investigation was complete as of April 19, 2013. SMF, ¶ 16. No one – repeat – no one – from the Coast Guard or any other government agency ever attended the Vessel at any point after April 19, 2013 with respect to alleged misconduct because, simply put, there was no need or other reason to go back on board. *See* Milbourne 5/24/2016 Dep. 78:6-23 (confirming that she did not go back to the ship to conduct a criminal investigation once the Port State Control inspectors left the ship, "Because we already had everything off the ship by then."). As further explained by Captain Barnes:

> Q. If the deficiency was noted and then corrected -- are you aware that the deficiency was corrected while the vessel was in port?
>
> A. All the MARPOL deficiencies were eventually corrected.
>
> Q. So once corrected, what purpose would the continued detention -- the continued withholding of the vessel's departure clearance serve for the Coast Guard?
>
> A. To allow the government to seek penalties, until surety is provided.

> Q. And at that time, once the deficiencies were cleared, what was the risk to the environment?
>
> A. When the deficiencies are cleared, there is not a risk to the environment, thus we rescind the IMO detention.

Barnes Dep. 31:17- 32:7.

As Special Agent Milbourne testified, there was no operational or investigative reason for the Vessel to remain in the Eastern District of Virginia.

> Q. Okay. And what was the need for the ship to continue to sit there, in your mind's eye, seeing that you didn't go back on board the ship after April 19th?
>
> A. I had no say in any of that so I don't know what anybody else was thinking.
> …
>
> Q. Is it a fair inference that given the agreed fact that you have never been back to the ship after April 19th or thereabouts that there was no need for you to have the ship here for your investigation?
>
> A. I mean, I never went back on so I didn't -- I didn't need the vessel here, as long as the crew members were.
>
> Q. And just so I'm clear, are you aware of anyone else from the Coast Guard that needed the vessel here to complete their investigation?
>
> A. I don't know. To complete the investigation?
>
> Q. Yes.
>
> A. No.
>
> Q. Are you aware of anyone from the Department of Justice attending on board the vessel ever?
>
> A. Not that I know of.

Milbourne 7/20/2016 Dep. 224:7-12, 224:16-225:8.

On April 27, 2013, the Coast Guard confirmed that any previously alleged operational deficiencies had been corrected. SMF, ¶ 18. Accordingly, as of April 27, 2013, there was no

reasonable basis to continue to detain the Vessel at Norfolk as it posed no risk to the environment and was worthless for the purpose of enforcement of a potential judgment. The only reason articulated by the government in this case for the Vessel to remain in the jurisdiction was a misguided belief that enforcement efforts against the Vessel could be fruitful for the government. However, as explained, the evidence demonstrates that there was no recovery possible from the heavily-mortgaged Vessel and the fact that any unpaid judgment would be an extremely low ranking claim, never to be reached if the Vessel were to have been sold at judicial auction.[20] See point 11, *supra*.

**13. The Non-Financial Terms and Conditions Required Were Unreasonable Under the Facts and Circumstances of this Matter.**

The legislative history of 33 U.S.C. 1908(e) confirms that Congress intended the Coast Guard's authorization to request CBP to withhold or revoke a vessel's customs clearance was granted for the limited and express purpose to obtain security to **ensure the payment of a fine or civil penalty** that might be imposed against a vessel. *See* House Report No. 96-1224 *reprinted in* 1980 U.S.C.C.A.N. 4849, 4864 (emphasis added). Parenthetically, the government never sought to pursue any *in rem* claims. The House of Representatives Committee on Merchant Marine and Fisheries, in discussing HR 6665 (the Bill that was subsequently enacted as APPS) stated:

> ***To ensure payment of any fine or civil penalties*** that might be incurred upon completion of criminal proceedings or civil penalty actions, the Secretary of

[20] Vessel auctions are conducted by the U.S. Marshal Service on the "courthouse steps" on notice and pursuant to the local rules of the District Court. Once a party succeeds in obtaining the winning bid, the first 5-10% of the sale price is taken by the U.S. Marshal service for administrative expenses. Thereafter, the competing claims are ranked according to priority class. "The classes are, from highest priority to lowest, the following: 1. Expenses of justice during *custodia legis* -- expenses arising from the care and operation of the ship while it is in the custody of the Court through the U.S. Marshal (not regarded as a lien, but given priority); 2. Seamen's liens (including those of the Master) for wages, maintenance and cure; and wages of longshoremen directly employed by the vessel; 3. Salvage and general average liens.; 4. Tort liens, including personal injuries; 5. Preferred ship mortgage liens; 6. Liens for necessaries under the Maritime Lien Act of 1920.; 7. State -- created liens of maritime nature; 8. Maritime liens for penalties and forfeiture for violation of Federal Statutes; 9. Perfected non-maritime liens, including tax liens; 10. Attachment liens in causes of action within the admiralty and maritime jurisdiction (foreign attachment); 11. Maritime liens in bankruptcy." *United States v. One (1) 254 Ft. Freighter, the M/V Andoria*, 570 F. Supp. 413, 415, 1983 U.S. Dist. LEXIS 14706, *3-4 (E.D. La. 1983).

