**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ANGELEX LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-56 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' REPLY TO ECF NOS. 22 & 38**
**AND MEMORANDUM IN OPPOSITION TO ECF NO. 40**

**Introduction**

There is little dispute about the fact that the crew of the M/V ANTONIS G. PAPPADAKIS unlawfully disposed of oily bilge waste in violation of the MARPOL Protocol and the Act to Prevent Pollution from Ships (APPS).[1] Similarly, there is virtually no factual dispute about the actions of federal officials in withdrawing the departure clearance of the PAPPADAKIS based on these MARPOL and APPS violations. The determinative issue is whether the facts show the vessel to have been "unreasonably detained or delayed" within the meaning of 33 U.S.C. § 1904(h).

On the other hand, there are a variety of problems with Angelex Ltd.'s (Angelex's) assertions of fact. For example, (1) Angelex relies on *Angelex I*, which was reversed and thus has no further force or effect; (2) Angelex claims that this Court's earlier resolution

---

[1] "'MARPOL Protocol' means the Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, 1973 . . . ." 33 U.S.C. § 1901(a)(4). The term "Convention" is further defined within the next subsection.

of the United States' motion to dismiss, ECF No. 6, which turned on the sufficiency of Angelex's pleadings, controls on the merits; and (3) Angelex relies on inadmissible evidence.

## I. There Is No Genuine Dispute as to Any Material Fact

Angelex admits a number of the government's statements of material fact without qualification. *See* ECF No. 40-3 at 1 (Angelex's Statement of Genuine Issues) (identifying 1, 3-6, 8-12, 15-17, 52-53, 57, 63-67, 71-80, 82-86, 90-94, 98, 101-102, 110-114, 129-131, 142, 149-157, and 166-167). Certainly, these statements are uncontroverted. Fed. R. Civ. P. 56(c); LCvR 7(h).

Angelex further concedes that many of the United States' statements of material fact are accurate, however, it contests their materiality. *See* ECF No. 40-3 at 1 (identifying 13-14, 18-41, 43-48, 58-59, and 68-70); *id*. at 2 (identifying 60-62, 88-89, 99-100, 104-08, 132-33, and 137); *id*. (identifying 115-26). Similarly, "Angelex admits that the following paragraphs are accurate recitations of the testimony provided by Coast Guard witnesses, but submits that these alleged bases for the imposition of non-financial conditions are not reasonable: 138-141." ECF No. 40-3 at 2. The Court may regard all of these statements as uncontroverted under Rule 56(c) and LCvR 7(h). *See Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 62 n.5 (D.D.C. 2015) ("[L]egal arguments alone are insufficient to create a factual dispute to defeat a motion for summary judgment.") (quoting *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 289 (D.D.C. 2014)); *Slate v. ABC*, 941 F. Supp. 2d 27, 29 n.3 (D.D.C. 2009) (treating facts in defendant's statement of facts as conceded "in light of the plaintiff's failure to controvert the fact[s] with record evidence.")).

Only in certain instances does Angelex assert that genuine issues of material fact exist. *See* ECF No. 40-3 at 2-9 (Angelex's Statement of Genuine Issues) (identifying U.S. Statement of Fact Nos. 2, 7, 42, 49, 50, 51, 54, 55, 56, 81, 87, 95, 96, 97, 103, 109, 127, 128, 134, 135, 136, 143 to 148, 158 to 165, and 168).

In addition to this brief, which includes an exhibit, the United States files a separate document containing specific replies to Angelex's responses to the United States' statement of material facts. The United States also files a document setting forth its responses to Angelex's statement of material facts. To the extent that these documents include legal arguments, the United States asks that the Court consider them incorporated by reference.

## II. Procedural Posture

At ECF No. 40-1 (Angelex Mem.) at 2, Angelex discusses the earlier emergency petition, which it filed on April 25, 2013. *See Angelex Ltd. v. United States* (*Angelex I*), No. 2:13-cv-237 (E.D. Va.), ECF No. 1. Angelex sought "injunctive relief" and, in particular, asked the United States District Court for the Eastern District of Virginia to "set a bond and other conditions for the release of the vessel." ECF No. 40-1 (Angelex Mem.) at 2.

Events unfolded quickly. The United States opposed the petition and moved to dismiss on May 2, 2013. *Angelex I*, ECF No. 15. Judge Doumar held a hearing on May 6, 2013, as shown by the hearing transcript, which is filed in this case. *See* ECF No. 38-3.

