# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANGELEX LTD., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0056 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 38, 40, 42 |
| | : | | |
| UNITED STATES OF AMERICA | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT;
DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE

## I. INTRODUCTION

In April 2013, the United States Coast Guard ("Coast Guard") performed a routine inspection aboard a foreign-flagged shipping vessel named the M/V ANTONIS G. PAPPADAKIS, which revealed potential criminal violations stemming from the unlawful disposal of oily bilge waste. Criminal charges were subsequently filed against the vessel's owner, its International Safety Management manager, and its Chief Engineer. While these charges were pending, the Coast Guard refused to reinstate a clearance that would allow the ship to return to sea unless a bond in the amount of $2.5 million dollars was posted and the parties agreed to certain other nonmonetary conditions. However, these demands were never met. Ultimately, both the owner and the International Safety Management manager were acquitted of the charges and the ship's departure clearance was finally granted in September 2013.

In the present action, Plaintiff Angelex Ltd. ("Angelex"), the owner of the ship, has filed suit against Defendant the United States of America (the "Government") under 33 U.S.C.

§ 1904(h), seeking compensation for losses incurred as a result of the nearly five-month delay of the vessel. In short, Angelex contends that the Coast Guard's acts and omissions, including its demand for a $2.5 million bond and other nonmonetary conditions, resulted in the unreasonable delay of the vessel, thus entitling Angelex to compensation. Pending now before the Court are the parties' cross-motions for summary judgment. *See* Def.'s Renewed Mot. Summ. J. ("Def.'s Renewed Mot."), ECF No. 38; Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 40. For the reasons stated below, the Court finds that the Government is entitled to summary judgment on all claims.

## II. BACKGROUND[1]

Angelex is a foreign corporation registered in Malta and is the owner of the foreign-flagged vessel known as the M/V ANTONIS G. PAPPADAKIS (the "Pappadakis" or the "Vessel"). Def.'s Statement Material Facts ("Def.'s SMF") ¶¶ 1, 3, ECF No. 22-2; Pl.'s Resp. SMF at 1. At all times relevant to the current action, Kassian Maritime Navigation Agency, Ltd. ("Kassian"), a Greek company, contracted with Angelex to serve as the International Safety Management manager ("ISM manager") aboard the Pappadakis. Def.'s Resp. SMF ¶ 3. On April 14, 2013, the Pappadakis was on a long-term time charter to United Bulk Carriers International when it arrived at the Norfolk Southern terminal at the Port of Norfolk to load a shipment of coal. Def.'s SMF ¶ 5; Pl.'s Resp. SMF at 1; Def.'s Resp. SMF ¶ 4. The next day, officers from the United States Coast Guard ("Coast Guard") conducted a routine Port State

---

[1] Unless otherwise noted, this section recounts only facts that the parties do not dispute or facts substantiated by the record. *See generally* Pl.'s Resp. Def.'s Statement Material Facts ("Pl.'s Resp. SMF") at 1–2, ECF No. 40-3 (admitting that certain facts and evidence supporting factual assertions are undisputed); Def.'s Resp. Pl.'s Statement Material Facts ("Def.'s Resp. SMF"), ECF No. 46-2 (admitting certain factual contentions); Answer First Am. Compl., ECF No. 21 (admitting certain factual contentions).

Control inspection onboard the ship. Def.'s SMF ¶ 15; Pl.'s Resp. SMF at 1. During the

inspection, a member of the crew provided Coast Guard inspectors with a note and photographic

evidence of a so-called "magic pipe," which was designed to bypass certain environmental safety

features aboard the ship. Def.'s SMF ¶¶ 16, 18; Pl.'s Resp. SMF at 1. Specifically, this

temporary modification was intended to bypass the ship's oily water separator such that oily

bilge waste that accumulated aboard the Vessel would be pumped directly overboard without

first having contaminants removed. Def.'s SMF ¶¶ 16, 18; Pl.'s Resp. SMF at 1. Given this

information, the Coast Guard decided to conduct a wider investigation into the Vessel's

compliance with the Act to Prevent Pollution from Ships ("APPS"). Def.'s SMF ¶ 20; Pl.'s

Resp. SMF at 1.

### A. The Act to Prevent Pollution from Ships

The APPS is a federal statute that implements an international maritime treaty called the

International Convention for the Prevention of Pollution from Ships, commonly known as

"MARPOL." MARPOL aims "to achieve the complete elimination of intentional pollution of

the marine environment by oil and other harmful substances and the minimization of accidental

discharge of such substances." *See Wilmina Shipping AS v. U.S. Dep't of Homeland Sec*.

(*Wilmina Shipping II*), 934 F. Supp. 2d 1, 6 (D.D.C. 2013) (quoting *United States v. Pena*, 684

F.3d 1137, 1142 (11th Cir. 2012)); *see also* 33 U.S.C. § 1901(a)(4). In furtherance of that goal,

MARPOL requires that a vessel only discharge oily water at sea if special equipment is used to

contain most of the oil and other contaminants and also requires that vessels record all oil

transfers and discharges in an oil record book, which must be made available for a government to

inspect. *See Wilmina Shipping II*, 934 F. Supp. 2d at 6–7 (citing *United States v. Ionia Mgmt.,

S.A.*, 555 F.3d 303, 306–07 (2d Cir. 2009)). MARPOL, however, is not self-executing. Each

signatory nation must implement the treaty by establishing rules that, among other things, sanction ships that violate MARPOL's provisions. *See id*. at 6.

In 1980, the United States enacted the APPS to implement MARPOL. The "APPS authorizes the Secretary [of the United States Department of Homeland Security ('DHS')] to administer and enforce MARPOL and to issue regulations to implement the treaty's requirements." *Id*. at 7 (citing 33 U.S.C. § 1903(a), (c)(1); 33 C.F.R. § 151.01 (2014); *see also Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 807 F.3d 325, 327 (D.C. Cir. 2015); *United States v. Sanford Ltd.*, 880 F. Supp. 2d 9, 11–12 (D.D.C. 2012). Under the APPS, "[i]t is unlawful to act in violation of the MARPOL Protocol . . . or the regulations issued thereunder." 33 U.S.C. § 1907(a). One such regulation requires vessels over a certain tonnage to maintain an oil record book. *See* 33 C.F.R. § 151.25. This document must contain, among other things, an accurate record of discharges of bilge water and oily mixtures. *See id.* at § 151.25(d). In addition, it must be made readily available for inspection at all reasonable times. *See id.* at § 151.25(i). Anyone who knowingly maintains a false oil record book is guilty of a felony and may also be subject to civil liability. *See, e.g., Sanford*, 880 F. Supp. 2d at 11 (individual defendants charged with seven felony counts under the APPS including maintaining a false oil record book); 33 U.S.C. § 1908(a) ("A person who knowingly violates the MARPOL Protocol . . . commits a class D felony."); 33 U.S.C. § 1908(b) (setting forth the amount of fines that individuals must pay when found civilly liable for violations of MARPOL). If charged criminally, individuals can face possible fines up to $250,000 while organizations can face fines up to $500,000 for each violation.[2] *See* 18 U.S.C. § 3571(b)(3), (c)(3). And any ship that

---

[2] Originally, APPS made each criminal violation subject to a fine of "not more than $50,000" for each violation. Act to Prevent Pollution from Ships, Pub. L. No. 96-478, § 9, 94 Stat. 2297 (1980). Congress later passed the Oil Pollution Act of 1990, which, among other

violates MARPOL, APPS, or the regulations promulgated thereunder is "liable *in rem* for any [criminal] fine . . . or civil penalty" that that might be assessed in those proceedings. 33 U.S.C. § 1908(d).

Under the APPS, as well as certain other statutes, the Coast Guard is authorized to board and inspect vessels that are docked at U.S. ports to detect potential violations of the APPS, MARPOL, and other environmental laws. 33 C.F.R. § 151.23(a); *see also* 14 U.S.C. § 89 (authorizing Coast Guard officers to board and inspect ships at ports). Before departing a U.S. port, foreign-flagged ships must obtain a departure clearance from U.S. Customs and Border Protection ("CBP"). 46 U.S.C. § 60105(b). However, under 33 U.S.C. § 1908(e), if there is "reasonable cause" to suspect that "a ship, its owner, operator, or person in charge" may be subject to a fine or civil penalty under the APPS and the Coast Guard has requested that the departure clearance be withheld, CBP is obliged to withhold or revoke the clearance. *See* 33 U.S.C. § 1908(e); *Watervale Marine Co.*, 807 F.3d at 330. Furthermore, federal officials are authorized to grant departure clearances for ships previously detained only "upon the filing of a bond or other surety satisfactory to the Secretary." 33 U.S.C. § 1908(e). The D.C. Circuit has noted that this provision grants the Coast Guard "wide discretion" in setting the monetary amount of a bond and has further held that § 1908 authorizes the Coast Guard to condition the reinstatement of a departure clearance on other non-financial conditions as well. *See Watervale Marine Co*, 807 F.3d at 330.