> Treasury is required to refuse or revoke clearance to any ship upon the request of the Secretary of Transportation. ***However, clearance may be granted upon filing a bond or other satisfactory security***.

*See* House Report No. 96-1224 *reprinted in* 1980 U.S.C.C.A.N. 4849, 4864. Commander Laurina Spolidoro confirmed at deposition that the government's purpose in delaying the ship was to ensure payment of future APPS fines or penalties:

> Q. Regarding the Coast Guard's agreement on -- agreements on security generally, what to your understanding is the purpose of the monetary bond?
>
> A. The purpose of the bond is to satisfy potential fines for civil penalties.
>
> Q And why is that necessary?
>
> A. It's a sub -- it's an alternative to using the vessel itself to satisfy the fines and penalties.
>
> Q. In other words, if the vessel is gone?
>
> A. Correct. So we have a -- when a vessel is suspected of environmental crimes under certain statutes like the Act to Prevent Pollution from Ships and a criminal case has been referred, the Coast Guard requests that customs clearance be withheld so the vessel is kept in port so that the criminal investigation can proceed, and so that any potential fines or penalties can be recovered from the vessel in an *in rem* -- in a separate in rem action. In the alternative, to allow the vessel to leave, the Coast Guard can negotiate a surety agreement, including a bond, that would put the government in substantially the same place it would have been if the vessel were still here.

Spolidoro Dep. II 206:17-207:15; *see also* 233:23-25.

Here, the Coast Guard demanded and required as conditions of the reinstatement of the Vessel's departure clearance, numerous unfairly onerous and unreasonable non-financial requirements and conditions which have nothing to do with the enforcement of a fine or penalty, but rather shift costs to defendant(s); facilitated the prosecution; coerced waivers of significant rights and defenses, including but not limited to jurisdictional defenses. There simply is no statutory or other legal authority, not even APPS, which authorizes the Coast Guard (or any other

law enforcement agency), to pass the costs of prosecution to a putative defendant. *See United States v. Bevilacqua,* 447 F.3d 124, 127 (1st Cir. 2006) ("The American legal tradition does not, absent specific statutory authority, require defendants to reimburse the government for the costs of their criminal investigations or their criminal prosecutions."). Just because the Coast Guard had the discretion to present overly-broad demands in the first instance, it does not make any of the requirements reasonable. Indeed, they are not. None of these conditions were in accord with legislative intent and Coast Guard-acknowledged purpose of 33 U.S.C. § 1908(e), *i.e*., financial security for the payment of a fine or penalty, and, as such, it is respectfully submitted that these "other" non-financial terms demanded were unreasonable under the facts and circumstances of this case.

## IV. PLAINTIFF DOES NOT SEEK A JURY TRIAL

Further to the Court's directive during the December 19, 2016 Court conference, Plaintiff confirms that it does not seek a jury trial and that this case, to the extent judgment is not entered in Plaintiff's favor as a matter of law, should proceed to a bench trial.

## CONCLUSION

**WHEREFORE,** for the reasons set forth above and what may be added at oral argument should this Court deem oral argument helpful, Plaintiff Angelex respectfully requests that the Court deny the government's Motion for Summary Judgment and grant Angelex's cross-motion for summary judgment on the grounds that the undisputed material facts demonstrate that the government's continued detention and delay of the M/V ANTONIS G. PAPPADAKIS was unreasonable. Angelex further requests such other relief as the Court deems just and proper under the facts and circumstances of this case.

Dated: March 10, 2017
Oyster Bay, New York

Respectfully submitted,

**CHALOS & CO, P.C.**

/s/ George M. Chalos
George M. Chalos
Bar ID 1011459
55 Hamilton Avenue
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516) 750-9051
Email: gmc@chaloslaw.com

## CERTIFICATE OF SERVICE

I certify that on March 10, 2017, the foregoing was filed using the Court's CM/ECF filing system, which will send electronic notification of this filing to counsel of record.

/s/ George M. Chalos
George M. Chalos
Bar ID 1011459