The government argued that the Administrative Procedure Act (APA) does not allow review in cases challenging agency actions that are "committed to agency discretion

by law." Under 5 U.S.C. § 701(a)(2), review is not available "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Although unsuccessful before the district court, *see Angelex I*, 2013 U.S. Dist. LEXIS 65846, 2013 WL 1934490, 2013 AMC 1217 (E.D. Va. May 8, 2013), the United States prevailed on appeal. *See Angelex Ltd. v. United States* (*Angelex II*), 723 F.3d 500, 509 (4th Cir. 2013) ("For these reasons, the Coast Guard's decisions regarding bond conditions with regard to the Pappadakis are unreviewable, and the district court thereby did not possess subject matter jurisdiction under the APA."). The Fourth Circuit reversed and remanded, directing that the district court dismiss the petition for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Id.* at 510.

## III. Angelex Fails to Acknowledge that Different Standards of Proof Govern a Rule 12 Motion to Dismiss and a Rule 56 Motion for Summary Judgment

Earlier in this proceeding, the United States filed a Rule 12(b)(6) motion to dismiss, which the Court granted in part and denied in part. *See generally Angelex Ltd. v. United States*, 123 F. Supp. 3d 66 (D.D.C. 2015). As it was a Rule 12 motion, the Court's inquiry necessarily focused on whether Angelex's amended complaint stated legally sufficient claims. Even where those claims were found to be sufficient, however, the motion did "not test [Angelex's] ultimate likelihood of success on the merits . . . ." *Angelex*, 123 F. Supp. 3d at 75 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

By contrast, where a Rule 56 motion such as this is concerned, a non-moving party must designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 324 (1986). When Angelex argues, for example, that the Court earlier made an "unambiguous ruling," and that the United States' arguments are "unsupported by this Court's prior opinion," ECF No. 40-1 (Angelex Mem.) at 4, it fails to appreciate the difference between Rule 12 and Rule 56 determinations.

An opposition to a Rule 56 motion must consist of more than unsupported allegations or denials, and must instead be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. "[S]tatements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Slate v. ABC*, 941 F. Supp. 2d 27, 38 (D.D.C. 2013) (citing *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 39, 46 (D.D.C. 2009)); Fed. R. Evid. 56(c)(4).

Angelex tries to alchemize allegations and hearsay into admissible evidence. For example, during the May 6, 2013 hearing before Judge Doumar, Angelex's counsel said to the court, "I'm told that this ship has [$]10,950,000 worth of security interest by a mortgage holder." ECF No. 38-3 (Transcript) at 10:13-15. Based on this representation and hearsay documents, that court concluded, "[T]he Pappadakis [is] burdened by a mortgage that exceeds its present value by nearly double." *Angelex I*, 2013 U.S. Dist. LEXIS 65846, at *14. Here, Angelex claims that "the evidence before Judge Doumar was undisputed by the government . . . ." ECF No. 40-1 at 30. But the United States had no opportunity to dispute Angelex's evidence then, and it does not concede the admissibility of that evidence now.

Similarly, Angelex offers ECF No. 40-2 (The Declaration of Attorney George M.

Chalos); ECF No. 40-5 at 35-37 (Chalos e-mail, Apr. 22, 2013 "URGENT ATTENTION & RESPONSE REQUIRED," Angelex is in "dire financial condition"); ECF No. 40-5 at 39-42 (Chalos e-mail, Apr. 24, 2013, warning against "disastrous results for all concerned"); and ECF No. 40-5 at 52-54 (Chalos e-mail, Jul. 11, 2013, "URGENT ATTENTION AND RESPONSE REQUESTED" alleging "serious humanitarian issues"). The United States objects to the admission of these documents. As with the statement to Judge Doumar, they consist of hearsay presented through Angelex's counsel. *See Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (any evidence considered by a court at the summary judgment stage "must be capable of being converted into admissible evidence.").

Angelex also submits that a demand letter from its counsel to the Coast Guard, *see* ECF No. 20 at 48-56 (PACER pagination), proves that it suffered damages "in an amount not less than USD 4,179,907.44." Angelex's Statement of Material Fact No. 33. The United States objects to its admission. The letter is hearsay, it is unauthenticated, and it asserts information not based on personal knowledge. *See Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996) ("Unless the opposing party points to 'affirmative evidence' showing disputed material facts, the court shall enter summary judgment, if appropriate, against the adverse party.") (internal citation omitted); *Collington v. District of Columbia*, 828 F. Supp. 2d 210, 212 n.5 (D.D.C. 2011) (finding deficient a motion that relied on unauthenticated documents consisting of hearsay); *Akers v. Liberty Mut. Grp.*, 744 F. Supp. 2d 92, 97 (D.D.C. 2010) ("Unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.") (internal citations omitted).

On a separate issue, Angelex has pointed to certain "rough notes" prepared by investigators during crew interviews, *see* ECF No. 22-11 (Eng'g Crew Rough Notes), and claimed that they "showed without ambiguity that none of the alleged bad conduct was done within the course and scope of the crew members' employment and none was done to benefit Angelex." ECF No. 20 (First Am. Compl.) ¶ 79. But review of these notes demonstrates that they do not address the scope of the crew members' employment, nor intent to benefit Angelex. The allegation is not supported by fact.