---

things, "strengthen[ed] penalties under a number of [] marine transportation safety laws, including penalties for . . . the Act to Prevent Pollution from Ships . . . ." H.R. Conf. Rep. No. 101-653 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 883.

## B. Withdrawal of the Pappadakis's Departure Clearance

The expanded investigation of the Pappadakis revealed that the Vessel's oil record book contained no entries recording the direct discharge of oily bilge water overboard without being processed through the oily water separator. Def.'s SMF ¶ 21; Pl.'s Resp. SMF at 1. Yet, inspectors discovered that the ship's oily water separator was not even operable. Def.'s SMF ¶ 22–23; Pl.'s Resp. SMF at 1. Coast Guard officials continued to inspect the Pappadakis and interview crewmembers in the days that followed. Def.'s SMF ¶ 25; Pl.'s Resp. SMF at 1.

On April 19, 2013, the Coast Guard completed its onboard investigation and no further investigation was ever conducted after that point. Def.'s SMF ¶ 63; Pl.'s Resp. SMF at 1; Def.'s Resp. SMF ¶ 16. That evening, in light of its findings, the Coast Guard sent a letter to Angelex and Kassian informing them that the Coast Guard had collected evidence "establishing reasonable grounds to believe" that the Pappadakis had violated MARPOL and APPS. Def.'s SMF ¶ 64; Pl.'s Resp. SMF at 1. Accordingly, the Coast Guard requested that CBP withhold the Pappadakis's departure clearance, but did not provide any information reasoning or factual predicate supporting its recommendation. Def.'s SMF ¶ 64; Pl.'s Resp. SMF at 1; Def.'s Resp. SMF ¶¶ 5, 7. Upon the Coast Guard's request, and without conducting its own investigation, CBP withdrew the Pappadakis's departure clearance. Def.'s Resp. SMF ¶ 5–6. However, the Coast Guard informed Angelex that it would request the departure clearance be reinstated "[w]hen adequate surety" was provided. Def.'s SMF ¶ 64; Pl.'s Resp. SMF at 1.

Soon thereafter, Angelex and the Coast Guard began discussing the terms and conditions necessary to reinstate the Vessel's departure clearance. Def.'s SMF ¶ 65; Pl.'s Resp. SMF at 1. The Coast Guard sought both the posting of a monetary bond and the execution of a "Security

Agreement" that imposed various non-financial conditions. Under the Security Agreement both Angelex and Kassian would be required to take the following actions:

- pay wages, housing and transportation costs, along with a per diem for those crew members deemed material witnesses that remained in the jurisdiction and facilitate their travel for court appearances;

- maintain the employment of the crew members that remained in the jurisdiction;

- encourage crew members to cooperate with investigators and refrain from taking disciplinary or other adverse actions against crewmembers who cooperate;

- hold the crew members' passports for safekeeping and notify the government if any crew member requested the return of his passport;

- arrange for repatriation of crew members once they left the United States;

- stipulate to the authenticity of documents and items seized from the vessel;[3]

- assist the Government in effecting service of process on crew members located outside the United States;

- waive objections to both *in personam* jurisdiction over themselves and waive *in rem* jurisdiction over the vessel; and

- authorize counsel to accept service of legal papers and enter an appearance in federal district court.

*See* Def.'s SMF ¶ 66; Pl.'s Resp. SMF at 1; Def.'s Mot., Ex. 7, ECF No. 22-8.

---

[3] The Security Agreement provided, however, that Angelex and Kassian were not waiving any objections "they may have to the relevance or admissibility of the documents . . . , or to the manner in which they were seized and removed, or to any other matter concerning the documents or things except their authenticity at the time of their seizure." Def.'s Mot., Ex. 7.

The parties, however, did attempt to negotiate. According to Angelex, neither it nor Kassian could afford the bond amount that the Coast Guard was demanding and Angelex attempted to persuade the Coast Guard of this. *See* First Am. Compl. ¶¶ 41, 50, ECF No. 20; Pl.'s Cross-Mot., Exs. 3–4, ECF No. 40-5; *see also* Pl.'s Cross-Mot. at 7, ECF No. 40; Pl.'s Reply at 6, ECF No. 48. Additionally, Angelex represented to the Coast Guard that the Pappadakis was encumbered with a mortgage that exceeded the value of the Vessel. *See* Pl.'s Cross-Mot., Exs. 3–4. As a result of these factors, the negotiations between the parties appear to have largely centered on the bond amount. *See* Def.'s Supplemental Statement Material Facts ("Def.'s Supplemental SMF") ¶¶ 149–157, ECF No. 38-2; Pl.'s Resp. SMF at 1; Pl.'s Cross-Mot., Exs. 3–4. Initially, the Coast Guard demanded a bond in the amount of $3 million. Def.'s Supplemental SMF ¶ 150; Pl.'s Resp. SMF at 1. Angelex counter-offered with a $174,000 bond and later increased its offer to $500,000 and then $775,000. Def.'s Supplemental SMF ¶¶ 150, 152–53; Pl.'s Resp. SMF at 1. The Coast Guard, on the other hand, was only ever willing to reduce the bond amount to $2.5 million. Def.'s Supplemental SMF ¶ 154; Pl.'s Resp. SMF at 1. The Coast Guard insisted that unless Angelex and Kassian jointly and severally posted a $2.5 million bond, the Vessel was to remain in the district as security for potential criminal fines or penalties. Angelex would not agree and therefore the parties were at an impasse. Def.'s SMF ¶ 73; Pl.'s Resp. SMF at 1. As a result, the Coast Guard continued to withhold the ship's departure clearance.

## C. Litigation in the Fourth Circuit

Unwilling or unable to meet the Coast Guard's demands, and with the Pappadakis unable to leave port, Angelex filed an emergency petition in the District Court for the Eastern District of Virginia seeking the reinstatement of the Pappadakis's departure clearance. *See Angelex Ltd. v.*

*United States*, No. 13-237, 2013 WL 1934490, at *3 (May 8, 2013 E.D. Va.) ("*Angelex I*").

Senior District Judge Robert Doumar held a hearing on Angelex's emergency petition on May 6,

2013. *Id.* At one point during the hearing, the court took a recess to allow the parties to

negotiate further. *Id.* The parties discussed and ultimately reached an agreement in principle.

*Id.* Specifically, Angelex agreed that it would accept all of the non-financial conditions if the

Coast Guard would be willing to accept a bond amount of just $1.5 million. *See* First Am.

Compl. ¶¶ 56–58, ECF No. 20; Answer First Am. Compl. ¶ 58, ECF No. 21. But when the court

reconvened, the Government informed the judge that Coast Guard headquarters had rejected the

proposed agreement and refused to accept anything less than the $2.5 million bond it had

previously offered. *Angelex I*, 2013 WL 1934490, at *3.

     Because the parties failed to reach an agreement, Judge Doumar was forced to rule on

Angelex's emergency petition. After first finding that the court had subject matter jurisdiction to

hear Angelex's emergency petition under both the Administrative Procedure Act ("APA") and

the court's admiralty jurisdiction, Judge Doumar ruled that the Coast Guard had abused its

discretion in demanding a bond of $2.5 million and imposing other non-monetary conditions. *Id.*

at *9. The court then entered an order setting a bond of $1.5 million with several specific non-

monetary conditions. *See id.* at *10. The Government requested that the district court

temporarily stay its order and simultaneously filed a notice of appeal requesting a stay from the

U.S. Court of Appeals for the Fourth Circuit. *See Angelex Ltd. v. United States*, 723 F.3d 500,

505 (4th Cir. 2013) ("*Angelex II*"). The district court denied the motion to stay, but the Fourth

Circuit granted it and implemented an expedited briefing schedule. *See id.*

     On appeal, the Government argued that the matter should be dismissed because the

district court lacked subject-matter jurisdiction. *See id.* But in its briefing, the Government

suggested that the Coast Guard's decisions were not entirely unreviewable. Pl.'s Opp'n Mot. Dismiss, Ex. 3 at 4–7, ECF No. 8-3. Indeed, it emphasized that "Congress . . . authorized an after-the-fact remedy for obtaining compensation from the government." Pl.'s Opp'n Mot. Dismiss, Ex. 3 at 7. Specifically, it noted that"[u]nder 33 U.S.C. § 1904(h), '[a] ship unreasonably detained or delayed by the Secretary acting under the authority of this Act [sic] is entitled to compensation for any loss or damage suffered thereby.'" Pl.'s Opp'n Mot. Dismiss, Ex. 3 at 7. Thus, according to the Government, "Congress [] did not leave vessel owners without recourse against unreasonable denials of clearance" because it "authorized an independent damages action, separate from the enforcement proceedings against the vessel." Pl.'s Opp'n Mot. Dismiss, Ex. 3 at 7.