## IV. The Fourth Circuit's Reversal of *Angelex I* Causes that Decision to be Without Validity, Force, or Effect

For the purpose of issue preclusion or collateral estoppel, Angelex seeks to rely on what it describes as "unchallenged factual findings" made in *Angelex I*. ECF No. 40-1 (Angelex Mem.) at 2. Collateral estoppel "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Angelex*, 123 F. Supp. 3d at 76 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)) (omitting internal citation and quotation marks). For issue preclusion to apply, however, "the issue must have been . . . determined by a court of competent jurisdiction in that prior case." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). Because the *Angelex I* court lacked jurisdiction, its findings may not be relied on for the purpose of collateral estoppel. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) ("It has long been well established that the reversal of a lower court's decision sets aside that decision, leaves it 'without any validity, force, or effect,' and requires that it be treated thereafter as though it never existed.") (quoting *Butler v. Eaton*,

141 U.S. 240, 244 (1891)); *South Carolina Nat'l Bank v. Atlantic State Bankcard Ass'n, Inc.*, 896 F.2d 1421, 1430 (4th Cir. 1990); *Int'l Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 527 F.2d 1162, 1163 (4th Cir. 1975) (per curiam).

**V. Defining the Scope of Reasonable Cause**

Angelex contends that "[d]espite this Court's clear and unequivocal ruling on this legal point in its Order denying the government's Motion to Dismiss, the government repeatedly argues that 'reasonable cause' is a low bar for determining whether to detain a Vessel under 33 U.S.C. 1908(e) (or not)." ECF No. 40-1 at 14. Once again, Angelex fails to appreciate the earlier Rule 12 context.

Furthermore, the Court did not interpret the phrase reasonable cause. It wrote that "Angelex, in its attempt to dodge the issue of reasonable cause entirely, does not offer any standard or contest the Government's standards," *Angelex*, 123 F. Supp. 3d at 81, and concluded: "The Court need not define the precise contours of reasonable cause under *Section 1908(e)*, because Angelex fails to allege in its Complaint that the Coast Guard lacked reasonable cause—under any standard—to believe that the Pappadakis might be subject to a fine or civil penalty for violating MARPOL or APPS." *Id*.

Angelex has yet to identify any reasonable cause standard. Oddly, however, it argues that the United States' analysis was performed "without citation to authority." ECF No. 40-1 (Angelex Mem.) at 14. The contention is odd because the government cited considerable authority, particularly at ECF No. 38-1 (U.S. Mem.) at 4-7. It is Angelex that has largely failed to do so.

Angelex does identify two cases, both of which predate MARPOL by more than a

hundred years, and argues that they properly inform the measure of "judicial oversight contemplated by 33 U.S.C. § 1904(h)." ECF No. 40-1 (Angelex Mem.) at 11 (citing *Gilchrest v. Collector of Charleston*, 10 F. Cas. 355 (C.C.D.S.C. 1808) and *Sumner v. Philadelphia*, 23 F. Cas. 392 (C.C.E.D. 1873)).[2] This seems unlikely. In enacting APPS, Congress spoke directly to the question at issue. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). It set a reasonableness standard. The focus should fall on interpreting the language of APPS.

The United States continues to believe that a Port State Control Officer's expanded MARPOL examination done by Coast Guard personnel fits into the middle ground "between full Fourth Amendment protection and no protection at all, requiring that the government show 'reasonable grounds' but not 'probable cause' . . . ." *United States v. Carpenter*, 819 F.3d 880, 889 (6th Cir. 2016).

## VI. The Presence of Reasonable Cause to Detain a Vessel under 33 U.S.C. § 1908(e) Should Lead to the Presumption that the Vessel Was Not Unreasonably Detained within the Meaning of 33 U.S.C. § 1904(h)

Angelex states that "[t]here is an obvious and compelling legal distinction between reasonable grounds to pursue criminal prosecution and what is reasonable conduct in delaying the sole income earning asset of a lawful business for over six (6) months." ECF No. 40-1 (Angelex Mem.) at 14. Just as before, "Angelex appears to be arguing that the

---

[2] Interestingly, in *Gilchrest*, the court determined that "[t]he granting of clearances is left absolutely to the discretion of the collector; the right of detaining in cases which excite suspicion is given him, with a reference to the will of the executive. . . . [H]aving vested the right of granting or refusing in the collector, with an appeal to the president only in case of refusal—the right of granting clearances in him remains unimpaired and unrestricted." 10 F. Cas. at 356.

Coast Guard could correctly determine that there is reasonable cause to believe that a vessel is in violation of MARPOL or APPS and may be subject to a fine or criminal penalty and request that [Customs Border Protection (CBP)] withdraw the vessel's departure clearance as authorized by *Section 1908(e)* and yet still be unreasonable in doing so under *Section 1904(h)*." *Angelex*, 123 F. Supp. 3d at 80. And now, as then, "Angelex provides no basis for such a tortured reading of *Section 1904(h)*, which, like *Section 1908(e)*, speaks in terms of reasonableness." *Id*.