The Fourth Circuit agreed that the district court lacked subject matter jurisdiction and reversed the district court's decision. *See Angelex II*, at 502. The Fourth Circuit held that the Coast Guard's position on the terms for the Pappadakis's release was unreviewable under the APA because the APA did not permit review of agency actions that are committed to agency discretion by law. *See id.* at 506–09. It also agreed with the Government's argument that § 1904(h) of the APPS provided a remedy for vessel owners such as Angelex against unreasonable denials of clearance:

> Finally, APPS contains a built-in safeguard to governmental abuses, which further convinces us that Angelex's Petition is out of place and time. In addition to the criminal and civil penalties that APPS authorizes the United States to seek, APPS provides for compensation for loss or damage as a result of unreasonable detention by the Coast Guard. Section 1904(h) . . . is, as the government asserts, an "after-the-fact damages remedy against the United States for unreasonable detention or delay." Appellant's Br. 37. This safeguard gives Appellees a remedy, distinct from the unauthorized injunctive relief they now seek.

*Id.* at 508–09. Accordingly, the court held that "the district court thereby did not possess subject matter jurisdiction under the APA." *Id.* at 509. After also concluding that admiralty jurisdiction

was inapplicable, the court remanded the case to the district court for dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See id.* at 509–10.

### D. Criminal Trial and Release of the Pappadakis

On May 23, 2013, a grand jury for the Eastern District of Virginia returned an eight-count indictment against Angelex, Kassian, and the Vessel's Chief Engineer. *See* Def.'s SMF ¶ 68; Pl.'s Resp. at 1. Among other charges, the indictment included three violations of the APPS. *See* Def.'s SMF ¶ 68; Pl.'s Resp. SMF at 1. Specifically, three counts of failing to maintain an accurate oil record book. Def.'s SMF ¶ 68; Pl.'s Resp. SMF at 1. A two-week criminal trial then began in August 2013. Def.'s SMF ¶ 69; Pl.'s Resp. SMF at 1. Meanwhile, the Coast Guard and CBP continued to withhold the Pappadakis's departure clearance. Def.'s SMF ¶ 73; Pl.'s Resp. SMF at 1. Ultimately, Angelex and Kassian were acquitted, while the Chief Engineer was convicted on all charges except conspiracy. Def.'s SMF ¶¶ 71–72; Pl.'s Resp. SMF at 1. On September 17, 2013, four days after the conclusion of the trial, the Coast Guard advised Angelex and Kassian that the Pappadakis's departure clearance had been reinstated and that the Vessel was permitted to depart. Def.'s SMF ¶ 73; Pl.'s Resp. SMF at 1; Def.'s Resp. SMF ¶ 31. In total, the Coast Guard withheld the Pappadakis's departure clearance for nearly 5 months. *See* Def.'s SMF ¶¶ 64, 73; Pl.'s Resp. SMF at 1; Def.'s Resp. SMF ¶¶ 5–6, 31.

### E. Present Action

On January 14, 2015, Angelex commenced the present action pursuant to 33 U.S.C. § 1904(h). *See* Compl. at 2, ECF No. 1; *see also* First Am. Compl. ¶ 87. The Government subsequently filed a motion to dismiss the Complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim upon which relief can be granted.

Def.'s Mot. Dismiss, ECF No. 6. In ruling on that motion, the Court held that Angelex failed "to allege sufficient facts that, if true, state a plausible claim that the Coast Guard's request that CBP withdraw the Pappadakis's departure clearance was unreasonable." *Angelex Ltd. v. United States*, 123 F. Supp. 3d 66, 82 (D.D.C. 2015) ("*Angelex III*"). However, this holding did not dispose of Angelex's case entirely because Angelex's claim "concerns more than the reasonableness of the initial withdrawal of the Pappadakis's departure clearance." *Id.* at 79. Indeed, it "encompasses the Coast Guard's continued detention of the Pappadkis from April to September 2013, which [Angelex] alleges was unreasonable in light of the evidence and the circumstances." *Id.* Accordingly, that portion of Angelex's claim survived the Government's Motion to Dismiss.

In October 2015, Angelex filed its First Amended Complaint. *See* First Am. Compl. The Government subsequently filed, along with its Answer, a Motion for Summary Judgment seeking to resolve the remainder of Angelex's claim. Def.'s Mot. Summ. J. ("Def.'s Mot"), ECF No. 22. The Court denied the Government's Motion for Summary Judgment without prejudice subject to renewal following the close of discovery. *See* Minute Order (Nov. 25, 2015). Now that discovery has closed, the Government has renewed its Motion for Summary Judgment and Angelex has filed its own Cross-Motion for Summary Judgment.[4] *See* Def.'s Renewed Mot., ECF No. 38; Pl.'s Cross-Mot., ECF No. 40.

---

[4] Also pending before the Court is the Government's Motion to Strike a declaration filed by Angelex's attorney in support of its Cross-Motion for Summary Judgment. *See* Def.'s Motion Strike Decl. George M. Chalos, ECF No. 42. The declaration in question supports Angelex's contention that, in order to post the Coast Guard's bond, it would have been required to give a surety company cash representing the full amount of the bond to serve as collateral. *See* Declaration Attorney Goerge M. Chalos, ECF No. 40-2. Because the Court finds this fact to be immaterial to the Court's analysis, the Court will deny the Government's Motion to Strike as moot. Even if the issue were material, however, the Court would have accepted the substitute affidavit proffered by Angelex.

### III. LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### IV. ANALYSIS

Very few facts are in dispute between the parties and those that are in dispute are immaterial to resolving this case. Angelex has been clear that, at this point in the proceedings, it is "not seeking review of the Coast Guard's exercise of its discretion to withdraw the Vessel's

departure clearance in the first instance," but instead "seeking damages arising from the unreasonable delay of [the Vessel]." Pl.'s Reply at 3–4. Because the parties generally agree upon the circumstances of that delay, the central dispute between the parties is not a factual one, but a legal one. Specifically, what constitutes an "unreasonable" delay under 33 U.S.C. § 1904(h) and whether the Government's continued withholding of the Pappdakis's departure clearance resulted in such a delay. Based upon the undisputed record, the Court concludes that the Coast Guard's actions did not result in an unreasonable delay of the Pappadakis.

### A. Ships "Unreasonably" Delayed Under 33 U.S.C. § 1904(h)

This case presents a matter of first impression: what constitutes an "unreasonabl[e]" delay for purposes of 33 U.S.C. § 1904(h)? Despite squarely posing this novel issue, the parties spend very little effort assisting the Court in answering the question. Indeed, the parties spend most of their briefing arguing that the Government's actions were reasonable or unreasonable without much explanation of how reasonableness should be judged within the context of the statute.

For its part, Angelex simply asserts that the Court should look to the plain meaning of the word "unreasonable," which it defines as "not governed by or acting according to reason; exceeding the bounds of reason or moderation." Pl.'s Reply at 5 (quoting *Merriam-Webster*). While it is certainly beyond argument that words found in statutes should be interpreted using their ordinary, contemporary, common meaning, *Perrin v. United States*, 444 U.S. 37, 42 (1979 (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975)), the definition of the word "unreasonable" hardly sheds light on what it means to be unreasonable in a given case. And Angelex offers no analogous cases or circumstances to help draw out that meaning in the context of § 1904.

The Government, on the other hand, offers workable frameworks, but they too miss the mark. The Government argues that it should enjoy one of two presumptions. First, the Government argues that the Coast Guard's continued withholding of a departure clearance should be considered presumptively reasonable whenever there was "reasonable cause" to withdraw the departure clearance in the first instance. See Def.'s Reply at 9–11. Moreover, according to the Government, this presumption should win the day "[a]bsent some fundamental change in the complexion of the evidence that led to a finding of reasonable cause."[5] Def.'s Reply at 11.

The Court finds this argument flawed in several respects. First, this interpretation is unfaithful to the text of § 1904(h). Section 1904(h) clearly authorizes compensation for *both* unreasonable detentions *and* unreasonable delays. Yet the Government argues that the inquiry of unreasonable detentions should essentially subsume the inquiry of unreasonable delays. In effect, only unreasonable detentions would ever be compensable, rendering the words "and delays" in the statutory text meaningless and without effect. Such a result is intolerable when other reasonable interpretations are available. Indeed, basic cannons of statutory interpretation counsel that "statute[s] should be construed so that effect is given to all [of their] provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Hibbs v. Winn*, 542

_____

[5] In making this argument, the Government apparently relies on this Court's prior statement that "whether the Coast Guard had reasonable cause under Section 1908(e) is at the heart of whether the withdrawal of the Pappadakis's departure clearance was reasonable under Section 1904(h)." Def.'s Reply at 10 (quoting *Angelex v. United States*, 123 F. Supp. 3d 66, 80 (D.D.C. 2016)). This reliance is in error. Indeed, the portion of the opinion that the Government now cites was discussing only whether Angelex's Complaint had stated a claim relating to the *initial withdrawal* of the departure clearance. But the question that the Government failed to raise at that time and that the Court must now consider is different—that is the reasonableness of "Coast Guard's *continued detention* of the Pappadakis from April to September 2013 . . . ." *Angelex III*, 123 F. Supp. 3d at 79–80 (emphasis added).

U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181–86 (rev. 6th ed. 2000)). Here, the Government's interpretation would produce precisely this result. Even though the canon against surplusage is "not an absolute rule" and "instances of surplusages are not unknown," *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (internal quotations omitted), other considerations likewise suggest that the Government's position is unsound.