After this Court ruled on the United States' motion to dismiss, the D.C. Circuit decided *Watervale Marine Co., Ltd. v. United States*, 807 F.3d 325, 330-31 (D.C. Cir. 2015). Having determined that the Coast Guard's nonfinancial conditions were authorized by Section 1908(e), the D.C. Circuit likewise asked whether those conditions might, despite clearing the Section 1908(e) hurdle, yet be deemed unreasonable under Section 1904(h). *Watervale Marine*, 807 F.3d at 330-31 ("We note that another statutory section provides a ship owner with a cause of action for the government's unreasonable delay in granting departure clearance."). But appellants had not raised the point. The Court declined to entertain it and concluded, "[W]e must assume that holding the ships and crew until a civil or criminal proceeding was completed was reasonable." *Id*. at 331. The *Watervale Marine* decision thus does not affect this Court's prior determination "that whether the Coast Guard had reasonable cause under *Section 1908(e)* is at the heart of whether the withdrawal of the Pappadakis's departure clearance was reasonable under *Section 1904(h)*." *Angelex*, 123 F. Supp. 3d at 80.

From the United States' perspective, the prosecution and recovery of any fine or penalty that may be adjudged are a part of the whole where the enforcement of MARPOL and APPS is concerned. Absent some fundamental change in the complexion of the evidence that led to a finding of reasonable cause under Section 1908(e) in the first instance, that finding should, if not wholly determinative, go far in confirming that the vessel was not unreasonably detained under Section 1904(h).[3] Unless Angelex can rebut the presumption of regularity, the Coast Guard's terms of vessel release should be deemed reasonable as a matter of law.

## VII. There Was a Clear Decisionmaker

Angelex argues "that there was no clear process or decision-maker" who established surety terms. ECF No. 40-3 at 9. This is incorrect. Captain Little's superior, the district commander, made the determination. *See* ECF No. 38-12 (Captain John Little, U.S. Coast Guard, Dep. 175:19-21 ("Admiral Ratti, based on his discussions with his legal team and Headquarters Legal, that's where that number came from.")). Such a practice is permissible. *See Columbia Riverkeeper v. United States Coast Guard*, 761 F.3d 1084, 1096 (9th Cir. 2014) ("[W]e are bound by the final determination at the higher level of the agency.").

## VIII. A $2,500,000 Bond Demand Was Reasonable

The Coast Guard has wide discretion in setting a bond demand. *See Watervale*

---

[3] Angelex has not pointed to any fundamental change in evidence in this case. Angelex merely argues that the crew hid their actions, but as the United States has already shown, Kassian had sufficient information in its office files to detect the problem.

*Marine*, 807 F.3d at 330 (acknowledging the Coast Guard's discretion as to a bond amount); *id*. at 331 ("As the majority recognizes, Congress has given the Coast Guard wide discretion in setting the conditions of a bond or other surety.") (Griffith, J., concurring).

Despite the scope of the Coast Guard's discretion, Angelex argues that the agency acted unreasonably in demanding a $2,500,000 bond. ECF No. 40-1 (Angelex Mem.) at 7. Angelex references the THETIS case. But THETIS was *not* "a nearly identical matter" insofar as a bond demand was concerned. As Lieutenant Commander Andrew Grant, U.S. Coast Guard, explains, Kassian was a repeat offender, a fact that the Coast Guard was well aware of at the time of the surety negotiations:

> 14. Prior to the case involving the PAPPADAKIS, I had been involved in approximately 7 involving suspected violations of MARPOL Protocols and APPS. In these cases, I was involved in the successful negotiation of satisfactory surety agreement terms.
>
> 15. One of these cases involved the M/V Thetis. *See* (ECF 40-5 at pgs 58-68, Exhibit 10).
>
> 16. A surety agreement was reached with the Coast Guard concerning the M/V THETIS that provided for a 1.5 million dollars bond along with other conditions. The facts and circumstances involving the M/V Thetis were different than situation involving the PAPPADAKIS. Most significantly, the operator of the PAPPADAKIS, Kassian, had a history of MARPOL Protocol/APPS violations including a past conviction. This factor, which was not present in the THETIS case, was a reason the Coast Guard requested a higher bond amount for the PAPPADAKIS.

Grant Declaration, U.S. Exhibit 45, at ¶¶ 14-16.