The Government's presumption is myopically focused on the sufficiency of evidence underpinning a civil or criminal action and fails to take into account any other circumstances attendant with the continued delay of a ship. The Government's proposed presumption would conveniently exclude consideration of any bond amount or any other condition demanded by the Coast Guard in connection with the reinstatement of a departure clearance—issues that are now central to Angelex's claim. In essence, the Government asks the Court to accept a presumption that would effectively foreclose judicial review of those conditions altogether.

The foreclosure of such review is both disfavored by case law and unsupported by the statutory scheme established by Congress. To start, it is worth noting that the D.C. Circuit, although it has never directly addressed the standard of review under § 1904(h), has expressed a skeptical view of the argument that the Coast Guard's discretion under the APPS is unreviewable. *See Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 807 F.3d 325, 330 (D.C. Cir. 2015) ("Nor do we agree with the government and the district court that the Coast Guard's discretion is unreviewable. . . . the Coast Guard may have wide discretion as to the *amount* of the bond it requires (we doubt that even that is totally unreviewable) . . . .) (emphasis and parentheses in original). This skepticism is of course in accord with the "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct.

1645, 1651 (2015).  The Supreme Court has instructed that the discretion afforded to an agency should only foreclose judicial review "when [the] statute's language or structure demonstrates that Congress wanted an agency to police its own conduct."  *Id.*  In making such a showing, an agency "bears a heavy burden . . . to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate."  *Id.* (internal citations and quotations omitted).

Here, Congress did not clearly prohibit judicial review.  To the contrary, it explicitly propounded an unqualified requirement that any "detention or delay" of a vessel pursuant to the APPS not be "unreasonabl[e]" and made compensable any damages or injuries an unreasonable detention or delay might cause.  *See* 33 U.S.C. § 1904(h).  And even though Congress granted DHS and the Coast Guard with substantial discretion in fashioning the conditions upon which a vessel's departure clearance might be reinstated, it did not specifically exclude review of that power for purposes of suit brought pursuant to § 1904(h).  *See generally id.* at §§ 1904(h), 1908(e).  Nor did Congress more generally exclude review of claims based upon the exercise of discretion, *see generally id.* at §§ 1904(h), 1908(e), as Congress did for the citizen suit provisions of APPS and has done for other statutes.[6]  *See, e.g.,* 33 U.S.C. § 1910(a)(2)–(3); 28 U.S.C. § 2680(a) (FTCA does not waive sovereign immunity for tort cases against the government "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused.").

Moreover, MARPOL and the legislative history of the APPS further confirm that Congress did not intend the Coast Guard to police itself on matters such as this.  Under Article 4 of MARPOL, whenever a violation occurs, one possible course of action for a signatory to the

---

[6] The Government concedes that "a section 1904 action such as this does not need to satisfy the citizen-suit provisions set forth in section 1910," Def.'s Mot. at 13, and the Court has no reason to doubt this assertion.

convention is to "cause proceedings to be taken in accordance with its law." MARPOL Art. 4(2). However, MARPOL also requires that "[a]ll possible efforts should be made to avoid a ship being unduly detained or delayed." *Id.* at Art. 7(1). Thus, "[w]hen a ship is unduly detained or delayed under article[] 4. . . , it shall be entitled to compensation for any loss or damage suffered." *Id.* at Art. 7(2). When Congress enacted APPS, Congress made clear that it was adopting this framework. Indeed, the statute provides that "[a]ny action taken under [APPS] shall be taken in accordance with international law." 33 U.S.C. § 1912. Furthermore, according to a congressional report, § 1904(h) was intended, "consistent with the requirements of international law[,] to prevent unilateral arbitrary actions and to provide some measure of control over potential abuse." H.R. Rep. 96-1224, at 16 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4849, 4863. Applying a presumption that would effectively foreclose judicial review of the bond and other non-financial conditions requested by the Coast Guard in connection with civil or criminal proceedings would therefore thwart Congress's intent by affording no "measure of control over potential abuse" subsequent to the initial withdrawal of a departure clearance. Consequently, the Court rejects the Government's invitation to espouse such a presumption.

The Government also argues for a different presumption. The Government emphasizes that "Congress has authorized DHS to negotiate terms 'satisfactory to the Secretary'" under § 1908. Def.'s Mot. at 38. It argues that, as a result, the "terms the agency proposed as satisfactory are reasonable as a matter of law" and should only be considered rebutted "with evidence to show that the proposed departure conditions are so inconsistent with the agency's mission of implementing APPS that the Secretary should not have found them satisfactory." Def.'s Mot. at 38. To be sure, Congress gave DHS and the Coast Guard wide discretion in setting the conditions for reinstating a vessel's departure clearance, and that feature is significant

in assessing the proper standard for review. But the Government goes too far when it suggests that any conditions can be reasonable so long as they do not generally depart from "the agency's mission of implementing APPS." The exercise of the Coast Guard's power under § 1908 should most certainly comport with its mission to enforce the APPS, as opposed to other laws and regulations. But requiring only an intention to somehow further enforcement of the APPS in an abstract sense would divorce the power that Congress vested in the Coast Guard under § 1908 from the specific purpose for which Congress contemplated that power would be used. Thus, the Court finds the Government's second argument to be wanting.

In contrast to the parties' flawed proposals, the Court is convinced that reasonableness under § 1904 is properly understood as imposing an obligation on the Government to balance its own specific and legitimate enforcement interests with the interests of the vessel's other stakeholders. This approach is far from novel. Indeed, in other contexts, courts routinely interpret statutory, regulatory, and constitutional commands for "reasonableness" as requiring a balance of relevant interests. *See e.g.*, *Scott v. Harris*, 550 U.S. 372, 383 (2007) ("In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'") (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) (brackets in original); *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n*, 350 F.2d 753, 766 (D.C. Cir. 1965) ("The Commission, by virtue of Section 6(a)(3) of the Compact, is obligated to set for the carriers over which it has jurisdiction 'just and reasonable fares'— a standard which has invariably imposed an obligation to balance the interests of both the utility and the consumers."); *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009) (Under the Rehabilitation Act of 1973, "[a]n

accommodation is 'reasonable' if it allows the employee to fulfill all essential functions of her job without imposing an undue hardship on the employer.") (*citing Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007); *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994)).  And, in this case, the framework established by MARPOL and embraced by Congress suggests that it is this type of balance that should prevail in the interpretation of the APPS.  *See* MARPOL Art. 7(1) ("All possible efforts should be made to avoid a ship being unduly detained or delayed.").

Therefore, in order to assess the reasonableness of the Coast Guard's actions pursuant to § 1908(e), the Court must first discern the specific and legitimate governmental interest or interests involved.  Section 1908(e), requires that a vessel's departure clearance be withheld whenever there is "reasonable cause" to believe that the vessel violated the APPS and then only authorizes clearance be granted upon the filing of a "bond or other surety satisfactory to the Secretary."  *See* 33 U.S.C. § 1908(e).  The natural implication of this structure is that the bond and other conditions set by the Coast Guard are meant to secure whatever interest the Government originally had in denying the ship a departure clearance.  That is, this regime ensures that the Government will be no worse off when it allows a vessel to sail because, by obtaining a bond and agreement with other terms and conditions, it has secured the same benefits that it otherwise would have enjoyed.  According to a congressional report, the Government's interest in withdrawing a vessel's departure clearance is to "assure payment of any fine or civil penalties that might be incurred upon completion of criminal proceedings or civil penalty actions."  H.R. Rep. 96-1224, at 17 (1980).  This of course makes sense in the context of APPS because APPS makes any ship that violated the Act "liable *in rem* for any [criminal] fine . . . or civil penalty" that might be assessed in connection with its violations.  33 U.S.C. § 1908(d).  Thus, the Government naturally has an interest in withholding a departure clearance of a vessel

through any civil or criminal proceedings so that it might later prosecute the vessel *in rem* and secure payment for any fines or penalties that were previously assessed. This interest, in turn, informs the Court's understanding of the specific, legitimate governmental interests at issue when the Coast Guard imposes monetary and nonmonetary terms and conditions for the reinstatement of a departure clearance under § 1908(e). That is, those terms and conditions are imposed to continue ensuring that fines or penalties assessed in future legal proceedings will be paid, even in the absence of the vessel.

That interest, however, must be balanced against those with an interest in the use and enjoyment of the vessel. Thus, when the Coast Guard's exercise of power under § 1908(e) delays a vessel, the reasonableness of that delay should be assessed by inquiring whether the government's actions exceeded its interest in "assuring payment of any fine or civil penalties that might be incurred upon completion of criminal proceedings or civil penalty actions." H.R. Rep. 96-1224, at 17 (1980). Under circumstances where the Coast Guard's demands exceed that interest, any resulting delay is necessarily unreasonable.