Angelex complains that the Coast Guard required a "bond which exceeded the maximum fine which could have been imposed upon the Vessel *in rem*, even if the alleged acts were proven in a criminal trial." ECF No. 40-1 (Angelex Mem.) at 7. But this is

wrong: Had Angelex and Kassian been convicted for Katipis's actions, each APPS violation potentially carried with it—against Angelex and Kassian, separately—a fine of up to $500,000, or twice the gross gain or loss resulting from the unlawful conduct. *See* 18 U.S.C. § 3571(c) and (d). As the PAPPADAKIS called at four U.S. ports with a falsified oil record book, potential fines were up to $2,000,000 each, which drove the Coast Guard's demands for a monetary bond. Throughout its detention, the PAPPADAKIS remained susceptible to *in rem* liability for the payment of such penalties under 33 U.S.C. § 1908(d). Because this possibility existed, the PAPPADAKIS was not "unreasonably detained or delayed" under 33 U.S.C. § 1904(h), and Angelex is not entitled to monetary compensation.

Angelex argues that "District Judge Doumar previously found" that a $2,500,000 bond was "beyond the financial wherewithal" of Angelex and Kassian. ECF No. 40-1 (Angelex Mem.) at 7. And Angelex argues that the Coast Guard was provided with "uncontroverted evidence of Angelex (and Kassian's) limited financial resources and ability to post a bond." ECF No. 40-1 (Angelex Mem.) at 7. As discussed above, *Angelex I* has no force or effect, Angelex's "uncontroverted evidence" is not admissible here, and the Coast Guard was never obligated to accept it as unvarnished truth. Moreover, Angelex and Kassian's representations of limited financial means, if true, suggest that the Coast Guard acted prudently in insisting on a bond or other surety before agreeing to release the PAPPADAKIS.

Nonetheless, Angelex argues that it was irresponsible of the Coast Guard not to have accepted as conclusive the information offered by Angelex as to its limited financial

resources and the heavy debt secured by the PAPPADAKIS. Angelex maintains that the Coast Guard should have the considered the foreign "preferred ship mortgage recorded on the Vessel" and analyzed "the priority of liens if the Vessel were to be liquidated and sold at judicial auction." ECF No. 40-1 (Angelex Mem.) at 7.[4] The implication is that even if the Coast Guard has evidence of a crime under the APPS it would still be unfair to continue detention of the polluting vessel if the owner and operator contend they have limited means to satisfy a fine and the vessel is heavily encumbered by mortgages.

Not only does APPS require no such inquiry by the Coast Guard, but placing such a burden on a law enforcement agency, especially one dealing with foreign entities and facing time constraints, would be unworkable. Even if the agency had the resources and expertise necessary to assess the financial health of the often intentionally-opaque, privately-held overseas companies that operate much of the world's shipping, it would have little way to know if the information provided was accurate. The Coast Guard would certainly have no discovery tools to compel the production of information from the vessel's lenders or other third parties.

Angelex's ultimate point is that the foreign mortgage or mortgages on PAPPADAKIS would prime any lien for a fine or penalty obtained for an APPS violation, so the vessel could provide little security, and the Coast Guard should have let the ship sail

[4] The exhibits that Angelex cites do not show that any mortgage on PAPPADAKIS was executed and properly registered in Malta, as is required to establish a preferred ship mortgage. *See* 46 U.S.C. § 31301(6) (requiring, where foreign vessels are concerned, that the mortgage be "executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and . . . *registered under those laws in a public register at the port of registry of the vessel or at a central office*[.]") (emphasis added).

almost immediately. While no case has addressed the issue of the priority of a maritime lien for an APPS fine, such a fine could indeed prime a foreign mortgage.

It is true that a preferred ship mortgage placed on a *U.S.-documented* vessel under 46 U.S.C § 31322(d) of the Federal Maritime Lien Act (FMLA) would be paramount to a lien for a fine or penalty. However, foreign mortgages on foreign vessels are treated differently. Although foreign mortgages can be foreclosed by proceedings in federal courts, they remain subordinate to liens from U.S. suppliers of necessaries. *See* 46 U.S.C. § 31326 ("[F]or a foreign vessel whose mortgage has not been guaranteed under [46 U.S.C. §§ 53701, *et seq*.], the preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States[.]"). It is the United States' view that a fine assessed for an APPS violation should be accorded as much weight under United States law as a domestic lien for necessaries; that is, it should prevail over a foreign mortgage interest.

No case could be found to so hold, nor to reject such a proposition, and the cases cited by Angelex simply stand for the premise that the general maritime law grants priority status to mortgages on U.S.-documented vessels and that foreign ship mortgages are also accorded recognition, though of lesser rank. Be this as it may, the issue is not squarely before the Court. No fine was adjudged in the criminal case, the United States is not trying to collect one, and Angelex's proof where a mortgage on the PAPPADAKIS is concerned is inadmissible.

## IX. The Nonfinancial Conditions

### A. *Watervale Marine*

Angelex contends that the Coast Guard and CBP acted unreasonably in predicating the return of the PAPPADAKIS's departure clearance on Angelex and Kassian's compliance with certain nonfinancial conditions. In particular, it argues that the Coast Guard acted unreasonably by "[i]mposing numerous nonnegotiable demands wholly unrelated to monetary security for the payment of a fine or penalty, contrary to the requirements of 33 U.S.C. § 1908(e)." ECF No. 40-1 (Angelex Mem.) at 6.