In weighing the governmental and private interests, however, the Court must be mindful of the significant discretion that Congress expressly vested in the Secretary to fashion the terms and conditions upon which a vessel's departure clearance might be reinstated. *See* 33 U.S.C. § 1908(h); *Watervale Marine Co.*, 807 F.3d at 330. Although this discretion does not withdraw the courts' authority to determine whether the exercise of that discretion contributed to an unreasonable delay of a vessel, it does imply that the scope of review should be narrow and that the court should defer to the government's judgment as long as its actions fall within a range of reasonable outcomes. *Cf. Mach Mining, LLC*, 135 S.Ct. at 1656 ("[N]othing in Title VII withdraws the courts' authority to determine whether the EEOC has fulfilled its duty to attempt

conciliation of claims[,] [b]ut the scope of that review is narrow, reflecting the abundant discretion the law gives the EEOC to decide the kind and extent of discussions appropriate in a given case."); *N. States Power Co. (Minnesota) v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994) ("Because '[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission,' our review of whether a particular rate design is 'just and reasonable' is highly deferential.") (quoting *Town of Norwood v. FERC*, 962 F.2d 20, 22 (D.C. Cir. 1992)). With this framework in mind, the Court now turns to the parties' contentions.

### B. Pappadakis's Ability to Satisfy Future Fines and Penalties

Although Angelex no longer contends that the Pappadakis was unreasonably detained in the first instance, it argues that the continued withholding of the Vessel's departure clearance was unreasonable because, in actuality, the Vessel provided no assurance that any fines or penalties would be satisfied. According to Angelex, the Vessel "was encumbered with a preferred ship mortgage" that exceeded the value of the ship and would allegedly "prime any potential judgment which could have been obtained by the government." Pl.'s Cross-Mot. at 30–32. Given that, as Angelex contends, the Vessel did not in fact assure payment of fines and penalties in the future, the Coast Guard's failure to consider this alleged fact resulted in an unreasonable delay of the Pappadakis. *See* Pl.'s Cross-Mot. at 32.

This argument, however, has little support either in the record or in the law. To start, the record before the Court contains only two documents evidencing a lien on the Pappadakis—both of which are emails from Angelex's counsel to Coast Guard officials. *See* Pl.'s Cross-Mot., Exs. 3–4. Those documents simply provide counsel's unsupported assertions that the Vessel "is encumbered with $10.95 million in mortgage indebtedness." Pl.'s Cross-Mot., Ex. 4; *see also*

Pl.'s Cross-Mot., Ex. 3 ("[T]he vessel has an estimated market value of USD 6.5 million and operates with a mortgage indebtedness of nearly twice such amount."). Because counsel's statements amount to nothing more than unqualified hearsay, they do not establish the existence of any encumbrance. *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("Because Greer's evidence about Carter's statement is 'sheer hearsay,' it 'counts for nothing' on summary judgment.") (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Without admissible evidence of an encumbrance, the premise of Angelex's argument, and therefore its conclusion, must fail. Moreover, the law is hardly clear as to what the relative lien priorities would be between a ship's mortgagee and the Government seeking to recover criminal penalties for APPS violations, and authority cited by Angelex does not provide a clear answer to this question. Because Angelex and Kassian are foreign entities, given a choice between possessing the Vessel, even if a contested lien existed, and simply releasing it, the Coast Guard would be reasonable to conclude that maintaining possession provided a better chance of securing potential recovery of future fines (even if it did not necessarily assure it). Accordingly, Angelex has not demonstrated that the Coast Guard's failure to consider potential liens on the Vessel resulted in any unreasonable delay because neither the record nor the law cited by the parties demonstrates that the Vessel was definitively unavailable to satisfy a potential judgment and, in fact, continued possession reasonably provided a better chance at recovery than outright release.

**C. The Government's Decision to Refer Criminal Charges Against Angelex and Kassian**

The bulk of the parties' arguments are aimed at the Coast Guard's conditions for reinstating the Pappadakis's departure clearance. Broadly speaking, Angelex's arguments fall into two categories: arguments relating to the financial terms of the bond and arguments relating

to the nonfinancial terms of the Security Agreement.  Before reaching these arguments, however, the Court must first address Angelex's arguments concerning the Government's decision to refer charges against Angelex and Kassian for APPS violations.  As already discussed, the monetary and nonmonetary terms are intended to ensure that the Government can collect fines and penalties that might be assessed in civil or criminal proceedings—in this case, a criminal proceeding against Angelex and Kassian.  As such, both the bond amount and the nonfinancial conditions were predicated on the Government's initial decision to refer Angelex and Kassian for criminal APPS charges.  Thus, the Court must first consider Angelex's challenge to this decision.[7]

Angelex raises two points concerning the Government's decision to refer charges against Angelex and Kassian for criminal APPS violations.  First, it argues that the decision was unreasonable because Kassian could have no criminal liability under the APPS.  *See* Pl.'s Cross-

---

[7] The Government argues that, "[t]o the extent that the decision to prosecute underpins the decision to withhold the [Pappadakis's] departure clearance, judicial review is precluded." Def.'s Renewed Mot. at 7.  In so arguing, the Government relies on several cases that stand for the proposition that decisions to prosecute criminal matters constitute "discretionary functions" and therefore cannot be challenged in a suit against the Government under the Federal Tort Claims Act ("FTCA").  *See* Def.'s Renewed Mot. at 8–9.  The "FTCA waives the sovereign immunity of the United States from suits for negligent or wrongful acts of government employees subject to certain exceptions" written into the statute. *Moore v. Valder*, 65 F.3d 189, 196 (D.C. Cir. 1995) (citing 28 U.S.C. §§ 2671–80).  "The 'discretionary function' exception protects the federal government from liability for '[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'"  *Id.* (citing 28 U.S.C. § 2680(a)).  However, Angelex is not asserting a claim under the FTCA.  Rather, it is asserting a claim directly under 33 U.S.C. § 1904(h), which does not provide any exception to that waiver for actions arising out of exercises of the Government's "discretionary functions."  Moreover, the decisions challenged by Angelex are akin to the abuse of process and malicious prosecution cases that the FTCA does in fact permit against certain law enforcement officials.  *See* 28 U.S.C. § 2680(h); *Moore v. United States*, 213 F.3d 705, 711–13 (D.C. Cir. 2000).  Thus, the Court sees no reason why it should be precluded from considering the reasonableness of the Government's decisions here.

Mot. at 27–29. Specifically, Angelex urges that there was no jurisdiction over Kassian because, contrary to the Government's assertions, it was not the "operator" of the vessel and thus was not responsible for its actions when it arrived at the port in Norfolk.[8]  *See* Pl.'s Cross-Mot. at 27–29. Second, Angelex argues that, in any event, it was unreasonable to refer charges against *either* Kassian or Angelex because the Government's "investigation found no evidence" supporting "vicarious liability" for the criminal actions of the crew.  *See* Pl.'s Cross-Mot. at 16.  According to Angelex, the evidence demonstrated that the Chief Engineer sought to conceal his conduct from Angelex and Kassian and that his conduct was motivated, not with the intent to benefit his employer, but with his own self-interest and convenience in mind.[9]  *See* Pl.'s Cross-Mot. at 18. The Government, of course, disputes each of these arguments.  It argues that the evidence

---

[8] The argument seems to be that, if Kassian was not the operator of the Vessel, it would not have sufficient minimum contacts with the United States for the Court to assert personal jurisdiction over it.

[9] Angelex is quick to point out that both it and Kassian were acquitted of all criminal charges.  *See* Pl.'s Cross-Mot. at 18.  An acquittal alone, however, does not necessarily demonstrate that the Government's decision to refer charges was unreasonable.  Whether, at the end of the day, the evidence presented at trial was insufficient to prove guilt beyond a reasonable doubt does not necessarily answer the question of whether the pursuit of criminal charges was, in the first instance, reasonable or unreasonable.  Indeed, the mere fact that the Government might later be unsuccessful at trial should not alone—retrospectively—render unreasonable its earlier decisions to pursue charges against both Angelex and Kassian and to predicate its conditions of the bond and surety on the prospect of obtaining criminal fines from those two defendants.  This is apparently a notion that the Plaintiff agrees with.  *See* Pl.'s Reply at 4 ("[T]he result of the underlying case has little, if any, bearing on whether the continued detention of the Vessel was reasonable . . . .").  But that is not to say that the acquittal is of no import.  In fact, in cases where a conviction is achieved, a plaintiff seeking recovery under § 1904(h) may be precluded from doing so if the basis for recovery asserted by the plaintiff would impugn a lawful conviction.  *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994) (extending the "hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments" to damages actions brought pursuant to 42 U.S.C. § 1983).  But whether a given Plaintiff would be so precluded would, of course, turn on the specific arguments asserted and whether those claims would in fact impugn an outstanding criminal judgment.  *See Wallace v. Kato*, 549 U.S. 384, 393 (2007).

demonstrates that Kassian was the "operator" of the vessel and therefore subject to liability and that it was reasonable to pursue a theory of vicarious liability against both Kassian and Angelex for the actions of the Pappadakis's Chief Engineer.