But the surety terms proposed by the Coast Guard in the PAPPADAKIS matter are essentially the same as those considered in *Watervale Marine Co., Ltd. v. United States*, 807 F.3d 325 (D.C. Cir. 2015). "[T]he main issue in [that] case [was] whether the Coast Guard may require the nonfinancial conditions." *Id.* at 330. And the *Watervale Marine* court was well aware that the Coast Guard's surety "agreements include several terms above and beyond the posting of a typical financial bond." *Watervale Marine*, 807 F.3d at 328. Indeed, it knew precisely what those conditions were:

> They called for the vessel owners and operators to pay wages, housing, and transportation costs to crew members who remain in the jurisdiction, as well as facilitate their travel to court appearances, to encourage crew members to cooperate with the government's investigation, to help the government serve subpoenas on foreign crew members located outside of the United States, to waive objections to both *in personam* and *in rem* jurisdiction, and to enter an appearance in federal district court.

*Watervale Marine*, 807 F.3d at 328.

The *Watervale Marine* court further recognized that the agreements "were designed to allow the government to later prosecute its case if merited[,]" and concluded that the "nonfinancial conditions can, therefore, be thought of as simply the *quid pro quo* for allowing ships to depart." *Id.*

Angelex attempts to distinguish *Watervale Marine* by claiming "the issues here are completely different." ECF No. 40-1 (Angelex Mem.) at 11. It is not clear how. As discussed above, it would make little sense to accept as proper the Coast Guard's surety terms under Section 1908(e) and then, without any change in circumstance, find them to be unreasonable under Section 1904(h).

Moreover, the nonfinancial conditions are *not*, as Angelex contends "wholly unrelated to monetary security for the payment of a fine or penalty." ECF No. 40-1 at 6. As the *Watervale Marine* court observed, "the financial terms of a bond referred to in [APPS] cover the ultimate liability of a ship owner, which can be determined only after a legal proceeding, either civil or criminal." *Id*. at 329. "[N]othing prevents the ship, after posting the bond, from sailing away. And if the government lacks sufficient evidence to present in court without the ship and its crew, the ship owner's liability disappears." *Id*.

A bond or other surety most certainly can include both financial and nonfinancial conditions and usually does. As Judge Griffith explained, a bond is simply a "'written promise to pay money or *do some act* if certain circumstances occur or a certain time elapses.'" *Watervale Marine*, 807 F.3d at 331 (quoting Black's Law Dictionary (10th ed. 2014)) (emphasis original) (Griffith, J., concurring). Judge Griffith observed that the definition of a "surety is similarly broad: a 'formal assurance,' especially 'a pledge, bond, guarantee, or security given for the fulfillment of an undertaking.'" *Id*. (quoting Black's Law Dictionary). He concluded "that both bonds and sureties are general contractual devices used to assure performance of some act. The text of the statute [APPS] nowhere limits these ordinary meanings to financial conditions alone." *Id*.

### B. Crew Rights and Liberties Are a Red Herring

Angelex argues that the Coast Guard demanded that it interfere with the "rights and liberties" of its crew by requiring them to "disembark the Vessel and remain functionally detained in the Eastern District of Virginia for an unspecified and unlimited amount of time at the pleasure of the government." ECF No. 40-1 (Angelex Mem.) at 6. But the stay-behind crew members were not "functionally detained" by the surety agreement, to which they were not—crew members never are—a party. In this instance, they were arrested as material witnesses, or in Chief Engineer Katsipis's case as a target.[5] A material witness is free to request, through independent counsel, which these crew members had, that he be deposed and allowed to return home pursuant to 18 U.S.C. § 3144 (authority to secure testimony of material witnesses) and Fed. R. Crim. P. 15 (authority to take depositions of witnesses).

Judge Steele's comments in *Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*, 843 F. Supp. 2d 1241, 1250 n.16 (S.D. Ala. 2012), are apt here:

> As for the crew members, objections predicated on their "rights and liberties" are a red herring at this juncture. The rights and liberties of those individuals are more than adequately protected, given that [they] have been served with arrest or material witness warrants, are represented by independent counsel, and are under the active supervision of this District Court . . . .

*Id*.

---

[5] On information and belief, the stay behind crew members were arrested on material witness warrants not because they were unwilling to cooperate, but because the government had to have a mechanism to provide them with funds when Angelex terminated their employment.

In fact, while Angelex could have attended to the crew members' financial well-being when the APPS violations came to light, it instead terminated the employment of the stay-behind crew.