The reasonableness or unreasonableness of referring charges against Angelex and Kassian is, in actuality, a question of whether probable cause existed. Indeed, probable cause is "competent evidence which induces a *reasonable ground* for the inference that the charges may be well founded." *Wilson v. Anderson*, 335 F.2d 687, 691 n.6 (D.C. Cir. 1964) (internal quotation omitted, emphasis added); *see also Pitt v. Dist. of Columbia*, 491 F.3d 494, 501–02 (D.C. Cir. 2007) ("Probable cause is defined as the existence of 'facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper.'" (quoting *Ammerman v. Newman*, 384 A.2d 637, 639–40 (D.C. 1978)). Whether there is probable cause to institute a suit "'depends not on the actual state of the case in point of fact, but upon the honest belief of the person instituting it and may flow from a belief that turns out to be unfounded *as long as it is not unreasonable*.'" *Lyles v. Micenko*, 404 F. Supp. 2d 182, 190 (D.D.C. 2005) (citing *Ammerman v. Newman*, 384 A.2d at 640) (emphasis added).

In civil cases involving a factually disputed question of probable cause, the presence or absence of probable cause is ordinarily an issue left to the finder-of-fact. *See Davis v. Giles*, 769 F.2d 813, 815 (D.C. Cir. 1985). However, the D.C. Circuit has instructed that a grand jury indictment represents prima facie evidence of probable cause. *See Moore v. Hartman*, 571 F.3d 62, 67–69 (D.C. Cir. 2009); *see also Russo v. New York*, 672 F.2d 1014, 1018 (2d Cir. 1982) ("[U]nder New York law, where a warrant has been issued following an indictment by a grand jury, a presumption arises that the defendant acted with probable cause."); *Rothstein v. Carriere*,

373 F.3d 275, 282 (2d Cir. 2004) ("[A] grand jury's indictment creates a presumption that the criminal proceeding was supported by probable cause."). "The imposition of a prima facie standard creates a rebuttable presumption that will stand until the appellant introduces sufficient evidence to negate it." *Moore*, 571 F.3d at 69. A party may rebut the presumption of probable cause only through a showing "that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id.*; *see also Amobi*, 755 F.3d at 992.

In this case, a grand jury returned an indictment in May 2013 charging both Kassian and Angelex with three violations of the APPS. *See* Def.'s SMF ¶ 68; Pl.'s Resp. SMF at 1; Def.'s Mot., Ex. 1. Contrary to Angelex's arguments, the indictment specifically states that the Pappadakis was "operated by Defendant [Kassian]," meaning it was subject to criminal liability for violations of the APPS. Def.'s Mot., Ex. 1 at § A.1. Moreover, it asserted that the Chief Engineer, "[a]t all times . . . acted within the scope of his employment and agency on behalf of, and for the intended benefit, at least in part, of Defendants [Kassian] and [Angelex]," Def.'s Mot., Ex. 1 at § C.1, thereby providing a basis for their vicarious liability. Thus, the grand jury indictment gives rise to a rebuttable presumption of probable cause. In the face of this presumption, it becomes Angelex's burden to demonstrate that the indictment was procured through "fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Moore*, 571 F.3d at 69. However, Angelex has made no attempt to show that the indictment was wrongfully obtained. Thus, the grand jury indictment is not only prima facie evidence of probable cause, but is also dispositive of the reasonableness of the Government's decision to charge both Angelex and Kassian with violations of the APPS. *See Moore v.*

*Hartman*, 102 F. Supp. 3d 35, 118 (D.D.C. 2015) (finding grand jury indictment definitively established probable cause when plaintiff failed to undermine the indictment's validity).

Even if the grand jury indictment were not dispositive of these issues, the Government's referral decisions were reasonable. First, the Coast Guard had sufficient evidence to reasonably believe that Kassian was the "operator" of the Pappadakis.[10] When the Pappadakis arrived in Norfolk, Kassian was serving as the ISM manager for the Vessel. *See* Def.'s Resp. SMF ¶ 3. According to the contract between Kassian and Angelex, Kassian was responsible for the "safe management *and operation*" of the Pappadakis. *See* Def.'s Renewed Mot., Ex. 35 at 9–10 (emphasis added). Further, when the Pappadakis called into U.S. ports, including Norfolk on April 8, 2013, Kassian submitted Notices of Arrival to the United States Coast Guard that specifically identified itself as the "operator"[11] of the Pappadakis. *See* Def.'s Mot., Ex. 6; Def.'s Mot., Ex. 23 at 1145–46. Kassian was also responsible for hiring the Vessel's master and chief engineer for Angelex and they carried out the duties that were assigned to them by Kassian. *See* Def.'s SMF ¶ 53; Pl.'s Resp. SMF at 1. Furthermore, even though they were technically employed by Angelex, several of the Vessel's crew members believed that they worked for Kassian. *See* Def.'s Mot., Ex. 23 at 235, 412–13, 615–16. And several other crew member

---

[10] In fact, Angelex admitted this to be the case during discovery in this matter. In its interrogatories, the Government asked who constituted the "operator" of the Pappadakis, which it defined consistent with the APPA, as anyone "who is responsible for the operation, manning, victualing, and supplying of the vessel." Def.'s Renewed Mot. at Ex. 32. Angelex responded that "[t]he ISM Manager, Kassian Maritime Navigation Agency Ltd., would be the 'Operator' under the definition set forth in the Act to Prevent Pollution from Ships." Def.'s Renewed Mot. at Ex. 32.

[11] Under U.S. regulations, foreign-flagged vessels, such as the Pappadakis, are required to submit a Notice of Arrival to the U.S. Coast Guard 96 hours prior to the vessel's arrival in a U.S port. *See* 33 C.F.R. §§ 160.205–.212. The notice must include the name of the vessel's registered owner and operator, 33 C.F.R. §§ 160.206(a)(1)(ii), (vi), where "operator" is defined as "any person including but not limited to, an owner, a charterer, or any other contractor who conducts, or is responsible for, the operation of a vessel," *id.* at § 160.202.

testified that Kassian implemented policies onboard the ship and assigned them responsibilities. *See* Def.'s SMF ¶¶ 58–59; Pl.'s Resp. SMF at 1. Viewed in the aggregate, this evidence provides a reasonable basis to believe that Kassian was the operator of the Vessel and subject to potential liability under APPS.

The Coast Guard was also reasonable in believing that the Chief Engineer had acted within the scope of his employment when he violated APPS. As noted above, Angelex advances two arguments. First, Angelex argues that there was no evidence that the Chief Engineer intended to benefit Angelex or Kassian. *See* Pl.'s Cross-Mot. at 18. It is true that "an agent's acts will not be imputed to the principal in a criminal case unless the agent acts with the intent to benefit the principal." *United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 970 (D.C. Cir. 1998). This, however, does not mean that the criminal acts must be done entirely, or even predominantly, with the principal's benefit in mind. *See United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 406–07 (4th Cir. 1985) (holding agent's conduct may be imputed to corporation in criminal case if motivated at least in part by intent to benefit it). Here, the Chief Engineer was responsible for the operation of the Engineering Department, which included ensuring proper disposal of oily bilge waste and properly maintaining the oil record book. *See* Def.'s SMF ¶¶ 9, 12; Pl.'s Resp. SMF at 1. At the time, however, the ship's oily water separator was not functioning, so proper disposal of oily bilge water at sea was necessarily impossible. *See* Def.'s SMF ¶¶ 22–23; Pl.'s Resp. SMF at 1. While a jury could conclude that the Chief Engineer was motivated to use the magic pipe and not properly record discharges in the oil record book purely for his own convenience, a jury could also plausibly conclude that, given the circumstances, he was motivated to benefit Angelex and Kassian, even if only in part, by avoiding costly delays and saving money on repair costs. *See Sun-Diamond Growers of Cal.*,

138 F.3d at 970 ("Part of Douglas's job was to cultivate his, and Sun–Diamond's, relationship with Secretary Espy. By responding to the Secretary's request to help his brother, Douglas may have been acting out of pure friendship, but the jury was entitled to conclude that he was acting instead, or also, with an intent (however befuddled) to further the interests of his employer."). Thus, the Coast Guard was reasonable to conclude that Angelex and Kassian could be held criminally responsible for the Chief Engineer's acts.

Angelex also points out however that the Coast Guard's investigation revealed that the Chief Engineer sought to conceal his conduct. *See* Pl.'s Cross-Mot. at 18. Indeed, the criminal investigator's notes do reveal that some crewmembers claimed that the Chief Engineer instructed them not to mention the magic pipe either to the Coast Guard or even to the Captain of the Vessel. *See* Def.'s Mot., Ex. 12. Nevertheless, the Chief Engineer's concealment of criminal conduct, even concealment from Angelex or Kassian, does not necessarily lead to the conclusion that the conduct was not meant to benefit them nor does it otherwise absolve them of potential criminal liability. As the D.C. Circuit has previously explained, "[w]here there is adequate evidence for imputation (as here), the only thing that keeps deceived corporations from being indicted for the acts of their employee-deceivers is not some fixed rule of law or logic but simply the sound exercise of prosecutorial discretion." *Sun-Diamond Growers of Cal.*, 138 F.3d at 970.

Based on the foregoing, the Court finds that the Government's decision to refer criminal charge against both Angelex and Kassian with APPS violations was reasonable under the circumstances.