**C. Kassian's Operation of the PAPPADAKIS**

Angelex continues to paint Kassian as a "third party" and to claim that there was no personal jurisdiction over it. ECF No. 40-1 (Angelex Mem.) at 6. Angelex offers these arguments:

> Kassian was, at all times pursuant to contract, the Vessel's International Safety Management manager, responsible for ensuring compliance with International Management Code for the Safe Operation of Ships (ISM Code). The term "operator" is a Coast Guard colloquialism. The government erroneously attempts to apportion personal jurisdiction over Kassian for alleged criminal conduct under APPS, on the basis that it had agreed to serve as the "company" designated by Angelex to ensure the establishment of policies and procedures are in place pursuant to ISM Code requirements. As a matter of law, there is no personal jurisdiction over Kassian. *See, e.g., Porina v. Marward*, 521 F.3d 122 (2d Cir. 2008).

ECF No. 40-3 at 3.

The arguments are incorrect. While Kassian was the PAPPADAKIS's ISM manager, overwhelming evidence shows that it was also the PAPPADAKIS's "operator" as defined in APPS. *See* 33 U.S.C. § 1901(a)(9)(a) ("'operator' means—in the case of a ship, . . . any other person, except the owner, who is responsible for the operation, manning, victualing, and supplying of the vessel").

Indeed, in answering U.S. Interrogatory No. 2, Angelex conceded that Kassian was the PAPPADAKIS's operator:

> INTERROGATORY NO. 2: The Act to Prevent Pollution from Ships specifically defines a vessel operator as "any other person, except the owner,

> who is responsible for the operation, manning, victualing, and supplying the vessel." 33 U.S.C. § 1901(a)(9)(a). Within the meaning of this provision, please identify the operator of the M/V ANTONIS G. PAPPADAKIS for the period May 1, 2012, to April 15, 2013.
>
> ANSWER
>
> The ISM Manager, Kassian Maritime Navigation Agency Ltd., would be the "Operator" under the definition of the Act to Prevent Pollution from Ships.

ECF No. 38-8 (Angelex Answers) at 3.

Mr. George Pappadakis, who shares a name with the vessel at issue, affirmed the accuracy of this answer under oath in accordance with Federal Rule of Civil Procedure 33(b)(3), *id.* at 13, which Angelex has not withdrawn or supplemented. Fed. R. Civ. P. 26(e).

Angelex and Kassian themselves use the term "operation," another form of the word "operator," in the contract between them. *See* ECF No. 38-10 (admitting the accuracy of the August 13, 2009 Safe Management Agreement between Angelex and Kassian). *See also* ECF No. 22-16 (ISM Declaration) (listing Kassian as "the entity who is responsible for the *operation* of the ship.") (emphasis added).

Kassian's Corporate Compliance Manager, Captain John Liokouras, testified that Kassian is a ship management company and that "management" means the operation of ships. *United States v. Kassian Maritime Navigation Agency, Ltd.*, Crim. No. 2:13-cr-70 (E.D. Va.), ECF No. 131 (Crim. Trial Transcript) at 1140-42 (excerpted at ECF No. 22-22).

Captain Liokouras further explained that, before calling at a U.S. port, Kassian would submit a Notice of Arrival to the Coast Guard listing itself as the operator of the

PAPPADAKIS. *United States v. Kassian Maritime Navigation Agency, Ltd.*, Crim. No. 2:13-cr-70 (E.D. Va.), ECF No. 131 (Crim. Trial Transcript) at 1145-46 (excerpted at ECF No. 22-22).

Kassian hired the PAPPADAKIS's master and chief engineer on Angelex's behalf. *See United States v. Kassian Maritime Navigation Agency, Ltd.*, Crim. No. 2:13-cr-70 (E.D. Va.), ECF No. 131 (Crim. Trial Transcript) at 1152-53 (excerpted at ECF No. 22-22).

Kassian's control over the PAPPADAKIS and its crew underscore its role as operator. *See United States v. Kassian Maritime Navigation Agency, Ltd.*, Crim. No. 2:13-cr-70 (E.D. Va.), ECF No. 135 (Crim. Trial Transcript) at 235 (Enicola testimony); id., ECF No. 134 (Gabalonzo testimony) at 412-13; *id.*, ECF No. 134 (Silfavan testimony) at 615-16; *id.*, ECF No. 133 (Gedalanga testimony) at 712; *id.*, ECF No. 132 (Montilla testimony) at 960-62; *id.*, ECF No. 132 (Aransa testimony) at 981-83 (all excerpted at ECF No. 22-22).

Once a vessel enters the waters of the United States, there is personal jurisdiction over its operator. The United States references and incorporates its earlier arguments to this effect. *See* ECF No. 38-1 (U.S. Mem.) at 16-20.