### D. Financial Terms of the Bond

The Court now turns to the parties' arguments over the financial bond that the Coast Guard requested. As a matter of first impression, the Court is persuaded that any bond amount

up to and including the maximum fines and penalties that a criminal defendant could potentially face for APPS violations is reasonable as a matter of law. "[T]he financial terms of a bond referred to in [the APPS] cover the ultimate liability of a ship owner [or operator], *which can be determined only after a legal proceeding . . . .*" *Watervale Marine Co. v. U.S. Dept. of Homeland Sec.*, 807 F.3d 325, 329 (D.C. Cir. 2015) (emphasis added). Because this liability can only truly be determined after the proceedings have concluded and after a court has considered and weighed numerous subjective factors,[12] *see* U.S. Sentencing Guidelines Manual § 8C2.10 (2016); 18 U.S.C. §§ 3553(a), 3572(a), the only objectively reasonable bound on that potential liability when viewed prospectively can be the maximum fines and penalties set by statute. Of course, there can be no fine or penalty in excess of the statutory maximums. But, there is also no reason to expect that anyone can accurately predict what fines or penalties a court might impose at some point in the future after trial. Indeed, setting expectations might be done through an exercise of subjective judgment or an objectively-based analysis, but given the sheer number of factors that might influence that outcome before, during, and after trial, there is simply no reason to believe that any prediction will necessarily be any more accurate—or in another word, more reasonable—than any other. Thus, the Court is convinced that any bond amount up to, and

---

[12] Unlike many other crimes, the U.S. Sentencing Commission has not promulgated sentencing guidelines governing the setting of fines for violations of APPS. Instead, the U.S. Sentencing Guidelines simply instruct courts to determine an appropriate fine amount by applying the provisions of 18 U.S.C. §§ 3553 and 3572. *See* U.S. Sentencing Guidelines Manual § 8C2.10 (2016). Those statutes, in turn, require courts to consider a litany of subjective factors, including for example, the "nature and circumstances of the offense", the "history and characteristics of the defendant", the size of a given defendant organization, "whether the defendant can pass on to consumers or other persons the expense of the fine," and measures taken by an organization to discipline employees responsible for the offense. 18 U.S.C. §§ 3553(a), 3572(a).

including, the maximum possible fines and penalties is necessarily within a range of reasonableness.

In this case, the Coast Guard's demand of a $2.5 million bond was reasonable. Angelex and Kassian were each charged with three criminal violations of APPS based on three calls to port in the United States while knowingly having failed to maintain an accurate oil record book. *See* Def.'s SMF ¶ 68; Pl.'s Resp. SMF at 1; Def.'s Mot., Ex. 1 (Counts 5–7). Each of those charges carried a potential fine of up to $500,000. *See* 18 U.S.C. § 3571(c); *United States v. Seher*, 562 F.3d 1344, 1371 n.29 (11th Cir. 2009) ("The normal statutory maximum fine for a corporation found guilty of a felony is $500,000 per offense."). Therefore, Angelex and Kassian each faced criminal penalties up to $1.5 million—a combined total of $3 million. *See United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 994 (9th Cir. 2001) (conviction of seven felonies results in "a maximum fine of $3,500,000."); *United States v. LaGrou Distrib. Sys. Inc.*, 466 F.3d 585, 594 (7th Cir. 2006) (affirming imposition of maximum $500,000 fines for each of two counts). Consequently, if such fines had been imposed, the Government would have been authorized to institute a proceeding against the Pappadakis *in rem* for up to $3 million.[13] *See* 33 U.S.C. § 1908(d). Thus, the Coast Guard's request for a $2.5 million bond was

---

[13] Angelex argues that the bond amount "exceeded the maximum fine which could have been imposed upon the Vessel *in rem*, even if the alleged acts were proven in a criminal trial." Pl.'s Reply at 6. Angelex is mistaken. Section 1908(d) makes any "ship operated in violation of the MARPOL Protocol, Annex IV to the Antarctic Protocol, the [APPS], or the regulations thereunder . . . liable *in rem* for *any* fine imposed under subsection (a)." 33 U.S.C. § 1908(d) (emphasis added). Subsection (a), in turn, makes it a felony for any "person" to violate those treaties, statutes, and regulations. *See* 33 U.S.C. § 1908(a). Thus, § 1908 clearly authorized the government to collect any criminal fines that might have been assessed against the owner, Angelex, and the alleged operator, Kassian, through an *in rem* proceeding against the Pappadakis. Indeed, this understanding is further confirmed by § 1908(e)'s requirement that the departure clearance be withheld anytime there is "reasonable cause" to believe that "the owner, the operator, *or* person in charge may be subject to a fine or civil penalty." 33 U.S.C. § 1908(e) (emphasis added).

reasonable when the potential fines and penalties it could potentially collect from an action against the Pappadakis was $3 million.

Angelex argues that the bond amount set by the Coast Guard was unreasonable because, in setting the amount, the Coast Guard failed to consider several supposedly relevant factors. Specifically, Angelex contends the Coast Guard failed to consider: (1) "how a sentence might be imposed or charges might be grouped," *see* Pl.'s Cross-Mot. at 21, (2) other recent surety demands in APPS cases, *see* Pl.'s Cross-Mot. at 21–22, (3) the ability of Angelex or Kassian to post the monetary bond,[14] *see* Pl.'s Cross-Mot. at 22–25, and (4) that the Vessel was "on charter" to another company, *see* Pl.'s Cross-Mot. at 2 n.2.

---

[14] On this point, it is worth noting that Angelex has provided very little evidence demonstrating that it was *actually* unable to pay the bond amount set by the Coast Guard. The logical mooring for Angelex's argument is that, if the Coast Guard had considered Angelex's and Kassian's ability or inability to post the bond, it would have, or at least should have, resulted in some lower bond amount. That is to say that the consideration of Angelex's and Kassian's financial status would have necessarily yielded some different result. Thus, the argument is premised on the notion that Angelex and Kassian were, in fact, unable to post the bond. But the record evidence supporting that assertion is decidedly sparse. Indeed, the only evidence identified by Angelex are two emails from its counsel to the Coast Guard which assert that Angelex is "in a dire financial condition" and that Kassian "owns no significant assets" and "makes no significant net annual profit." *See* Pl.'s Cross-Mot., Exs. 3–4. Although these emails also purport to attach Angelex's financial statements, *see* Pl.'s Cross-Mot., Exs. 3–4, no such statements or any other financial information actually appears in the record. Thus, the only record evidence supporting Angelex's claim that it could not pay the bond amount are the hearsay statements of counsel. As discussed above, these hearsay statements mean nothing on a motion for summary judgment. *See Greer,* 505 F.3d at 1315. Without evidence supporting its assertion that it could not pay the bond amount, this Court could not possibly conclude that a failure to consider this purported inability caused an unreasonable delay of the Vessel, even if such an inquiry was proper (which it is not).

Moreover, even if Angelex's claims that neither it nor Kassian could pay were true, assessing these claims would appear to be an exceptionally difficult task for the Coast Guard to accomplish. Indeed this would require the Coast Guard to assess the financial soundness of foreign entities that the Coast Guard claims are "often intentionally-opaque, privately-held overseas companies." Def.'s Reply at 14. Such a task may be nigh impossible given that the Coast Guard has no discovery tools to compel the production of relevant information and this analysis would have to be performed under very tight time constraints.

But these arguments do not so much suggest that the Coast Guard's monetary bond demand was unreasonable as much as they suggest that the amount was not the *most* reasonable or that the Coast Guard did not arrive at its bond amount in the most reasonable way. But this is not what is required. Congress vested the Secretary with broad discretion in this area and only mandated that the Coast Guard act reasonably. *See* 33 U.S.C. §§ 1904(h), 1908(e). This fact is significant. It suggests that a Court reviewing the Coast Guard's determination should do so deferentially and should only question it when the Coast Guard sets a bond amount that itself falls outside the ambit of reasonable alternatives. *Cf. Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1656 (2015) (holding that judicial review of the EEOC's duty to attempt conciliation of claims is "narrow," which "reflect[s] the abundant discretion the law gives the EEOC to decide the kind and extent of discussions appropriate in a given case."); *N. States Power Co. (Minnesota) v. FERC.*, 30 F.3d 177, 180 (D.C. Cir. 1994) ("Because '[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission,' our review of whether a particular rate design is 'just and reasonable' is highly deferential.") (quoting *Town of Norwood v. FERC*, 962 F.2d 20, 22 (D.C. Cir. 1992)).