Angelex relies on *Porina v. Marward Shipping Co.*, 521 F.3d 122 (2d Cir. 2008) for the proposition that "[a]s a matter of law, there is no personal jurisdiction over Kassian." ECF No. 40-3 at 3. This reading is incorrect, however, and *Porina* must be distinguished. In a nutshell, *specific* personal jurisdiction in the criminal case involving the PAPPADAKIS parties was based on the PAPPADAKIS's presentation of a false Oil

Record Book while in the Eastern District of Virginia. APPS, by its terms, expressly applies to non-U.S.-flagged ships "while in the navigable waters of the United States." 33 U.S.C. § 1902(a)(2) (identifying ships subject to preventive measures). Although Angelex disagrees, it is clear that Kassian was "responsible for the operation, manning, victualing, and supplying of the [PAPPADAKIS]" while it was in the navigable waters of the United States. 33 U.S.C. § 1901(a)(9)(a) (defining the term "operator").

*Porina*, on the other hand, involved an alleged vessel collision that sank a fishing vessel in the Baltic Sea causing a loss of life. The United States District Court for the Southern District of New York declined to exercise *general* jurisdiction over the Cypriot vessel owner based on contacts unrelated to the purported collision. *See Porina*, 521 F.3d at 128 ("The difficulty with plaintiffs' reliance on the *Vladimar's* American port visits is that none of the visits were made at Marward's direction."). Here, however, the PAPPADAKIS's visit to the Port of Norfolk did not have to be made at Kassian's direction, nor Angelex's for that matter, for personal jurisdiction to exist over both. The critical fact is that Kassian operated the PAPPADAKIS, and that Angelex owned it, when a false oil record book was presented in the Port of Norfolk.

**D. Angelex Manufactures a Due Diligence Requirement for CBP**

Angelex complains that CBP failed "to exercise any *due diligence* to make sure the continued delay and detention of the Vessel was reasonable before interfering with Plaintiff's only income earning asset's ability to continue her journey and trade." ECF No. 40-1 (Angelex Mem.) at 7 (emphasis added). Angelex's "due diligence" requirement is a creature of its own invention.

Under circumstances such as these, APPS requires that CBP withhold a vessel's departure clearance on the Coast Guard's request. *See* 33 U.S.C. § 1908(e) ("[I]f reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of [DHS], upon the request of the Secretary [of DHS], *shall* refuse or revoke the clearance . . . .") (emphasis added).

CBP's actions were similarly required by regulation:

> If a port director receives a request from a Coast Guard officer to refuse or revoke the clearance or permit to proceed of a vessel because . . . reasonable cause exists to believe that they may be subject to a fine or civil penalty under the provisions of 33 U.S.C. 1908 for violating the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973 (MARPOL Protocol), the Act to Prevent Pollution from Ships, 1980 (33 U.S.C. 1901-1911), or regulations issued thereunder, such clearance or a permit to proceed shall be refused or revoked. Clearance or a permit to proceed may be granted when the port director is informed that a bond or other security satisfactory to the Coast Guard has been filed.

19 C.F.R. § 4.66c(a). *See also Watervale Marine*, 807 F.3d at 330 ("[I]t is clearly the Coast Guard under the Secretary's regulations that has the authority granted by the Secretary to 'request' that Customs 'refuse' clearance.") (referring to 19 C.F.R. §§ 4.60(a), 4.66a, 4.66c(a)).

**E. The Charter Is of No Moment**

Angelex complains that the United States failed "to consider the Vessel was 'on charter' to an unrelated third party United Bulk Carriers International . . . ." ECF No. 40-1 (Angelex Mem.) at 8. The Coast Guard is charged with a duty to enforce certain laws passed to protect the environment. In this instance, to enforce APPS, the Coast Guard

asked that CBP withhold the PAPPADAKIS's departure clearance. This withholding was necessary to ensure the United States' ability to collect any fine or penalty that might be assessed. It is unfortunate if chartering arrangements were upset, if cargo was delayed, or if commercial interests were affected, however, neither MARPOL, nor APPS, nor the regulations that follow, contain an exception to enforcement based on such concerns.

**Conclusion**

For the foregoing reasons, and those set forth at ECF Nos. 22-1 and 38-1 (U.S. Mems.), the United States respectfully requests that the Court grant summary judgment in its favor.

DATED: April 3, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JOHN G. INTERRANTE
Assistant United States Attorney

*/s/ Michael A. DiLauro*
MICHAEL A. DiLAURO
Senior Admiralty Counsel
Aviation & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
1425 New York Ave., N.W., Ste. 10146
Washington, D.C. 20005 (overnight courier)
P.O. Box 14271
Washington, D.C. 20044-4271 (mailing)
Telephone: (202) 616-4047
Facsimile: (202) 616-4159
michael.dilauro@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on April 3, 2017, the foregoing was filed using the Court's CM/ECF filing system, which will send electronic notification of this filing to counsel of record.

*/s/ Michael A. DiLauro*
MICHAEL A. DiLAURO
Senior Admiralty Counsel