---

This case illustrates precisely the challenges that the Coast Guard faces in this regard. According to the Coast Guard, both Kassian and Angelex are private companies and very little public information is available about them. Def.'s Renewed Mot. at 22. While Angelex did supposedly provide some financial information about itself to the Coast Guard, the Coast Guard claims (and Angelex does not dispute) that Angelex did not provide information concerning the financial wherewithal of its parent organizations to which capital could be effectively channeled. Def.'s Renewed Mot. at 22. Even Angelex's own finances raised questions. In fact, during negotiations between the Coast Guard and Angelex concerning the bond amount, Angelex's free cash reserves allegedly grew from $174,000 to $770,000 in the course of only two days. Pl.'s Resp. SMF ¶ 150–151; Pl.'s Cross-Mot., Exs 3–4. Later, Angelex claimed that it may have the ability to provide a bond in the amount of $1.5 million. Pl.'s Resp. SMF ¶ 155. All of these matters raise questions that would have to be answered in order to assess Angelex's financial situation, but it is hard to understand how the Coast Guard could reasonably accomplish this under the relevant time constraints and without means of verifying Angelex's financial claims.

In this case, the Court is satisfied that the realm of reasonable bond amounts is established by the potential penalties that could be assessed against Angelex and Kassian. The bond need not be the amount most likely to be imposed by a court nor does the Court need to question how the bond amount was established. The Court will not attempt to substitute its judgment for that of the Coast Guard when the Coast Guard has set a bond amount within a reasonable range. Once the Coast Guard has met that burden, the inquiry ends. Because the bond amount fell within a range of potential fines and penalties that could potentially be assessed against Angelex and Kassian, the Court is persuaded that the Coast Guard has satisfied its burden.[15] Consequently, any delay that may have been caused by the financial conditions imposed by the Coast Guard was not unreasonable.

### E. Terms and Conditions of the Security Agreement

Statutorily, the Coast Guard may require certain non-financial conditions in addition to any bond amount that it might demand. In *Watervale Marine Co. v. U.S. Department of Homeland Security*, 807 F.3d 325 (D.C. Cir. 2015), the D.C. Circuit considered precisely this issue. *Id.* at 328. In examining the language of § 1908(e), the Court concluded that the statute "clearly provides authority in the Coast Guard to simply hold the ship in port until legal proceedings are completed." *Id.* at 330. It described these non-financial conditions as "the *quid pro quo* for allowing ships to depart" and distinguished the authority to impose non-financial

---

[15] In addition to its arguments about the factors the Coast Guard failed to consider, Angelex also argues that the Coast Guard unreasonably delayed the Pappadakis when it refused the tentative agreement between Angelex and Coast Guard counsel in May 2013 to reduce the bond amount to $1.5 million. *See* Pl.'s Cross-Mot. at 25–26. But counsel's willingness to accept a lower amount, whether it is ultimately approved or not, does not carry with it the necessary implication that the $2.5 million bond was unreasonable. The statutory framework does not require that the Coast Guard's lawyers be satisfied, rather it requires the posting of a bond or other surety "satisfactory to the Secretary." 33 U.S.C. § 1908(e). Thus, this argument lacks merit.

conditions from the authority to accept a bond.  *See id.*  The Court observed that, although "the Act *authorizes* the Secretary (Coast Guard) to request clearance of a ship if a bond is satisfactory, the Coast Guard is not required to accept a bond."  *Id.* (emphasis in original). Indeed, a financial bond, "given its limited use, is ordinarily not satisfactory, so the Coast Guard need not accept bonds without accompanying nonfinancial conditions."  *Id.*

In *Watervale Marine Co.,* the non-financial conditions at issue were very similar to the conditions at issue in this case.  *Compare id.* at 328 *with* Def.'s SMF ¶ 66; Pl.'s Resp. SMF at 1; Def.'s Mot., Ex. 7; *see also* Def.'s Renewed Mot., Ex. 42.  However, in that case, the "appellants [had] not asserted that the nonfinancial conditions [were] unreasonable" and thus the court did not examine them for purposes of § 1904(h).  *Id.* at 330–31.  In the absence of a challenge, the Court "*assume[d]* that holding the ships and crew until a civil or criminal proceeding was completed was reasonable."  *Id.* at 331 (emphasis added).  Having assumed that the greater power to hold the ship until trial was reasonable, it reasoned that the lesser power, to condition the reinstatement of the departure clearance, must also be reasonable.  *See id.*  Although the conditions in this case might be similar to those in *Watervale Marine Co.*, the Court cannot employ the same set of assumptions because, unlike the plaintiffs in that case, Angelex has specifically challenged the reasonableness of the nonfinancial conditions.

Nevertheless, the Court need not definitively decide the reasonableness or unreasonableness of these conditions to resolve the current motions.  While the reasonableness of the Coast Guard's conditions is certainly relevant to the inquiry under § 1904(h), both parties ignore the fact that § 1904(h) only provides a remedy for unreasonable *detentions or delays*.  *See* 33 U.S.C. § 1904(h).  Thus, demand for unreasonable terms and conditions alone is not enough. Rather, § 1904(h) grants relief only if those unreasonable terms and conditions resulted in a

delay.  Here, even if the Court were to assume that some or all of the terms that the Coast Guard demanded were unreasonable, there is no evidence that any of them were the cause of the Pappadakis's delay.  For example, even though Angelex argues that essentially all of the terms were unreasonable, there is no evidence that either Angelex or Kassian ever categorically refused any particular terms or even any combination of terms.  Instead, the record suggests that any delay suffered by the Pappadakis resulted not from the nonfinancial conditions, but from the bond amount, which this Court has already found to be reasonable.  Indeed, Angelex itself argues that the bond amount set by the Coast Guard was beyond Angelex's and Kassian's financial means.  First Am. Compl. ¶ 41 ("The quantum demanded was also well in excess of Angelex's financial ability to pay . . . ."); First Am. Compl. ¶ 50 ("Kassian's financials also clearly evinced its inability to meet the security quantum demanded . . . .").  Moreover, the record suggests that the parties' negotiations focused heavily, if not entirely, on the bond amount rather than on the non-financial terms.  *See* Def.'s Supplemental SMF ¶¶ 149–157; Pl.'s Resp. SMF at 1.  In fact, Angelex admits that, during the initial litigation before Judge Doumar, Angelex and Kassian agreed that they would accept *all* of the non-financial conditions if the Coast Guard would be willing to lower the bond amount to just $1.5 million.  *See* Pl.'s Cross-Mot. at 25 ("During the May 6, 2013 hearing before District Judge Doumar, the parties reached a negotiated agreement, wherein Angelex (and Kassian) would agree to the non-financial terms and other conditions sought in exchange for the Coast Guard accepting a surety bond in the amount of USD 1,500,000."); First Am. Compl. ¶¶ 56–58; Answer First Am. Compl. ¶ 58.  This, of course, is entirely inconsistent with any notion that the non-financial terms of the Security Agreement were responsible for the Pappadakis's delay.  Consequently, the Government is entitled to summary

judgment on this issue because the record admits of no causal link between the Security Agreement's non-financial terms and the delay of the Pappadakis.

## F. The Role of Customs and Border Protection

Finally, Plaintiff argues that CBP's "failure to investigate the facts, circumstance, and /or basis for the continued delay to the [Pappadakis] and/or the Court Guard's failure to provide any factual basis for the delay and demands at any time the Vessel was in the Port of Norfolk on CBP's orders, was unreasonable." Pl.'s Cross-Mot. at 16. But Angelex points to no statute, regulation, or other authority that requires CBP to conduct its own investigation or requires the Coast Guard to communicate its factual basis for its recommendation to CBP. *See* Pl.'s Cross-Mot. at 15–16. Indeed, any independent investigation conducted by CBP or any relay of factual support by the Coast Guard would be, at best, a pointless and superfluous exercise.

Angelex's argument seems to rely on the faulty premise that CBP had some independent authority to issue or reinstate the Pappadakis's departure clearance if, for some reason, it disagreed with the Coast Guard's recommendation. APPS, however, makes clear that CBP has no such authority. Section 1908 provides that "if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section," that CBP, "upon request of [the Coast Guard] . . . *shall* refuse or revoke [] clearance . . . ." 33 U.S.C. § 1908(e) (emphasis added); *Watervale Marine Co.*, 807 F.3d at 330. Congress's choice of the word "shall" indicates that CBP is *required* to withhold or withdraw a departure clearance at the Coast Guard's request. It has no authority to substitute its judgment for that of the Coast Guard once the Coast Guard has recommended that a departure clearance be withheld. *Angelex II*, 723 F.3d at 508 ("[I]f the Coast Guard requests that clearance be refused or revoked, it is mandatory that such action occur."); *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 109 (2002) (noting that the word "shall" admits of no discretion).  And once a departure clearance has been withheld at the Coast Guard's request, it can only be reinstated in the event that a bond or other surety is posted—a bond or surety that *the Secretary* must find to be "satisfactory."  33 U.S.C. § 1908(e); *see Watervale Marine Co.*, 807 F.3d at 330–31.  Because CBP had no authority whatsoever to issue or reinstate a departure clearance, its decision not to conduct its own independent investigation of the facts could have in no way been responsible for any delay of the Pappadakis.  Thus, it cannot provide a basis for compensation under § 1904(h).

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Renewed Motion for Summary Judgment (ECF No. 38); **DENIES** Angelex's Cross-Motion for Summary Judgment (ECF No. 40); and **DENIES AS MOOT** the Government's Motion to Strike (ECF No. 42).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 28, 2017                                    RUDOLPH CONTRERAS
                                                             United States District Judge